

U.S. Department of Justice

Criminal Division

*Fraud Section*
*Securities & Financial Fraud Unit*
*1400 New York Avenue, N.W.*
*Washington, D.C. 20005*

August 14, 2018

**Via Email and Hand Delivery**

Hon. Sheila M. Finnegan
United States Magistrate Judge
United States District Court for the Northern District of Illinois
United States Courthouse
219 South Dearborn Street
Chicago, Illinois 60604
Email: Proposed_Order_Finnegan@ilnd.uscourts.gov

                         Re: <u>United States v. James Vorley</u>
                                 18-CR-00035 (JJT)

Dear Magistrate Judge Finnegan:

       We respectfully submit this letter response in opposition to Defendant James Vorley's August 13, 2018 letter application for bail in the above-referenced matter. The Government alerted the Court at yesterday's initial appearance and arraignment that the Defendant's letter contains mischaracterizations—which the Defendant then reiterated to the Court at the hearing—that must be corrected in order for the Court to have accurate information on which to base its ruling on the Government's motion for the Defendant's detention. As such, this letter corrects the record, while providing the Court with further information supporting the critical need for the Defendant's detention under the current circumstances.

       Simply put, the Defendant presents a clear and extraordinary risk of flight and failure to appear, and—given the Defendant's self-created dearth of meaningful information by which to evaluate the Defendant's comprehensive financial picture—there is no condition or combination of conditions that, at present, can reasonably assure the Defendant's appearance. The Defendant therefore must be detained. 18 U.S.C. § 3142(e)(1).

1

## Overview

James Vorley is a sophisticated international trader with wealth and connections, who is alleged to have defrauded other traders for years as part of his scheme to lie, cheat, and manipulate others to enrich himself. In addition to his history of duplicity as charged, the Defendant has significant incentive and ability to flee from this case in the United States and not appear for trial. He is a UK citizen with no ties to the United States, substantial family ties abroad, access to substantial resources, a foreign passport, and the ability to easily travel and remain in countries from which he cannot reliably be extradited—if he could be extradited at all. He faces prosecution for serious offenses that carry a statutory maximum term of imprisonment of 30 years, a mandatory period of imprisonment, and a likely sentencing range under the United States Sentencing Guidelines of nearly half a decade. Moreover, the evidence of the Defendant's participation in the charged wire fraud scheme and conspiracy is strong: a co-conspirator, David Liew, who has admitted to and pleaded guilty for his own role in the fraud scheme, will testify that he committed and conspired to commit fraud with the Defendant, and will be corroborated at trial by the Defendant's own communications and trade and order data showing the co-conspirators' coordinated placement of fraudulent orders in furtherance of their scheme to trick other traders for money. As such, the Defendant presents a clear and extraordinary risk of flight and failure to appear, and, for the reasons discussed below, there are no bail conditions that will reasonably assure his return to this Court.

The Defendant suggests that a combination of cash bail and foreign assets will reasonably assure his return appearance. A quick look at the Defendant's proposal, however, exposes it for what it is: (1) a sum of money—without any detailed information as to either its source or meaningful information about the Defendant's alternate access to wealth; and (2) foreign assets over which this Court has no jurisdiction, based on the Defendant's wildly oversimplified and largely illusory premise this Court could monetize its interest in such assets if the Defendant violated a condition of his pretrial release. The Court should reject this weak and entirely uncertain proposal, which hardly mitigates the risk of flight created by the nature of the charges, the weight of the evidence, the Defendant's background, and his duplicity to date. For these reasons, and those set forth more fully below, the Defendant's application for bail should be denied.

## Background

The Defendant, along with his co-defendant and co-conspirator, Cedric Chanu,[1] is charged in a three-count indictment with one count of conspiring to commit wire fraud affecting a financial institution and one count of wire fraud affecting a financial institution—all because of his engaging, from at least in or around December 2009 through at least in or around November 2011, in fraudulent and manipulative trading involving precious metals futures contracts. The Defendant and his co-conspirators are alleged to have defrauded other traders by placing fraudulent orders that they did not intend to execute in order to create the appearance of false supply and demand and to induce other traders to trade at prices, quantities, and times that they otherwise would not have traded. The indictment further alleges that the Defendant, Chanu, Liew, and others placed

---

[1] Chanu has not yet appeared in the United States. He is anticipated to self-surrender in late September.

these kinds of fraudulent and manipulative orders by themselves and in coordination with other traders at Deutsche Bank, including each other.

## The Defendant's Strategic Self-Surrender is Neither "Voluntary" Nor a "Waiver" of His Potential Extradition

As noted above, the Defendant presents a clear and extraordinary risk of flight and failure to appear. Defendant's claim that he has sought to expedite his "voluntary appearance," while the Government has sought to postpone it, mischaracterizes the background of this case and the nature and circumstances of the Defendant's highly strategic self-surrender. The Defendant's recent self-surrender for arraignment is not a "voluntary" appearance at all—nor is it any enforceable "waiver" of extradition from the United Kingdom. Rather, his self-surrender was the calculated, strategic maneuver—that of a defendant charged with fraud and manipulation—to mitigate his risk of detention in the United States, while triggering his ability to receive discovery and to file motions to dismiss this case. Additionally, permitting the Defendant to return to the United Kingdom on the promise that he will return from, or even sign a written waiver of extradition from, his home country, even if it were enforceable, provides no guarantee that the Defendant will not flee to a third country from which extradition may be even more difficult or impossible.

The Defendant's self-surrender should be viewed in the context of the United States' readiness to extradite him from the United Kingdom and likely ability to do so. By way of background, at the time that the criminal complaint was filed, and at the Defendant's request, the Government refrained from initiating extradition proceedings against the Defendant and, thus, from arresting the defendant in his home country in favor of his self-surrender in the United States. Discussions between the parties regarding the specific logistics of the Defendant's self-surrender then spanned a period of several months, but it bears emphasis that both parties were responsible for and involved in attempting to negotiate the Defendant's self-surrender—not merely the Government, as the Defendant suggests. First, counsel for the Government accommodated the Defendant's request to delay the potential surrender date to March 2018 to accommodate the birth of the Defendant's child. Then, counsel for the Defendant accommodated the Government's request to defer the surrender—and, critically, to defer further discussion of the specific terms of surrender and any potential agreement on bail that the parties might reach prior to that date—until May to accommodate the trial schedules of the undersigned Government counsel, both of whom were on trial together in the District of New Jersey. Finally, the Government accommodated the Defendant's counsel's request for a meeting—his third such meeting with prosecutors in this case, all of which were at the Defendant's request—to try convincing the Government not to proceed with seeking an indictment. Those efforts failed, and the Government sought, and the grand jury returned, an indictment in this case.

Far from seeking to defer the Defendant's arraignment, the Government initially sought the earliest possible date, which the Defendant rejected. In advance of seeking the indictment, the Government sought to schedule the Defendant's self-surrender and arraignment within days of the reserved grand jury time in late July. Counsel for the Defendant claimed he could not make that week work, and subsequently requested a surrender date during the first week in August. The Government was simultaneously engaged in similar discussions with counsel for Chanu, and wished for both defendants to be arraigned on the same timetable, if possible. Defendant's counsel

insisted on his preference for an earlier arraignment date, and counsel for the Government informed counsel for the Defendant that, while the Defendant was of course free to self-surrender at any time, the undersigned could be available in Chicago on August 13 or 14.

At no point during these discussions did the Government ever ask the Defendant not to self-surrender. At any point, the Defendant could have self-surrendered for his initial appearance and arraignment, and, as always, the Government would have been prepared.

Notwithstanding the Defendant's repeated and conclusory claims to this effect, he has not "waived" extradition. Indeed, he has nothing to waive, because extradition proceedings have not yet begun. It is true that early in the process of discussing the potential terms of the Defendant's self-surrender, the Government entertained the Defendant's request for a document expressing an anticipatory "waiver" of any extradition proceedings, but the Government never agreed to such a document. In fact, the Government's subsequent, further inquiry and research into this issue revealed that—although agreements styled as anticipatory "waivers" of extradition have been agreed-upon in some prior cases involving foreign-national defendants—most courts now recognize that an "extradition waiver" is likely unenforceable in a foreign country and therefore legally insignificant for purposes of bail conditions. *See, e.g.*, *United States v. Morrison*, No. 16-MR-118, 2016 WL 7421924, at *4 (W.D.N.Y. Dec. 23, 2016) ("waiver may not become valid until an extradition request is pending in Canada and may be subject to withdrawal"); *United States v. Kazeem*, No. 1:15-cr-00172-AA-1, 2015 WL 4645357, at *3 (D. Or. Aug. 3, 2015) ("Defendant's suggestion that he might sign a waiver of extradition is undermined by grave doubts about the enforceability of such a waiver."); *United States v. Young*, No. 2:12-CR-502-TC-DBP, 2013 WL 12131300, at *7 (D. Utah Aug. 27, 2013) ("[I]n [defendant's] briefs, he offers to waive extradition. But this too is hollow. If he arrives in Lebanon, the United States's ability to enforce that contractual waiver is significantly hampered.").[2]

Specifically regarding the United Kingdom, at least one court has noted that "anticipatory" waivers of the sort proffered by the Defendant are unenforceable. *United States v. Stanton*, No. 91 CR 889 (CHS), 1992 WL 27130, at *2 & n.1 (S.D.N.Y. Feb. 4, 1992) (noting that British authorities advised that extradition waivers were possible only in cases where the fugitive actually appeared before a British magistrate after the filing of an extradition request). In *Stanton*, the district court found that "the proposed conditions attendant upon [the defendant's] leaving the United States and returning to England would not reasonably assure his return to the United States to face trial on these very serious charges. Accordingly the case is one where 'no condition or combination of conditions' which the defendant can proffer 'will reasonably assure the appearance' of the defendant at trial." *Id.* at *2.

---

[2] *See also, e.g.*, *United States v. Ali*, 793 F. Supp. 2d 386, 391 (D.D.C. 2011); *United States v. Cohen*, No. C 10-00547 SI, 2010 WL 5387757, at *9 n.11 (N.D. Cal. Dec. 20, 2010); *United States v. Georgiou*, No. 08-1220-M, 2008 WL 4306750, at *2-3 (E.D. Pa. Sept. 22, 2008); *United States v. Bohn*, 330 F. Supp. 2d 960, 961 (W.D. Tenn. 2004); *United States v. Stroh*, No. 396 CR 139-AHN, 2000 WL 1832956, at *5 (D. Conn. Nov. 3, 2000); *United States v. Botero*, 604 F. Supp. 1028, 1035 (S.D. Fla. 1985).

Particularly in light of the instructive and apposite opinion of the court in *Stanton*, the Government in this case sought an opinion from the Crown Prosecution Service ("CPS") regarding anticipatory waivers of extradition in cases such as the Defendant's. A Specialist Prosecutor in the Extradition Unit of the CPS recently replied that he "doubt[ed] that any such 'anticipatory waiver' agreement could be enforced before any UK extradition court." (8/10/18 Ltr. from S. Allen to N. Savransky (attached hereto as **Exhibit A**) at 1). This is because "[t]here is no mechanism under English law to somehow waive proceedings or circumvent them altogether." *Id.* "There is no method by which the US authorities could seek to enforce the terms of an agreement reached in the USA so as to prevent the defendant withholding consent in UK extradition proceedings." *Id.* Moreover, "[t]he Defendant cannot consent in advance of a request being made." *Id.*

According to UK counsel, therefore, "the most that a defendant in Mr. Vorley's circumstances can do is to promise to consent to his extradition to the USA should he in due course be arrested in the UK on an extradition request pertaining to these proceedings. That promise may be made in good faith but is an unenforceable undertaking in the UK. He may change his mind and withhold consent when the time comes." *Id.* Thus, the Defendant's self-surrender here would only be an effort to avoid his arrest in the United Kingdom and to avoid the attendant delay, and potential detention, of an extradition process with a high likelihood of success for the United States. The Defendant's surrender and purported "waiver" would no more "reasonably assure his return to the United States to face trial on these very serious charges" than the very similar proposal rejected by the court in *Stanton* over 25 years ago. *Id.* at *2 n.1 ("[N]o doubt [the defendant] would promise to appear before a British magistrate and waive extradition if requested; but the fact remains that he would leave the United States without having given an enforceable undertaking."). This Court should likewise reject the Defendant's unenforceable, tactical, and fleeting gesture.

**The Government Has Never Agreed to the Defendant's Proposed Bail Package**

In his submission and during yesterday's hearing, the Defendant repeatedly suggested that the Government had agreed in principle to their bail proposal months ago. As summarized above, counsel for the Government and the Defendant have been engaging in discussions over several months, the parties have never had an agreement—in principle or otherwise—to the Defendant's bail proposal. After the indictment was returned in this case and the Defendant made clear his interest in self-surrendering on a relatively short timetable—such that his surrender was now a very real and not remote or theoretical possibility—the Government re-focused on analyzing the Defendant's proposed bail package. The Government asked some fundamental and reasonable questions of the Defendant's counsel regarding their proposal, including: (1) the precise mechanism by which foreign assets could be secured as collateral and (2) information regarding the comprehensive financial picture of the Defendant, against which to assess the Defendant's proposed cash bond. That the Defendant, through counsel, was either unwilling or unable to meaningfully answer the Government's questions—which continues to this day—gave the Government serious doubts regarding the proposal's ability to "reasonably assure the appearance of [the Defendant] as required . . . ." 18 U.S.C. 3142(c). Each of these concerns is addressed below.

5

**Serious Doubts Exist as to the Enforceability and Practicality of Posting
Foreign Assets as Collateral**

I. The Defendant Provided No Meaningful Information to Support his Proposal

Although the Defendant breezily proposes that the Court accept two foreign assets as collateral—the Defendant's house and the Defendant's father's house, both of which are located abroad and outside the Court's jurisdiction—the Defendant provides only carefully crafted language that, when closely examined, lacks a meaningful, step-by-step, detailed explanation of: (1) the mechanisms involved in ensuring that a lien is placed on the foreign assets, and describing what authority the Court has to ensure that such mechanisms will be enforced; and (2) the practical means of who will monetize the interests in the foreign assets if the Defendant violates a condition of pretrial release, and how long that process will take. The absence of this information is telling.

II. The Government's Research Belies the Defendant's Proposal

In fact, based on the Government's research and consultation to date—including the Government's own consultation with UK-based counsel—the enforceability of the Defendant's proposal is doubtful, because English courts have no jurisdiction to entertain an action: (1) for the enforcement, either directly or indirectly, of a *penal*, revenue or other public law of a foreign State; or (2) founded upon an act of state. In the United Kingdom case of *United States v. Inkley*, Court of Appeal (Civil Division), 25 March 1988, [1989] Q.B. 255; [1988] 3 W.L.R. 304; [1988] 3 All E.R. 144; [1988] 2 F.T.L.R. 86; (1988) 132 S.J. 995, after the defendant was arrested and criminally charged in the United States, the defendant was released to the United Kingdom on bail, having entered into a personal appearance bond, making the sum payable to the United States District Court. After the United States District Court sought to enforce the bond and initiated civil litigation in the United Kingdom, the UK court dismissed the suit, holding that, even though the United Kingdom action was styled as a civil matter, it was properly characterized as the execution of foreign penal law. For this reason alone, the Court should reject the Defendant's proposal.

III. The *Ability* to Seize Foreign Assets versus the *Feasibility* of Seizing Foreign Assets

Even assuming for argument's sake that the Defendant's proposal is enforceable, the general motif provided by the Defendant as to how the Court would practically go about enforcing its interest in the foreign assets is summarized as, "the Court will have the ability under English law to appoint a receiver of the [foreign assets] and to sell the [foreign assets] in the Court's own name." *See* 7/20/18 letter from D. Fleming, partner at Bryan Cave Leighton Paisner LLP, provided by the Defendant via email to the Government (attached hereto as **Exhibit B**).[3] While the letter says the Court has the *ability* to take action, the Government, after reviewing that letter, asked the Defendant for more information as to the *feasibility* of his proposal (including, but not limited to, who from the Court would appoint the receiver, who would pay for the receiver, and how long would the process take). In reply, the Defendant simply stated through counsel that the Government was apparently "*incapable of* or *unwilling to figure out* how to sell UK property."

---

[3] Notwithstanding the anticipatory representation in this draft letter, the Government expressly objects to the Defendant's bail proposal.

(Emphasis added). Notably, however, it is the Defendant himself who is incapable or unwilling to provide any further practical information—presumably because his proposal is untested, and its feasibility unknown. Given the dearth of meaningful information as to whether the Defendant's proposal is feasible—with all signs suggesting that it is not—the Court should reject the Defendant's proposal.

      IV.      The "Overriding Interest" Exception Could Prevent the Court from Seizing the Foreign Assets

Finally, assuming once more for argument's sake that the Defendant's proposal was both enforceable and feasible, the English land law concept of Overriding Interest could render the Defendant's entire proposal toothless. The Government's current research and consultation with UK-based counsel informs that the Land Registration Act 2002, an Act of the Parliament of the United Kingdom, contains exceptions to attempts to remove individuals from certain types of property—including, for instance, an individual in "actual occupation" of a particular piece of property with an interest in that property. In a leading English case on point, *Williams & Glyn Bank v. Boland*, House of Lords, 19 June 1980, [1980] UKHL 4, [1981] AC 487, [1980] 2 All ER 408, the court held that a wife asserting "overriding interest" in a property that had been mortgaged by her husband for a bank loan could not be removed from the property when the bank tried to take possession of the property after the loan went into arrears. The rationale for this exception seems akin to so-called "homestead exemption" laws found in the United States, which, under certain circumstances, immunize an occupant from being removed from their primary residence (often through a forced sale) by a creditor. Since each foreign asset the Defendant proposes as collateral—both his "family home, where he lives with his partner and children" (8/13/18 letter from R. Burlingame, Esq. to Hon. Sheila Finnegan, at 2) and his father's primary residence—would both be covered by the Overriding Interest exception, any attempt by the United States District Court to sell the properties if the Defendant violated a condition of his bond could be entirely thwarted (and, at the very least, subject to protracted litigation) simply by one of the properties' occupants asserting that the exception applies. As such, for all of the foregoing risks discussed in the sections above, as well the simplicity by which this entire process could short-circuited as described herein, the Court should reject the Defendant's proposal.

**The Limited Financial Information provided by the Defendant Makes it Impossible to Evaluate the Sufficiency of the Defendant's Cash Bail Proposal**

At present, the Defendant proposes that the Court accept $100,000 cash bail, along with a $500,000 personal recognize bond ("PRB"). At the outset, the Government submits that in light of just the limited financial information provided thus far by the Defendant (including the information received from the Defendant mere hours before yesterday's hearing, despite the Government's repeated entreaties for information of that kind),[4] the Defendant's current cash

---

[4] The Defendant provided mere screenshots, generally no more than two pages each, for the small handful of financial accounts the Defendant has chosen to identify thus far. In some instances, the screenshots purport to show the current account balance to date. This gives the Government no reasonable way of determining whether the Defendant recently moved money out of the account to shield or hide assets. In other instances, the screenshot purports to show the account balance

7

proposal is far too minimal to have any significant impact on whether the Defendant—who purports to have a net worth of at least approximately $3 million—will ever return to this jurisdiction. Depositing $100,000—barely 3 percent of his purported net worth—for his pretrial liberty and ability to return to the United Kingdom (where he could litigate the case from the comfort of his house before making a more important and crucial decision as this case almost inevitably heads toward trial, with a looming mandatory federal prison sentence if convicted) is a deal the defendant could, and almost certainly, would make without any legitimate concern about his or his family's financial future. Similarly, the proposed $500,000 PRB is entirely meaningless if the Defendant fails to return. The PRB would only be enforceable in the United States, a country that the Defendant and his family rarely, if ever, visit, and could certainly avoid in the future. Incurring this additional PRB obligation would have no impact on the Defendant or his family's life going forward. The PRB would not be worth more than the paper on which it was printed. The Defendant's current proposal provides no disincentive for him to flee. For that reason alone, the Court should reject the Defendant's current proposal.

While the Defendant's current cash bond appears insufficient on its face, the Court should reject any other cash proposal that the Defendant makes, until the Court, the Government, and Pretrial Services have a comprehensive financial picture not only detailing the Defendant's financial situation, but his access to wealth, assets, and means from any source. All of the Defendant's financial assets, as are his partner's, his father's, and presumably anyone else upon whom the Defendant could rely, are located exclusively abroad, beyond the reach of the United States District Court. Not having detailed financial information, for example, about the Defendant's partner, or the Defendant's father, or the Defendant's close friends, or other individuals in the Defendant's sphere that might be willing to fund his life should he not return to the jurisdiction makes it impossible to have the necessary perspective to evaluate whether *any* amount of money that the Defendant proposes to post is sufficiently meaningful to reasonably assure his appearance in Court.

To that exact point, in a highly instructive and starkly similar case to the one currently before the Court, the Seventh Circuit Court of Appeals in *United States v. Szott*, 768 F.2d 159 (7th Cir. 1985), comprehensively analyzed this issue. There, the defendant—a Canadian citizen with no family ties in the United States, nor any residency in the United States—appealed an order from the magistrate and district court setting bail at $1 million cash, in light of the "high stakes of the case and the defendant's lack of ties to the community. . . ." *Id.* The Seventh Circuit held that "it was permissible for the magistrate and the district judge to conclude that the risk of flight is substantial and that low bail would not inhibit flight." Critically, the Seventh Circuit wrote that the Bail Reform Act "does not require that a defendant be able to post the bail 'readily.' The purpose of bail is not served unless losing the sum would be a *deeply-felt hurt to the defendant and his family*; *the hurt must be so severe* that defendant will return for trial rather than flee. This implies that *a court must be able to induce a defendant to go to great lengths to raise the funds*

---

from over a year ago, but does not reflect the current status of the account—allegedly because the Defendant is unable to obtain more recent account statements. Again, this gives the Government no reasonable way of determining whether the Defendant has more money in that account that he does not want to disclose. Either way, the Court, the Government, and Pretrial Services are left in the dark, by none other than the Defendant himself.

without violating the condition in § 3142(c) that bail may not be used to deny release altogether." *Id.* (emphasis added).

Here, nobody has better access to the Defendant's comprehensive financial picture than the Defendant himself. All of the Defendant's financial accounts are located abroad. Yet for reasons known only to him, the Defendant has chosen not to avail himself of the opportunity to reveal his financial situation to the light of day in order to attempt to better his current situation. In the particular instance where the Defendant himself has this ability to try helping himself, it is reasonable to infer that the Defendant is choosing not to do so because his true comprehensive financial picture, if revealed, either does not support what he has represented to the Court (that he has limited access to additional wealth, means, and assets), or because it contains questionable conduct and activity that the Defendant might not want exposed. Either way, the inference only bolsters the Government's view that the Court should harbor doubts about the Defendant's candor with the Court and, in turn, his likelihood of returning to the Court's jurisdiction.

### **The Defendant Would Receive Unfairly *Preferential* Treatment as a Foreign National**

Under his current proposal, the Defendant seeks to return to the United Kingdom during the pendency of his case. While there, he would enjoy all the comforts of his home, with no meaningful way to supervise or monitor him. Quite conversely, U.S. citizens who commit crimes in the United States but are released pending trial are frequently subjected to significant pretrial bond condition combinations, often involving all of the following, including: the surrender of a United States passport; an order not to travel outside the local jurisdiction (or often only directly between the local jurisdiction and the jurisdiction where the defendant resides and his lawyer is located); electronic monitoring;[5] a substantial cash bond (provided an adequate, comprehensive financial picture); a substantial fully secured property bond (that can be easily seized by the U.S. Marshals in the event a defendant violates a condition of pretrial release); an order not to transfer any assets abroad (from banks located in the United States and subject to the Government's reach); restrictions on the use of computer and internet programs; restrictions on the use of alcohol and drugs; agreements to be subject to random home searches; agreements to seek approved employment; and others.

---

[5] Nonetheless, the inadequacies of electronic monitoring are well-documented. Indeed, in a recent high-profile case, the defendant in *United States v. Paul Ceglia*, 12 Cr. 876 (VSB) (S.D.N.Y.) fled while on electronic monitoring, and remains at large. *See also United States v. Stroh*, No. 396CR139AHN, 2000 WL 1832956, at *4–5 (D. Conn. Nov. 3, 2000) (finding that "home confinement and electronic monitoring suggested by [the defendant] is not a condition that would reasonably assure his presence at trial" because "[t]hese restrictions can easily be circumvented."); *United States v. Orena*, 986 F.2d 628, 632 (2d Cir.1993) (noting that surveillance systems can be circumvented by the "wonders of science and of sophisticated electronic technology," and that monitoring equipment can be rendered inoperative) (citing *United States v. Gotti*, 776 F.Supp. 666, 672–73 (E.D.N.Y.1991)). Electronic monitoring would be no bar to flight in this case— particularly where the Defendant would be located abroad and beyond the supervision of Pretrial Services.

Hardly any of these would meaningfully apply to the Defendant—and in any event would depend solely upon his good-faith compliance. Given the nature of the deceptive and manipulative conduct with which the Defendant has been charged, the Government submits that this Court should lack confidence in such compliance. *See United States v. Kazeem*, No. 1:15-CR-00172-AA, 2015 WL 4645357, at *3 (D. Or. Aug. 3, 2015) (finding that defendant's alleged fraudulent conduct "undermines the Court's confidence in Defendant's good faith compliance with any condition or combination of conditions that might be imposed").

The Court—and importantly, Pretrial Services—would have no way to monitor any of the Defendant's activity abroad. Were the Court to adopt the Defendant's proposed bail package as-is—absent a comprehensive financial picture and substantially greater release conditions—it would result in this Defendant, a foreign national, enjoying a better pretrial situation than a United States citizen who was charged with a crime in this country, simply because this Defendant engaged in his alleged criminal conduct from abroad. The Court should reject this proposed outcome.

Moreover, the cases proffered by the Defendant as being purportedly "similar" to his current circumstances do not support his proposed bail package—even upon a cursory review. First, while the Defendant cites to the pretrial release conditions of the two *U.S.-based, U.S. citizen* defendants in *United States v. Bases*, 18-cr-00048 (N.D. Ill.) and *United States v. Pacilio*, 18-cr-00048 (N.D. Ill.), these cases are facially inapt. Notably, they involved U.S. citizens who lived in the United States and posted U.S. property and were subject to conditions and supervision by Pretrial Services. Second, while the Defendant cites cases involving foreign-national defendants, the Government submits, based on currently available information, that in some of these cases, the defendants proffered fulsome financial information to provide the Court, the Government, and Pretrial Services with a comprehensive and detailed picture upon which to determine what condition or combination of conditions were essential to reasonably assure the defendant's appearance.

In stark contrast here, there is no meaningful way to enforce on the Defendant any of the typical pretrial conditions, nor is there currently a comprehensive financial picture against which to meaningfully assess the Defendant's bail proposal. Accordingly, the Court should reject his proposal to return back to the United Kingdom absent conditions that, as the Seventh Circuit has resoundingly endorsed, would cause "a deeply-felt hurt to the defendant and his family; a hurt that would be so severe that Defendant will return for trial rather than flee." *Szott* 768 F.2d at 159.

**Conclusion**

For the foregoing reasons, the Government respectfully submits that the Defendant presents a clear and extraordinary risk of flight and failure to appear. Combining this risk with the present lack of meaningful information by which to evaluate the Defendant's comprehensive financial picture, the Government strenuously submits that there is no condition or combination of conditions that, at present, can reasonably assure the Defendant's appearance. The Defendant must therefore be detained. 18 U.S.C. § 3142(e)(1).

        Respectfully submitted,

        SANDRA L. MOSER
        Acting Chief, Fraud Section

  By:  *s/ Cory E. Jacobs*
        Cory E. Jacobs
        Michael T. O'Neill
        Trial Attorneys
        U.S. Department of Justice
        Criminal Division, Fraud Section
        1400 New York Avenue, N.W.
        Washington, D.C. 20005
        Tel: 202-616-4994 (Jacobs) / 202-616-1545 (O'Neill)
        Email: cory.jacobs@usdoj.gov / michael.t.oneill@usdoj.gov

Cc: Hon. John J. Tharp, Jr. (via email and hand delivery)
   Hon. Michael T. Mason (via email and hand delivery)
   Counsel for Defendant James Vorley (via email)