UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| | : | |
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Hon. John J. Tharp, Jr. |
| | : | |
| JAMES VORLEY and | : | No. 18 Cr 35 (JJT) |
| CEDRIC CHANU, | : | |
| | : | |
| Defendants. | : | |

---

## GOVERNMENT'S MEMORANDUM IN OPPOSITION TO
## THE DEFENDANTS' MOTION TO DISMISS

---

SANDRA L. MOSER
Acting Chief
U.S. Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue, N.W.
Washington, D.C. 20005
(202) 514-2000

On the Memorandum:

Cory E. Jacobs
Michael T. O'Neill
Trial Attorneys, Fraud Section

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................................1

BACKGROUND ......................................................................................................................2

I.     The Defendants and Related Entities……………………………………………………...2

II.    Market Background and Definitions…………………………………………………………3

III.   The Conspiracy and Scheme to Defraud ……………………………………………………4

ARGUMENT ……………………………………………………………………………...6

I.     The Indictment Adequately Alleges Wire Fraud ……………………………………………6

A.    Applicable Legal Standard……………………………………………………………...6

B.    The Indictment Properly Alleges False or Fraudulent "Representations" and "Pretenses" under the Wire Fraud Statute …………………………………………………………...6

1.     The Fraudulent Orders Were False or Fraudulent "Representations" …………………...10

2.     The Fraudulent Orders Were False or Fraudulent "Pretenses"…………………………..20

II.    The Wire Fraud Statute is Not Unconstitutionally Vague as Applied to the Defendants' Conduct ……………………………………………………………………………………..22

A.    Applicable Legal Standard……………………………………………………………22

B.    The Wire Fraud Statute Prohibits the Defendants' Scheme to Defraud …………………22

CONCLUSION………………………………………………………………………………..24

<u>**PRELIMINARY STATEMENT**</u>

This case arises from the Defendants' scheme to place false and deceptive futures orders—orders the Defendants intended to cancel before they were executed—to trick other traders for money. Contrary to the Defendants' claims in their motion to dismiss, ("Motion," Dkt. No. 76), this is not a "spoofing" case. It is a wire fraud case. The wire fraud statute, 18 U.S.C. § 1343, criminalizes schemes to defraud or to obtain money or property by means of "false or fraudulent pretenses, representations, or promises" where interstate wire or electronic communications are used to execute the scheme. The question presented in the Motion is whether the Indictment ("Indictment," Dkt. No. 12) adequately alleges these elements and apprises the Defendants of the nature of the wire fraud charges so that they can prepare a defense. Because the Indictment does so, the Motion should be denied.

*First*, the Court should reject the Defendants' claim that the wire fraud counts and object of the conspiracy count are not adequately alleged. The wire fraud statute—unlike the spoofing statute, Title 7 U.S.C. § 6c(a)(5)(C), which criminalizes the placement of futures orders with the intent to cancel them before execution—criminalizes schemes and artifices to defraud, including deceptive, communicative conduct that carries an implied misrepresentation or a misleading half-truth. Here, the Indictment adequately alleges that the Defendants placed orders (the "Fraudulent Orders") that constituted false or fraudulent "representations" and/or "pretenses" with the intention of inducing other traders into executing transactions with the Defendants (against their "Primary Orders") on the basis of a misleading picture of supply and demand in the precious metals futures market. The Government will present evidence at trial that the Defendants knew the Fraudulent Orders carried an implied misrepresentation as to their intent to trade the order, and that the Defendants placed the Fraudulent Orders precisely because the implied misrepresentations they

carried could—and did, in fact—trick other traders. As the Seventh Circuit recently recognized in an analogous case, that the alleged Fraudulent Orders were placed in an open market and could have been executed—despite the Defendants' intent to cancel them before execution—does not make them any less fraudulent. While the Defendants might contest the proof of the factual allegations in the Indictment—both as to the intent behind and potential impact of the Fraudulent Orders—those disputes are issues to be resolved by a jury, not by this Court on a motion to dismiss.

*Second*, the Court should reject the Defendants' constitutional challenge. The Defendants fail to show that an ordinary person would not understand that the plain language of the wire fraud statute prohibits the Defendants' scheme. As the Seventh Circuit has confirmed in an analogous case, although Congress has enacted newer and narrower statutes to combat spoofing—including, but not limited to the above-referenced spoofing statute—older and broader fraud statutes, such as the wire fraud statute, are constitutionally applicable to this same type of conduct, so long as the elements of those fraud statutes (including the scheme to defraud through the use of false or fraudulent representations or pretenses, and an intent to defraud) are adequately alleged.[1]

## BACKGROUND

### I. The Defendants and Related Entities

The Defendants, James Vorley and Cedric Chanu, are charged together with one count of conspiracy to commit wire fraud affecting a financial institution in violation of 18 U.S.C. § 1349, and are charged individually with one count each of wire fraud affecting a financial institution in violation of 18 U.S.C. § 1343.

---

[1] Many of the Government's arguments here are similar to those in a brief recently filed in *United States v. Bases*, 18-cr-48 (N.D. Ill.), a case currently pending before the Honorable John Z. Lee. *See generally* Dkt. No. 135 (Dec. 21, 2018).

The Indictment alleges that the Defendants were Deutsche Bank AG metals traders. Vorley was based in London from approximately May 2007 until March 2015, and Chanu was based in London from approximately March 2008 until May 2011 and Singapore from approximately May 2011 until December 2013. Indictment at ¶¶ 1(a)-(b). The Defendants' co-conspirator, David Liew—who has already pleaded guilty to a conspiracy that included both a wire fraud object and a spoofing object—was also a Deutsche Bank AG metals trader. Liew was based in Singapore from approximately July 2009 until February 2012. *Id*. at ¶ 1(c).

The Indictment charges that from December 2009 through November 2011, the Defendants and Liew engaged in a scheme to defraud other traders on the Commodity Exchange Inc. ("COMEX"), an exchange run by the Chicago Mercantile Exchange Group, Inc. ("CME").

## II.     **Market Background and Definitions**

A "futures contract" is a type of legally binding contract to buy or sell a particular product or financial instrument at an agreed-upon price and on an agreed-upon date in the future. Indictment at ¶ 1(f). When the parties to the futures contract (namely, the buyer and the seller) enter into an agreement, the buyer agrees to pay for, and the seller agrees to provide, a particular product or financial instrument at the agreed-upon price on the agreed-upon date in the future. *Id*. Futures contracts were traded on markets designated and regulated by the United States Commodity Futures Trading Commission. *Id*. at ¶ 1(g). CME was a commodities marketplace made up of several exchanges, including COMEX. *Id*. at ¶ 1(h). COMEX used an electronic trading system called Globex, which allowed traders to trade futures contracts from anywhere in the world. *Id*. at ¶ 1(i). CME operated Globex using computer servers located in the Northern District of Illinois. *Id*. Trading on Globex was conducted electronically using computers. Electronic traders could see a visible "order book" that displayed a certain number of visible price

levels on both the bid and offer sides, as well as the total volume of anonymous orders (*i.e.*, bids to buy and offers to sell futures contracts) at each of those visible price levels. *Id.* at ¶ 1(k). Precious metals futures contracts included gold, silver, platinum, and palladium futures contracts, which were contracts for the delivery of gold, silver, platinum, and palladium, respectively, in the future at an agreed-upon price. *Id.* at ¶ 1(n).

## III.     The Conspiracy and Scheme to Defraud

As alleged, the purpose of the conspiracy "was to deceive other traders by creating and communicating materially false and misleading information regarding supply or demand, in order to induce other traders into trading precious metals futures contracts at prices, quantities, and times that they would not have otherwise, in order to make money and avoid losses for the co-conspirators." Indictment at ¶ 3.

To commit their fraud, the Indictment alleges that the Defendants and Liew placed one or more visible Fraudulent Orders "for precious metals futures contracts on one side of the market that, at the time they placed the orders, they intended to cancel before execution . . . in order to deceive other traders." *Id.* at ¶ 4. By placing Fraudulent Orders, the Defendants and Liew "intended to create and communicate false and misleading information regarding supply or demand (*i.e.*, orders they did not intend to execute) in order to deceive other traders," knowing that their "false and misleading information often caused other traders to buy or to sell futures contracts at prices, quantities, and times that they otherwise would not have because, among other things, such traders reacted to the false and misleading increase in supply or demand." *Id.* at ¶¶ 4-6. The Government will present evidence at trial proving that the Defendants' knowledge of how their Fraudulent Orders could—and, in fact, did—trick other traders, was precisely why the Defendants placed the Fraudulent Orders.

For example, evidence will show that the Defendants "placed Fraudulent Orders to buy that created the false and misleading impression in the market of increased demand, which was intended to manipulate and move commodity futures prices upward." *Id.* at ¶ 7. Similarly, evidence will show that they "placed Fraudulent Orders to sell that created the false and misleading impression in the market of increased supply, which was intended to manipulate and move commodity futures prices downward." *Id.* at ¶ 8.

In connection with their scheme, the Defendants and Liew placed [Primary Orders] "at a lower visible quantity, often in the form of iceberg orders, on the opposite side of the market that they intended to execute." *Id.* at ¶ 9. An iceberg order is an order in which "the total amount of the order is divided into a visible portion of a certain pre-set quantity that was visible to other traders, and a portion of the order (*i.e.*, the remainder of the order) that was not." *Id.* at ¶ 1(m). By doing this in conjunction with placing Fraudulent Orders, the Defendants intended to "artificially manipulate and move the prevailing price in a manner that would increase the likelihood that one or more of their Primary Orders would be filled" based on deceiving other traders' perception of supply and demand. *Id.* at ¶ 10. In other words, the fraud scheme was not solely directed at defrauding traders who might be tricked into trading against the Fraudulent Orders, but was principally aimed at defrauding traders who would be induced into trading against the Defendants' *Primary Orders*. The Indictment alleges that the Defendants and Liew "engaged in this false, misleading, and deceptive practice both by themselves and in coordination with other traders at Deutsche Bank AG" and that they "intended to, attempted to, and often did cancel the Fraudulent Orders before any part of the Fraudulent Orders were executed." *Id.* at ¶¶ 12, 13.

**ARGUMENT**

I.      **The Indictment Adequately Alleges Wire Fraud**

      **A.  Applicable Legal Standard**

An indictment must "be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). An indictment is legally sufficient if it "(1) states all the elements of the crime charged; (2) adequately informs the defendant of the nature of the charges so that he may prepare a defense; and (3) allows the defendant to plead the judgment as a bar to any future prosecutions." *United States v. White*, 610 F.3d 956, 958-59 (7th Cir. 2010). An indictment is reviewed on its face, "accepting all of its allegations as true." *United States v. Moore*, 563 F.3d 583, 586 (7th Cir. 2009). "Indictments are reviewed on a practical basis and in their entirety, rather than in a hypertechnical manner." *United States v. Smith*, 230 F.3d 300, 305 (7th Cir. 2000). A court "does not consider whether any of the Indictment's charges have been established by evidence, or whether the Government will ultimately be able to prove its case." *White*, 610 F.3d at 959; *see also Moore*, 563 F.3d at 586 (7th (a motion to dismiss is not "a means of testing the strength or weakness of the government's case."). "In general, an indictment that tracks the words of a statute to state the elements of the crime is acceptable, provided that the indictment states sufficient facts to place a defendant on notice of the specific conduct at issue." *White*, 610 F.3d at 958-59.

      **B.  The Indictment Properly Alleges False or Fraudulent "Representations" and "Pretenses" under the Wire Fraud Statute**

"The wire fraud statute prohibits schemes to defraud or to obtain money or property by means of 'false or fraudulent pretenses, representations, or promises' where interstate wire or electronic communications are used to execute the scheme." *United States v. Weimert*, 819 F.3d 351, 355 (7th Cir. 2016) (citing 18 U.S.C. § 1343). To obtain a conviction for wire fraud affecting

a financial institution under Section 1343, the Government must prove beyond a reasonable doubt that (1) the defendant knowingly devised or participated in a scheme to defraud; (2) the defendant did so with the intent to defraud; and (3) the scheme to defraud involved a materially false or fraudulent pretense, representation, or promise; (4) for the purpose of carrying out the scheme or attempting to do so, the defendant caused interstate wire communications to take place; and (5) the scheme affected a financial institution. *See* Seventh Cir. Pattern Crim. Jury Instr., 18 U.S.C. § 1343, at p. 402 (2012 ed.) (plus 2015-2017 changes).

The Defendants' Motion should be denied because the Indictment adequately alleges all of the elements of wire fraud and conspiracy, and apprises the Defendants of the nature of the charges such that they can prepare their defense and plead double jeopardy in any future prosecution. *See White*, 610 F.3d at 958-59. Moreover, as described below, the Defendants would be guilty as charged if the jury were to find the facts as alleged in the Indictment.

The Defendants do not dispute that the face of the Indictment adequately alleges all of the elements of wire fraud, nor can they plausibly claim to be unaware of the nature of the charges given their voluminous Motion focused on wire fraud and specific allegations in the Indictment. Nonetheless, while the Defendants frame their arguments for dismissal by suggesting that their so-called "undisputed facts" negate the need for fact-finding by a jury, they concurrently raise *factual* disputes about the Government's ability to prove the allegations in the Indictment which necessarily calls for fact-finding by a jury. For example, the Indictment alleges, among other things, that the Defendants' scheme included false or fraudulent representations. *See* Indictment ¶¶ 2, 11, 22-23 (alleging material misleading representations and false pretenses); *see also id.* ¶¶ 3, 5-8 (describing the Defendants' communication of "false and misleading information" intended to create a "false and misleading impression"). The Defendants contend, however, that the nature

of the market and the expectations of other traders meant that the Fraudulent Orders were at most "mere omissions" without a duty to disclose, and were not materially false, misleading, and fraudulent "representations," either express or implied. *See, e.g.*, Motion at 13 (suggesting that "[t]he genuineness of supply or demand cannot turn on whether the trader *hopes* the offer or bid will be filled, nor on how long the trader [subjectively] expects or intends to keep the offer or bid on the market"), n.13 (characterizing "icebergs"), 19 (characterizing the expectations and capabilities of high-frequency traders as "sophisticated competitors").

While the Defendants cite *United States v. Risk*, 843 F.2d 1059, 1061 (7th Cir. 1988) for the significance of "undisputed facts," that case is inapt. Motion at 8, 12. In *Risk*, the Court of Appeals affirmed the district court's decision to dismiss a facially sufficient indictment where the government's discovery and characterization of undisputed facts compelled dismissal "not because the government could not prove its case, but because there was no case to prove." *Risk*, 843 F.2d at 1061. The defendant was charged with failing to file a Currency Transaction Report for transactions involving more than $10,000, but the government's characterization of undisputed facts did not constitute a violation of any statute because none of the transactions at issue exceeded $10,000. *Id.* at 1061, 1062 & n.6. In contrast, the Government in this case does dispute the Defendants' characterizations of the allegations in the Indictment. At this motion to dismiss stage, however, the "undisputed" claims advanced by the Defendants, and the Government's

disagreement with those claims, are inapplicable to this Court's consideration of the legal sufficiency of the Indictment, as they are issues of fact for a jury's resolution.[2]

The Indictment alleges that the Defendants' Fraudulent Orders were "intended to create and communicate false and misleading information . . . in order to deceive other traders." Indictment at 4, ¶¶ 4-5. The Indictment further alleges that the "Fraudulent Orders placed by [the Defendants] were material misrepresentations that falsely and fraudulently represented to traders that [the Defendants] were intending to trade the Fraudulent Orders when, in fact, they were not." *Id*. at ¶¶ 5, 11. Courts in the Seventh Circuit have held that the mail (and, by extension, wire) fraud statute extends to conduct where a defendant makes a representation known to be false, or a half-truth known to be misleading, "expecting [a victim] to act upon it to [the defendant's] benefit and [the victim's] detriment." *Emery v. American General Finance, Inc.*, 71 F.3d 1343, 1346 (7th Cir. 1995) (citing *Midwest Commerce Banking Co. v. Elkhart City Centre*, 4 F.3d 521, 524 (7th Cir. 1993)). The Seventh Circuit has held this to be true even "'without proof of a duty to disclose the information pursuant to a specific statute or regulation.'" *Id*. at 1347 (quoting *United States v. Keplinger*, 776 F.2d 678, 697 (7th Cir. 1985)). In these cases, the Seventh Circuit has held that whether a defendant's conduct "is fraudulent depends on context." *Id*; *cf. also United States v. Sloan*, 492 F.3d 884, 891 & n.2 (7th Cir. 2007) (discussing half-truths and fictions in solicitations designed to induce others to join an organization to their detriment and to the defendant's benefit

---

[2]  Particularly irrelevant and inaccurate is the Defendants' assertion that the Government's charging decisions are a "cynical and misguided effort to keep powerfully exculpatory evidence out of the case." Motion at 4. The Defendants mischaracterize the surveillance and "clearing" of certain trades by Deutsche Bank compliance as tacit "approval" of their fraudulent conduct, *id*. Moreover, the Defendants do not claim that Deutsche Bank advised any trader (including themselves) that their trades were being "cleared." Absent such notice, this fact is neither relevant to the Defendants' state of mind nor "exculpatory."

as a scheme to defraud and noting proverb that "[a] half truth is a whole lie."). The context of the Defendants' false representations and pretenses is the type of factual issue that should be presented and submitted to a jury.

### 1. The Fraudulent Orders Were False or Fraudulent "Representations"

The Indictment adequately alleges that the Defendants conspired to commit and committed wire fraud through false and fraudulent "representations"—specifically, that the Defendants' "Fraudulent Orders . . . were material misrepresentations that falsely and fraudulently represented to traders that [the Defendants and Liew] were intending to trade the Fraudulent Orders when, in fact, they were not because, at the time the Fraudulent Orders were placed, [they] intended to cancel them before execution." Indictment ¶ 11. As the Indictment alleges, the Defendants' Fraudulent Orders (*i.e.*, orders they did not intend to execute) were communicative conduct that implicitly—and falsely—represented an intent to trade that, in turn, misrepresented accurate expressions of supply or demand to other traders.[3] *Id.* at ¶ 5.

The Seventh Circuit has affirmed fraud convictions in other cases involving communicative conduct carried out by an implied misleading representation. In *United States v. Lack*, 129 F.3d 403, 406 (7th Cir. 1997), the Seventh Circuit affirmed the mail fraud conviction of an individual who had devised a scheme to steal money from his employer by depositing checks for sales on behalf of his employer into a bank account that he had opened for his personal benefit. Later, in *United States v. Stephens*, 421 F.3d 503, 507 (7th Cir. 2005), the Seventh Circuit affirmed the wire fraud conviction of a defendant who submitted false reports seeking cash advances from his employer—even though the money was not sought for any purpose related to work—reasoning

---

[3] Many of the Government's arguments here are similar to those in a brief recently filed in *United States v. Bases*, 18-cr-48 (N.D. Ill.), a case currently pending before the Honorable John Z. Lee. *See generally* Dkt. No. 135 (Dec. 21, 2018).

that the request for funds on each report "carried the implied representation that it was for purposes related to work."  In affirming the conviction, the *Stephens* Court pointed to *Lack*, noting its holding that a "pattern of deceit and the use of false pretenses" constituted a scheme to defraud that involved "*implicitly* at least representing to the buyers that they were paying the proper party for the purchases." *Id.* at 509 (emphasis added).

The Defendants argue that the Fraudulent Orders could not be false and misleading representations because they were "real orders that were exposed to actual market risk" for as long as they remained on the market and thus, at most, represented "fleeting" rather than "false" supply and demand.  Motion at 13.  However, a recent Seventh Circuit decision forecloses this argument. *See United States v. Coscia*, 866 F.3d 782 (7th Cir. 2017), *reh'g en banc denied* (Sept. 5, 2017), *cert. denied* 138 S. Ct. 1989 (2018).  In *Coscia*, the Seventh Circuit rejected a futures trader's claim that his conduct "was, as a matter of law, not deceptive" "because his orders were fully executable and subject to legitimate market risk, they were not, as a matter of law, fraudulent." *Id.* at 797.  The Seventh Circuit explained that this argument "confuses *illusory* orders with an *illusion* of market movement." *Id.* at 797 (emphasis in original).

The Defendants purport to distinguish *Coscia* in support of their arguments for dismissal of the Indictment, but if anything those proceedings stand for the proposition that the Fraudulent Orders alleged in the Indictment can indeed be deceptive and misleading.  In *Coscia*, the defendant was charged with commodities fraud in violation of 18 U.S.C. § 1348(1) as well as spoofing in violation of 7 U.S.C. §§ 6c(a)(5)(C) and 13(a)(2).  Coscia allegedly "utilized a computer program designed to place small and large [futures] orders simultaneously on opposite side of the commodities market in order to create illusory supply and demand and, consequently, to induce artificial market movement" on CME Group exchanges. *Id.* at 785.  Unlike the Defendants in this

case, Coscia was not charged with wire fraud, but his conduct was comparable to the Defendants'
conduct here. In affirming Coscia's conviction, the Seventh Circuit noted, in outlining the
applicable legal standard, that "[f]alse representations or material omissions are not required for
conviction under [Section 1348(1)]." *Id.* at 796. Nonetheless, the Seventh Circuit's reasoning in
affirming the defendant's fraud conviction did not depend on that proposition—nor did it suggest
that Coscia's conduct could not properly have been charged as wire fraud. *See generally id.* at
797-800 (analyzing (1) the sufficiency of the evidence of Coscia's fraudulent intent and (2) the
adequacy of the district court's jury instruction on materiality). Thus, the reasoning of *Coscia* is
both applicable and instructive here.

The Defendants' claim that the Fraudulent Orders could not be false and misleading
representations is also contrary to the allegations in the Indictment—particularly those regarding
the Defendants' fraudulent and manipulative intent in placing the Fraudulent Orders. *See*
Indictment ¶¶ 5-8, 11. The Indictment alleges that the Defendants' Fraudulent Orders were placed
with the intent to create and communicate false and misleading information regarding supply and
demand in the market, in order to facilitate trading of the Defendants' Primary Orders through that
deception. The Defendants' claims that the allegedly Fraudulent Orders were in fact "genuine"
and that "the genuineness of supply and demand turns not merely on the trader's intent, but also
on how long the order ultimately remains on the market" miss the mark. Motion at 13 & n.14.
While the Indictment acknowledges that the Fraudulent Orders were capable of being executed,
the Indictment alleges that the Defendants placed the Fraudulent Orders in the market without any
"genuine" intention to trade them, but rather to deceive other traders by mispresenting supply and
demand. Thus, however "fleeting" or long-lived they may have been, the Fraudulent Orders were
fraudulent because—contrary to the implied representation these orders carried (*i.e.*, that the

Defendants actually intended to execute them)—the Defendants *never* intended to execute them but instead intended to use the Fraudulent Orders to trick other traders into trading against the Defendants' Primary Orders.  Indictment at ¶¶ 4-5; *see also id.* ¶¶ 6-10.

As such, and as the Seventh Circuit recognized in *Coscia*, it is legally irrelevant whether the Fraudulent Orders could have been filled or how long they lasted.  *See Coscia*, 866 F.3d 782, 800 ("Although a trader may not have expected any given trade to remain on the market for any particular period of time, no trader expected a complex, concerted effort . . . to pump the market.").  Indeed, as the Indictment alleges, the Defendants' scheme contemplated that the Fraudulent Orders could be filled—*see id.* ¶ 19 ("Later in the chat, Liew wrote to Chanu, in pertinent part, "u be careful sweetie / dun get given here / lol.")—a risk of the Defendants' scheme that the Defendants took steps to mitigate.  *See id.* ¶ 13 (the Defendants and Liew "intended to, attempted to, and often did cancel the Fraudulent Orders before any part of the Fraudulent Orders were executed.").  None of the additional cases relied on by the Defendants suggest otherwise.

First, the proceedings in the Fifth Circuit in *United States v. Radley*, 659 F. Supp. 2d 803 (S.D. Tex. 2009), *aff'd*, 632 F.3d 177 (5th Cir. 2011), are based on inapposite facts, and the holdings from those proceedings should be rejected to the extent that they cannot be reconciled with precedent in this Circuit.  In *Radley*, the trial court dismissed an indictment charging violations of the Commodity Exchange Act ("CEA") and wire fraud for a scheme to artificially manipulate the price of propane futures contracts.  The trial court held that the wire fraud counts in the *Radley* indictment failed to "allege a single lie or misrepresentation."  *Radley,* 659 F. Supp. at 815.  The trial court further held that the government could not support allegations of artificial price manipulation "since [the] defendants have not been accused of making false or misleading statements, [and thus] the effect of the [defendants'] actions on the market was part of the

legitimate forces of supply and demand." *Id*. at 816. Neither holding applies here. First, the Indictment plainly alleges both the communication of materially false and misleading information and the purpose of such communications. *See* Indictment at ¶¶ 3-5, 7-8, 10-11. Second, artificial price manipulation under the CEA is not charged. Accordingly, *Radley* should have no impact.

Moreover, the Seventh Circuit in *Coscia* reasoned that *Radley* does not "provide[] an apt analogy" because the case did not involve the "development of a specific program to create the illusion of artificial market movement that included the use of large orders to inflate the price while also taking steps to avoid transactions in the large orders." *Coscia*, 866 F.3d at 797 n.64. Although the instant case involves manual trading, the Indictment similarly alleges that the Defendants' placement of Fraudulent Orders was intended to communicate materially false and misleading information to create the illusion of market movement and, in turn, to trick other traders.

The Defendants further argue that their Fraudulent Orders did not carry an implied misleading representation because the Defendants were not fiduciaries of the other COMEX traders, and the "absence of a fiduciary relationship precludes any argument that the Defendants' orders made implicit representations of anything." Motion at 16. To be sure, the Indictment does not allege a fiduciary relationship and this is not a duty-to-disclose case. To the extent the Defendants attempt to frame their conduct as "mere omissions," those "omissions" come in the context of the misleading and fraudulent representations carried in the placement of the Defendants' Fraudulent Orders, and the Defendants' concurrent—and withheld—knowledge and intent to cancel the Fraudulent Orders before their execution. *See, e.g.*, *Weimert*, 819 F.3d at 355 ("[T]he concept of a misrepresentation is also broad, reaching not only false statements of fact but also misleading half-truths and knowingly false statements. It can also include the omission or concealment of material information, even absent an affirmative duty to disclose, if the omission

was intended to induce a false belief and action to the advantage of the schemer and the disadvantage of the victim." (Internal citations omitted).

Moreover, none of the cases cited by the Defendants support their characterization of the law regarding "implicit representations." To start, in *United States v. Dial*, 757 F.2d 163, 169-70 (7th Cir. 1985), the Seventh Circuit affirmed the mail and wire fraud convictions of two commodities brokers who "traded ahead" of their customers' orders in silver futures contracts by trading in their own accounts without margin. In addition to finding that the defendants' trading conduct and material omissions defrauded both their customers and their employer (of whom the defendants were fiduciaries), the court also reasoned that "trading without margin [not backed by any cash] gives a misleading signal." *Id.* at 169. The court found that "[a]lthough [the defendants] owed no . . . [fiduciary] duty to people on the other side of their silver futures transactions, their trading an unmargined account was an *active misrepresentation and hence actionable even without a breach of fiduciary duty*." *Id.* (emphasis added). The Seventh Circuit further reasoned that "the defendants confused the market by signaling the presence of big buyers who had not in fact put up any money." *Id.* at 170. As in *Dial*, where the defendants "confused" the market by signaling their purported buying interest, the Defendants here are alleged to have tricked other traders by placing Fraudulent Orders that they did not intend to execute in order to distort supply and demand.

Similarly, the Defendants mischaracterize the holding in *Stephens*, discussed above, to suggest that it depended upon the defendant's fiduciary relationship to his employer. Motion at 16. Although the defendant was an employee and thus a fiduciary of his employer, the court's holding and reasoning did not depend upon that fiduciary relationship, but rather on the deception and false pretenses in the defendant's communicative conduct. *See* 421 F.3d at 507; *see also Emery*, 71 F.3d at 1347. As noted above, *Stephens* stands for the proposition that communicative

conduct carrying an implied misleading representation can constitute a scheme to defraud, and its reasoning—like that in *Dial*—counsels in favor of denying the Defendants' Motion.

In *United States v. Steffen*, 687 F.3d 1104, 1116-17 (8th Cir. 2012), the Eight Circuit rejected the government's theory that the defendant's draw request to a bank (against a loan where he had already sold the collateral) carried an implied false representation. In doing so, the court noted that there was no allegation of a fiduciary duty to disclose, but its decision turned on the finding that the defendant's draw request amounted to nothing more than his breach of contract and mere silence regarding that breach. *See id.* Here, in contrast to *Steffen*, the Indictment alleges that the Defendants engaged in a scheme to defraud through the use of false and fraudulent representations designed to distort supply and demand and thereby deceive other traders for the Defendants' benefit.

In *United States v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008), the Second Circuit actually recognized in a securities fraud case that "[c]onduct itself can be deceptive" and that criminal liability does not require "a specific oral or written statement." Where a stock exchange trading specialist was prosecuted for profiting by "interpositioning" his own trades between those of his customers, the Second Circuit reversed the conviction, holding that the "government ha[d] identified no way in which [the defendant] communicated anything to his customers, let alone anything false," and that there was no fraud proven because "there [was] no evidence that [the defendant] conveyed an impression that was misleading." *Id.* at 148-49. Here, in contrast, the Indictment alleges that the Defendants' placement of Fraudulent Orders was meant to create a false impression of supply and demand in order to deceive other traders. Indictment ¶¶ 5-7; *id.* at 148 (deception "entails some act that gives the victim a false impression").

The Defendants also quote a turn of phrase from the Southern District of New York in *Bondi v. Bank of Am. (In re Parmalat Sec. Litig.)*, 412 F. Supp. 2d 392, 492 (S.D.N.Y. 2006) ("[A] transaction is a transaction, not a communication"), but that proposition is in tension with the logic of *Finnerty* and with the implied representation case law in this Circuit, as discussed above. Moreover, *Bondi* is inapt because the district court was analyzing the plaintiff's civil RICO allegations that transactions structured by the defendant bank to conceal and facilitate the corrupt insiders' looting of the plaintiff corporation were both the scheme and the affirmative misrepresentations that made the scheme fraudulent. *Id.* at 402. Here, in contrast, the Indictment alleges that the Defendants used Fraudulent Orders as communicative conduct to make false and fraudulent representations regarding their intent to trade and thereby distort the value of futures contracts, in furtherance of their scheme to deceive other traders into transacting with their Primary Orders—not that these consummated transactions themselves were misrepresentations.

The Defendants further claim that *Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857, 861 (7th Cir. 1995) "controls" Motion at 17, but if anything, *Sullivan & Long* supports the charges here. In that case, the plaintiffs challenged short-selling conduct that actually "accelerate[d] rather than retard[ed] the convergence between the price of [the] stock [at issue] and its underlying economic value," and therefore served to "promote rather than impair the ultimate goals of public regulation of the securities markets." *Id.* The Seventh Circuit concluded that the defendants' conduct was the "opposite of a practice that creates artificial prices" and that there was "nothing" they had done that created "a false impression of supply and demand." *Id.* at 862, 864. In reaching this conclusion, the Seventh Circuit contrasted the defendants' conduct with "wash sales"—which, although completed through open-market activity, nevertheless "fool the market." *Id.* at 864.

As the Seventh Circuit recognized in *Coscia*, the decisions in *Finnerty* and *Sullivan & Long* "stand for the unremarkable rule that fraud requires deception," 866 F.3d at 800 n.77—not, as the Defendants argue, that open-market activity is exempt from the fraud statutes. *See id.* (citing *United States v. Finnerty*, 474 F. Supp. 2d 530, 542 (S.D.N.Y 2007) (holding that the government "failed to show that interpositioning constituted a deceptive act within the meaning of the federal securities laws because it did not provide proof of customer expectations"); *Sullivan & Long*, 47 F.3d at 864 (explaining that "there was no deception")).

The Defendants also cite *Williams v. United States*, 458 U.S. 279, 284-85 (1982), in support of their claim that, absent a fiduciary duty, the Indictment cannot properly allege an implied misrepresentation. That case is inapt, however, because in holding that check kiting does not violate 18 U.S.C. § 1014, a false statements statute, the Court focused on the technical definition of bank checks and reasoned that "technically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as 'true' or 'false.'"

Finally, in an effort to recast the Indictment as alleging "mere nondisclosure" absent any duty to disclose, the Defendants cite *Weimert*, 819 F.3d at 351, involving the private sale of a commercial real estate development, for the undisputed proposition that "[n]ot all conduct that strikes a court as sharp dealing or unethical conduct is a 'scheme or artifice to defraud'" for purposes of the mail and wire fraud statutes, *id.* at 357 (citations omitted). That case is similarly inapt. Although *Weimert* explains that parties in a private business transaction do not need to be forthright about their negotiating positions—*i.e.*, what prices and terms they are willing to accept to complete a deal—the decision confirms that parties cannot be misled about their "understanding of the subject of the deal" or the underlying value of the asset. 819 F.3d at 356. In this case, that form of misrepresentation is alleged to have occurred when the Defendants used the Fraudulent

Orders to distort other traders' perceptions of supply and demand in order to trick other traders to execute their Primary Orders. Indictment ¶¶ 4-11. The Seventh Circuit and at least one decision from this Court have likewise distinguished *Weimert* in other factual contexts that more closely resemble this case. *See, e.g.*, *United States v. Johnson*, 874 F.3d 990, 999 (7th Cir. 2017) (distinguishing negotiation tactics from actions that "purposefully swindled" victims for personal gain), *cert. denied*, 138 S. Ct. 1275, (2018); *United States v. Corrigan*, No. 13-CR-915, 2016 WL 4945013, at *14 (N.D. Ill. Sept. 15, 2016) (distinguishing mere "negotiation positions" from affirmative misrepresentations).

The additional cases the Defendants cite in support of their claim that the Indictment alleges a mere failure to disclose absent any duty—which is not alleged in the Indictment—are likewise inapposite because the Indictment alleges false representations. In any event, "whether a failure to disclose is fraudulent depends on the context." *See Emery*, 71 F.3d at 1347. For example, in *Reynolds v. East Dyer Dev. Co.*, 882 F.2d 1249 (7th Cir. 1989), the Seventh Circuit found that a real estate developer's failure to disclose information to home buyers—namely, publicly available soil reports showing the lots were not suitable for building—absent more (such as evidence of concealment), were not calculated to deceive the buyers about the soil conditions and did not constitute a scheme or artifice to defraud. *Id.* at 1252. Similarly, in *United States v. Ellis*, 50 F.3d 419, 424 n.2 (7th Cir. 1995), a bankruptcy fraud case, at most stands for the proposition (in dicta) that omissions, absent a duty to disclose or additional context indicating deception, are not sufficient to constitute fraudulent conduct under the mail and wire fraud statutes (the court affirmed the defendant's bankruptcy fraud conviction on a "mere" nondisclosure theory). Finally, in *United States v. Dick*, 744 F.2d 546, 550 (7th Cir. 1984), the Seventh Circuit noted that it "has recognized that breach of a fiduciary duty to disclose information" *can* support a mail fraud

conviction, but did not, as the Defendants suggest, announce that a fiduciary duty was a *requirement* to sustain an omissions theory. *See id.* at 551 (upholding conviction of co-defendant who owed no fiduciary duty). The Indictment alleges that the Defendants committed fraud through the use of false representations, so the "pure omissions" cases the Defendants cite are inapposite.

### 2. The Fraudulent Orders Were False or Fraudulent "Pretenses"

The Indictment also adequately alleges that the Defendants conspired to commit and committed wire fraud through false and fraudulent "pretenses." *See* 18 U.S.C. 1343; *see also Stephens*, 421 F.3d at 509 (characterizing the scheme in *Lack* as including the use of "false pretenses"). The Seventh Circuit's exploration, in a different statutory context (involving bank theft and fraud), of the distinction between "theft by false pretenses" and traditional "fraud"— although not controlling here—is instructive and supports the adequacy of the allegations in the Indictment. In *United States v. Kucik*, 844 F.2d 493, 499 (7th Cir. 1988), the Seventh Circuit explained that "[o]riginally a false pretense was a false token, such as a false weight or measure or a counterfeit coin"—deceiving someone about the "nature of the transaction[]" as opposed to its "purposes"—but "[t]hat narrow definition gave way long ago to one that equates false pretense with any untrue representation, including an implicit one." *Id.* On either of the understandings discussed in *Kucik*, the Fraudulent Orders constitute "false pretenses" because they attempt to mislead traders who might have executed against the Defendants' Primary Orders about supply and demand in the marketplace—which is a misrepresentation about the value of a transaction— and made implicit misrepresentations regarding the Defendants' intention to trade the Fraudulent Orders. *See id.*

The Seventh Circuit has noted that "the cardinal rule is that words used in statutes must be given their ordinary and plain meaning and . . . [it] will frequently look to dictionaries to determine

the plain meaning of words." *Cler v. Illinois Educ. Ass'n*, 423 F.3d 726, 731 (7th Cir. 2005) (internal quotation marks omitted) (citing BLACK'S LAW DICTIONARY); *cf. United States v. Michalek*, 54 F.3d 325, 335-36 (7th Cir. 1995) (Ferguson, C.J., dissenting in part) ("we must interpret statutes as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous") (internal quotation marks omitted) (citing BLACK'S). The allegations in the Indictment satisfy the definition of a "pretense" as, among other things, "[a] way of behaving that is calculated to make people believe something untrue," "[a] professed rather than real purpose," or "a false show; an instance of dissembling." *Pretense*, BLACK'S LAW DICTIONARY (10th ed. 2014); *False Pretenses*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("The crime of knowingly obtaining title to another's personal property by misrepresenting a fact with the intent to defraud."). The Indictment alleges that the Defendants placed orders they did not intend to execute with the intent to "create and communicate false and misleading information regarding supply and demand (*i.e.*, orders they did not intend to execute) in order to deceive other traders." Indictment ¶ 5. The Indictment thus alleges that the Defendants acted with the professed (rather than real) purpose of seeking to execute their orders, and that the Defendants' behavior was designed to make other traders believe something untrue about the state of the market.

The allegations of false "pretenses" in the Indictment, *see* Indictment ¶¶ 2, 21, 23, are therefore independently sufficient to withstand the Defendants' Motion. *See Coscia*, 100 F. Supp. 3d at 661 ("[T]he allegations of the Indictment—that Coscia created a 'false impression,' 'fraudulently induce[d]', and 'tricked' others—are[] consistent with the scheme to defraud and use of 'false or fraudulent pretenses, representations, or promises' described in the statute." (denying

motion to dismiss commodities fraud charge under 18 U.S.C. §1348(1); internal citations omitted)).

## II. The Wire Fraud Statute is Not Unconstitutionally Vague as Applied to the Defendants' Conduct

The Defendants further argue that the wire fraud statute is unconstitutionally vague as applied to their conduct, but this argument also lacks merit because the plain language of the wire fraud statute provides the Defendants with sufficient notice and provides explicit standards for enforcement.

### A. Applicable Legal Standard

A criminal statute is unconstitutionally vague if it fails to give fair notice to a person of ordinary intelligence that the conduct at issue falls within its prohibitions. *United States v. Andrews*, 749 F.Supp. 1520, 1523 (N.D. Ill. 1990) (citing *Bradley v. Lane,* 834 F.2d 645, 650 (7th Cir. 1987)). "'[T]he touchstone [of the fair notice inquiry] is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal.'" *Coscia*, 866 F.3d at 792 (quoting *United States v. Lanier*, 520 U.S. 259 (1997)). The principles underlying this inquiry are twofold: First, courts "insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly . . . . Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them." *Id.* (citing *Grayned v. City of Rockford,* 408 U.S. 104, 108–109 (1972)). From either perspective, "the inquiry . . . is one of 'fair notice' that hinges on the understanding of 'ordinary people.'" *Id.* (citations omitted).

### B. The Wire Fraud Statute Prohibits the Defendants' Scheme to Defraud

The Defendants argue that neither the plain language of the wire fraud statute nor the Seventh Circuit's decision in *Coscia* would have put a reasonable person on notice that the

Defendants' "manual spoofing scheme" was prohibited by the wire fraud statute. Motion at 20. However, as noted above, the Indictment charges the Defendants not with "spoofing" but with wire fraud, in violation of a statute that plainly prohibits schemes to defraud or to obtain money through false representations or pretenses. 18 U.S.C. § 1343; Indictment at ¶¶ 3-5. The Defendants also suggest that use of the wire fraud statute to prosecute the type of conduct alleged in the Indictment could result in "arbitrary and discriminatory enforcement," Motion at 20, but having alleged wire fraud, "the [G]overnment must prove intent and knowledge, . . . requirements [that] do much to destroy any force in the argument that application of the statute would be so unfair that it must be held invalid." *Coscia*, 866 F.3d at 794-95.

In support of their notice argument, the Defendants emphasize that the *Coscia* proceedings post-dated their alleged conduct, and suggest that because *Coscia* was the first spoofing prosecution and there had "never been a spoofing prosecution under *any* statute" before 2014, it could not have been "reasonably clear" to the Defendants before 2014 that their conduct violated the wire fraud statute. Motion at 21. The Defendants' reliance on *Coscia* is misplaced.

First, the Defendants need not rely on those proceedings for notice. The plain language of the wire fraud statute—which predates the Defendants' alleged conduct by over half a century—provided sufficient notice that their conduct was prohibited. *Cf. Coscia*, 866 F.3d at 795 (holding that a clearly defined statute provides sufficient notice).

Second, the trial court in *Coscia* made clear that the placement of orders with the intent to cancel them before their execution is "consistent with the scheme to defraud and use of false or fraudulent pretenses, representations, or promises described in the [commodities fraud] statute." *Coscia*, 100 F. Supp. 3d at 611. Thus, *Coscia* confirms that spoofing conduct can violate another statute, so long as that statute's other elements are sufficiently alleged and proved.

Third, nothing in the *Coscia* proceedings, in subsequent cases involving spoofing, nor in the legislative history when Congress first criminalized "spoofing" under the Dodd-Frank Act in 2010, suggests that Congress intended to preempt the statutory enforcement tools that were previously available to the government. If anything, the specific prohibition against spoofing— focused squarely on a trader's "intent to cancel"—suggests that Congress intended for prosecutors to have a wider array of tools, in addition to the criminal fraud statutes, to combat this new and pervasive problem in the electronic futures markets.

Prior to the enactment of the anti-spoofing statute in 2010, and prior to the commencement of the *Coscia* proceedings in 2014, the anti-fraud statutes have been employed to combat the "versable" fraud schemes that fall within their ambit. *See Weiss v. United States*, 122 F.2d 675, 681 (5th Cir. 1941) (observing that fraud is "as old as falsehood and as versable as human ingenuity"). So too, here. Because the Indictment alleges that the Defendant committed wire fraud—in violation of an unambiguous, long and widely used, and well-defined statute—the Defendants' claim that the statute is vague as applied to their conduct should be rejected.

## CONCLUSION

For the foregoing reasons, the Court should deny the Defendants' Motion.

Respectfully submitted,

SANDRA L. MOSER
Acting Chief, Fraud Section

By:      *s/ Cory E. Jacobs*
Cory E. Jacobs
Michael T. O'Neill
Trial Attorneys, Fraud Section
Telephone: (202) 616-4994 (Jacobs)
Telephone: (202) 616-1545 (O'Neill)
Email: cory.jacobs@usdoj.gov
Email: michael.t.oneill@usdoj.gov

Dated:  January 4, 2019

## CERTIFICATE OF SERVICE

I certify that by electronically filing a copy of the United States' Memorandum in Opposition to the Defendants' Motion to Dismiss the Indictment through the court's electronic docketing system on January 4, 2019, I caused the Government's opposition to be filed on the Defendants' counsel of record, who are ECF Filing Users and are served electronically by the Notice of Docket Activity.

*s/ Cory E. Jacobs*
Cory E. Jacobs
Trial Attorney, Fraud Section