# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| vs. | ) Case No. 1:18-cr-00035 |
| | ) |
| JAMES VORLEY and CEDRIC CHANU, | ) Honorable John J. Tharp, Jr. |
| | ) |
| Defendants. | ) |

## FUTURES INDUSTRY ASSOCIATION'S
## MOTION FOR LEAVE TO FILE BRIEF AMICUS CURIAE

The Futures Industry Association ("FIA"), by its counsel Steptoe & Johnson LLP, respectfully requests leave to file a brief *amicus curiae* in support of the defendants' motion to dismiss the indictment. FIA seeks leave to file a brief explaining the risks of harm to the vitality of futures markets posed by the government's theory of wire fraud liability. If granted leave, FIA respectfully requests that it be given until February 21, 2019 to file its *amicus* brief. Defendants consent to this request. Counsel for the Department of Justice ("DOJ") have advised FIA counsel that they take no position on the motion.[1]

The indictment's legal theory – that wire fraud liability can rest on the premise that open, executable orders for futures contracts, by themselves, can be deemed implied misrepresentations of an intention to trade – threatens the vitality of the markets. Treating unexpressed intentions and strategies underlying executable orders as misrepresentations could create substantial legal uncertainty over the scope of trader liability not just for wire fraud, but

---

[1] FIA also is requesting leave to file a brief *amicus curiae* in support of the defendants' motion to dismiss the indictment from the Honorable John Z. Lee in *U.S. v. Edward Bases and John Pacilio*, Case No. 1:18-cr-00048 (N.D. Ill.).

1

also for civil claims based on the same premise. If accepted, the government's theory of liability poses a serious risk of chilling legitimate, non-fraudulent trading by FIA's members and other markets participants, many of whom engage in trading to hedge commercial and other business risks.

Expanding wire fraud liability is not necessary for the protection of the markets because Congress provided ample and focused means in the criminal and civil trading prohibitions of the Commodity Exchange Act, 7 U.S.C. §1, *et seq.*, ("CEA") to combat futures market abuse without upending traditional legal standards and norms for legitimate trading. FIA takes no position on whether the defendants have committed a crime or other violation under the CEA. As the industry's leading global trade organization, however, FIA objects to the government's attempt to expand the wire fraud statute in a new way that unnecessarily invites harm to legitimate trading and the vitality of the futures markets.

In support of its motion, FIA states as follows:

1. FIA is the leading global trade organization for the futures, options and centrally cleared derivatives markets, with offices in Brussels, London, Singapore and Washington, D.C. FIA's membership includes clearing firms, exchanges, clearinghouses, trading firms and commodities specialists from more than 48 countries as well as technology vendors, lawyers and other professionals serving the industry. FIA seeks to submit an *amicus* brief to apprise the Court of the real-world implications should the government's expanded theory of liability under the wire fraud statute be accepted.

2. The Court has discretion whether to permit an *amicus* brief. *Chamberlain Group, Inc. v. Interlogix, Inc.*, 2004 WL 1197258, at *1 (N.D. Ill. May 28, 2004). An *amicus* brief should be permitted if the *amicus* "has a unique perspective or specific information that can

assist the court beyond what the parties can provide." *Id.* Here, it is important that FIA offer a perspective on policy issues implicating the interests of its members that would be impacted if the government is permitted to proceed on its expansive theory of wire fraud liability. This perspective reflects FIA's concern with the potential effect of the government's theory to adversely affect the proper functioning of financial and commodities markets, a concern that extends beyond the considerations of the parties to the case.

3. The indictment alleges that the defendants engaged in trading in the nature of "spoofing" in the commodities futures market – entering orders that the defendants intended to cancel before they were executed. Spoofing is a type of disruptive trading practice, prohibited under CEA section 4c(a)(5), 7 U.S.C. § 6c(a)(5), that is distinct from commodities fraud. The anti-spoofing prohibition was enacted in 2010 as part of the Dodd-Frank Act's amendments to the CEA. It provided a targeted means to combat the disruptive practice of orders entered with an intent to cancel before execution. The amended CEA avoids the need to try to stretch theories of fraud to cover that conduct that could themselves inject ambiguity concerning market participants' legal exposure and generally be disruptive to the vitality of legitimate trading.

4. The indictment, however, does exactly what the CEA amendments avoided. It seeks to allege the necessary element of a material misrepresentation of wire fraud by contending that defendants' open, executable futures orders each contained an implied misrepresentation of the defendants' trading intentions. This premise misconceives the nature of open orders and is at odds with the dynamics of futures markets. From their inception through today, futures markets have been characterized by (1) anonymous trading, (2) significant volatility, (3) leveraged transactions that can bear significant risk of loss as well as opportunity for gain, (4) freedom to modify and cancel orders at any time, and (5) the absence of any preexisting duty in connection

with entering an order or executing against a resting order to disclose any information to a counterparty or to the markets generally.

5. The ability to alter or cancel orders is essential to allow market participants to manage their risks in volatile markets. It is not uncommon for many market participants to modify and cancel resting orders throughout a trading day, acting frequently and rapidly in response to the many various factors affecting commodity market valuations. Indeed, with the advances in trading technology and algorithmic program trading, it is not uncommon in some markets for orders to be entered and then modified or cancelled within fractions of a second.

6. It also is well-settled that market participants have no pre-existing duty to disclose anything to the market in connection with entering open orders to buy or sell futures contracts. Specifically, when entering orders a market participant has no duty to disclose its proprietary information about, for example, its projections of futures commodity valuations, its trading objectives or strategies, or the intended purpose of its orders. The Commodity Futures Trading Commission ("CFTC"), the federal agency that oversees U.S. futures markets, has affirmed this principle multiple times. *See, e.g.*, "Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation," 76 Fed. Reg., 41398, 41404 (July 14, 2011).[2] Accordingly, when an order is entered into the market for execution, it traditionally is considered to be a representation only that, if accepted, the submitter will honor the obligations of the executed trade. *See, e.g.*, *U.S. v. Radley*, 659 F. Supp. 2d 803, 815 (S.D. Tex. 2009), *aff'd*, 632 F.3d 177 (5th Cir. 2011).

---

[2] "[I]t is not a violation of final [CFTC Anti-Fraud] Rule 180.1 to withhold information that a market participant lawfully possesses about market conditions. The failure to disclose such market information prior to entering into a transaction, either in an anonymous market setting or in bilateral negotiations, will not, by itself, constitute a violation of final Rule 180.1." *Id.*

4

7. Trying to discern a market participant's intentions from an order alone is a speculative endeavor at best. Futures markets bring together many different types of commercial and financial parties that have different opinions, points of view, business needs, challenges and financial objectives into trading anonymously with one another to hedge other transactions or to trade in futures alone. Indeed, a hedge fund and an oil company can have completely different intentions even when submitting orders for the same quantity of the same commodity at the same price. Recognizing that traders in the futures markets attempt to discern such objectives for their own gain or to frustrate rivals, the CEA has struck a balance that the government's theory of liability threatens to upset.

8. One of the principal tenets of trading is to protect the confidentiality of one's open positions, trading strategies, and intentions with respect to an order. It is commonly accepted that if a market participant's positions and objectives are known to others in the market, that information can be used by others to the participant's detriment by extracting better pricing from the participant in its trades. One consequence of this is that the trading intentions of market participants are routinely treated as closely guarded secrets. And there are times when a market participant, fearing that others might detect its trading intention, may enter some orders that are contradictory to its overall strategy yet designed to prevent others in the market from detecting its strategy. This is a common and legitimate phenomenon of trading in the futures markets.

9. The theory of liability underlying the indictment threatens these established norms. First, the contention that open, executable market orders by themselves can be misrepresentations of a market participant's intentions is inherently confusing because an executable order is, by definition, available for acceptance and can be taken and executed by any other market participant. Second, the government erroneously suggests that there is a duty to

5

disclose a market participant's intentions, that there might be a minimum period of time an order must be executable, and that an order represents something more than a commitment to honor the terms of the order if accepted by another market participant. All of these novel suggestions are contrary to the norms underlying the futures markets.

10. In very real terms, the indictment's characterization of an executable order threatens to introduce substantial legal uncertainty and confusion with respect to the legal duties of market participants. It opens the door for arbitrary enforcement of the wire fraud statute and vexatious private claims by losing traders based on contentions that another market participant failed to make adequate disclosure or "misrepresented" its intentions when entering an executable order. Such claims, if allowed, would be difficult to address at the pleading stage because they would be bound up with factual issues – *e.g.*, what a market participant's intentions were – to be decided by the trier-of-fact. *Compare Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 743 (1975). The government's theory also potentially could expose trading from years past to retroactive application of this new standard of wire fraud misrepresentation under the RICO statute (where the mail and wire fraud statutes are commonly pled as predicate acts to support the civil RICO claim). *See* 18 U.S. Code § 1961 (both mail fraud and wire fraud fall within the definition of "racketeering activity").

11. No court has approved of using the general wire fraud statute to criminalize a negotiating party's failure to disclose its future intentions or its subjective desire to enter into the transaction. The Court of Appeals for this Circuit has declared that, at least without much clearer direction from Congress, courts must be wary of criminalizing "[d]eception and misdirection" about a party's "values, priorities, [and] preferences" in negotiation because that is common and accepted aspect of negotiating. *See United States v. Weimert*, 819 F.3d 351, 355 (7th Cir. 2016).

Nor is there a need to expand wire fraud to protect futures markets because the CEA governs the futures market directly.

12. FIA recognizes that its request for leave to file an *amicus* brief comes after the close of briefing by the defendants. FIA retained counsel and acted promptly after it understood the potential implication to FIA's members of the government's position in this case. FIA respectfully submits that its perspective will be helpful to the Court as it considers the issues raised in the defendants' motion to dismiss. If granted leave, FIA requests that it be permitted to file its brief by February 21, 2019.

WHEREFORE, FIA respectfully requests leave to file a brief *amicus curiae* in support of the defendants' motion to dismiss, by February 21, 2019.

Dated: February 14, 2019

Respectfully submitted,

By: */s/Michael Dockterman*
Michael Dockterman
Steptoe & Johnson LLP
115 S. LaSalle Street, Suite 3100
Chicago, IL 60603
312.577.1300
mdockterman@steptoe.com

Charles R. Mills (Pro Hac Vice Pending)
Karen Bruni (Pro Hac Vice Pending)
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
202.429.3000
cmills@steptoe.com
kbruni@steptoe.com

*Counsel for Amicus Curiae Futures Industry Association*