IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 18 CR 00035 |
| | ) | |
| v. | ) | Judge John J. Tharp, Jr. |
| | ) | |
| JAMES VORLEY and | ) | |
| CEDRIC CHANU, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

The defendants' motion to compel disclosures concerning trading data [141] is granted in part and denied in part. The Government is required, by February 21, 2020, to: (1) identify the alleged "Primary Orders" in the 150 trading episodes it expects to present at trial; (2) to identify its "High Priority" episodes (defined below); and (3) to disclose the selection criteria it used in identifying potentially fraudulent trades. See Statement below for details.

## STATEMENT

The Government has identified 150 trading "episodes" as to which it intends to present evidence at trial. The identified episodes are time periods during which trading activity occurred; each identifies a span of time ranging from a few seconds (*e.g.*, episode 123, lasting 11 seconds) to more than half an hour (*e.g.*, episode 55, lasting 35 minutes and 20 seconds). The episodes span a period of more than five years, beginning on June 11, 2008 and running to July 9, 2013. In addition to the date of the episode and the time period defining each episode, the Government's list of these episodes identifies the product traded and the traders involved in each episode.

The Government has also produced a "displayed episode list" identifying a subset of 86 of the 150 trading episodes. This displayed episode list comprises the trading episodes about which the Government intends to ask specific questions during its case-in-chief. The displayed episodes comprise multiple trades; the example the defendants provide with their motion, Episode 14, includes 74 trades. *See* Motion, ECF No. 143, Ex. D. The balance of the trading episodes not included on the displayed episode list are trading episodes as to which the government intends some summary presentation and/or potential use in a rebuttal case.

The defendants have filed a motion to compel regarding the trading episodes the government has identified. First, the defendants seek identification of the alleged "Primary" and "Fraudulent" orders in each trading episode. Second, they seek to limit the number of the number of trading episodes as to which the government may present detailed evidence "to no more than

10." And third, the defendants seek disclosure of the selection criteria the government used to analyze the trading data. These three requests are discussed below.

### 1. Disclosure of the "Primary" and "Fraudulent" orders.

The Government has produced the data for the trading by the defendants during each episode.[1] As produced, that data did not identify the alleged "Fraudulent Orders" or "Primary Orders" by which the defendants allegedly attempted to move the market. See Superseding Indictment ¶¶ 4, 9. The defendants' first request in their motion is for an order compelling the Government to specifically identify those trades. The Government has, it is now agreed, identified the alleged "Fraudulent Orders" but it has not identified the alleged "Primary Orders." The Government provides no reason it should not be required to also identify the alleged "Primary Orders," and since they were an integral part of the alleged scheme, the Court agrees that they should be specifically identified. As this is information that has, presumably, already been identified by the Government, it should be able to provide that information to the defendants promptly.

### 2. Limitation of Trading Episodes the Government May Present in Its Case-in-Chief.

The defendants also seek an order limiting the number of trading episodes the government will "march through"—that is, present detailed evidence about the trading activity included within the episode—during its case-in-chief and requiring the government to identify that limited number of episodes. The defendants essentially charge that the government is playing hide-the-ball by refusing to identify the trading activity on which it will focus during its case-in-chief, forcing the defendants to waste time, resources, and money analyzing trading data that the government will not actually be highlighting in its case. They maintain that it is unrealistic for the government to represent that it will present detailed evidence about 86 trading episodes during the trial and point for corroboration to the *Flotron* trial, in which the government presented detailed information about fewer than 10 trading episodes during a one-week trial. The defendants maintain that the government cannot hope to present evidence of 86 episodes in a case-in-chief it has previously estimated will last only three to four trial days. *See* Tr. 11/4/19 at 20:1-3. In light of "the complexity of the trading records, the need to review related market data, and the expert analysis required," as well as the age of the trades, the government should be limited, the defendants say, to presenting no more than 10 of the 86 displayed episodes.

For its part, the government maintains that it can and likely will highlight specific trading activity within the 86 displayed episodes. The government has explained that it intends to highlight a substantial number of trades to show the variations employed by the defendants in placing fraudulent orders. Specifically, the government has represented that it intends to offer trading episodes illustrative of 7 types of trading scenarios: (1) Vorley trading on both sides of

---

[1] It is not clear to the Court whether Exhibit D to the defendants' memorandum was produced by the government or was created by the defendants based on raw data produced by the government, but the Court understands there to be no dispute that the government has produced, in some accessible form, the trading data relating not just to the displayed episodes but to all of the 150 trading episodes on its episode list.

the spoof; (2) Chanu on both sides; (3) Liew on both sides; (4) Vorley and Chanu; (5) Vorley and Liew; (6) Chanu and Liew; and (7) trading sequences accompanied by chat communications. *See* Tr. 10/31/19 at 22:9 – 23:3; Tr. 11/26/19 at 14:5-15. The government has also asserted that it needs to present evidence of a significant number of trading episodes of each type "to make the point this is not aberrational, this wasn't one-off, this wasn't something that happened one time over two years or five years." Tr. 10/31/19 at 23:4-18 ("I think we need a fair number of episodes falling into each of those seven different buckets. That would be our case-in-chief."). The government acknowledges, however, that it "does not expect to slog through every detail of 86 episodes at trial," Resp., ECF No. 155, at 6, and anticipates that it will typically highlight the entries of the alleged Primary and Fraudulent Orders, the execution of the Primary Order, and the cancellation of the Fraudulent Order. As such, the government insists that its identification of 86 episodes to present during its case-in-chief is both necessary and feasible.

In identifying 86 "episodes" to feature in its case-in-chief, the Court does not believe that the government has evaded the direction to identify the episodes that it intends to "march through" during its case-in-chief. There is nothing inherently unreasonable in the selection of 86 trades out of thousands the government has examined to demonstrate the chronological and substantive scope of the alleged scheme. That the government featured substantially fewer episodes in the *Flotron* trial does not necessarily show that the government's aspirations to cover that much ground are unrealistic; indeed, given that the government lost the Flotron trial, it is perhaps not surprising that the prosecutors have reconsidered the manner in which they will present their evidence.[2] Nor does the Court agree that in declining to further limit the presentation of its case, the government has impinged on "the federal rules, fundamental fairness, or the right to present a defense." Reply, ECF No. 156, at 3. The defendants have had notice of the 150 trading episodes the government will maintain were fraudulent, and of the 86 the government would highlight in its case-in-chief, since November 26, 2019. That timetable provides sufficient notice with regard to the evidence the government intends to present.[3]

It would, in the Court's view, be entirely arbitrary to limit the number of trading episodes that the government may present during its case-in-chief to some number less than 86. At the same time, the defendants' concern about having to prepare to meet evidence that may never be presented at trial also warrants accommodation. The Court can provide that accommodation, however, by requiring additional disclosure rather than imposing an arbitrary cap on the evidence the government may present to prove its case. The government has doubtless identified, within each of the trading scenarios it seeks to illustrate, a prioritization of the trading episodes it will employ in presenting those trades. To mitigate the prejudice that would inure to the defendants in the event that the government has overestimated its ability to streamline its presentation of each trading episode (resulting in presentation in its case-in-chief of only some subset of the 86

---

[2] One of the reasons the government reasonably invokes to justify its need to present so many trading episodes is to combat the "cherry-picking" defense mounted in *Flotron,* a defense that the defendants in this case have already suggested they may employ and which is the basis for their further request in this motion for disclosure of the selection parameters employed by the government to identify an initial collection of the defendants' trades to analyze.

[3] That said, it remains open to the defendants to seek to reset the trial date if they believe that they cannot adequately analyze the displayed episodes in advance of the current trial date.

displayed episodes), the Court will require the government to identify its prioritization of those trades in its expected evidentiary presentation. As discussed above, the government has identified 7 different types of trading it seeks to illustrate; requiring the government to identify the first two trading episodes that it intends to present to illustrate each trading pattern (the "High Priority" trading episodes) would identify for the defendants the trades that the government is almost certain to use and will spare them (if they are confident in their assessment that the government cannot realistically present more than 10 or so trading episodes) from devoting resources to the analysis of trading episodes that they have asserted will not actually be part of the government's case-in-chief. The Court will then require the government to begin its evidence with respect to a particular trading scenario with evidence relating to the High Priority episodes probative of that alleged trading pattern.

### *3. Disclosure of the Selection Criteria Employed by the Government to Analyze Trading Data.*

The defendants also seek disclosure of the selection criteria that the government used to identify the initial collection of approximately 3,000 trading episodes that it culled from the records of the defendants' trading activity. In addition to presenting detailed evidence of trading episodes (discussed above), the defendants point out that the government also intends to produce "bulk" evidence as to which it will argue that the sheer number of identified episodes (150) makes any non-spoofing explanation unlikely. The defendants argue that, short of taking on the bona fides of each trading episode, they need to know the selection criteria the government used to identify these episodes; analysis of that criteria is necessary, they contend, to ensure that the government's collection of trading episodes is not just the product of "cherry-picked" and biased selection criteria. They assert that the "algorithmic detection parameters" (*i.e.*, filters) the government used "caused the government to focus on only a narrow subset of the trading data, and potentially to ignore other trading data that undermines their [sic] case."

The government responds that it did not use objective selection criteria to identify its list of 150 trading episodes. Rather, it used selection criteria only to identify a collection of about 3,000 trading episodes, which it then analyzed individually to assess whether they were probative of fraudulent trading. A critique of the selection parameters is irrelevant, according to the government, because none of the trading episodes were selected for inclusion on the list of 150 trial episodes by virtue of such criteria. What matters, the government argues, is not how or why the government came to review a particular trading episode, but whether that episode is probative of fraudulent trading.

The Court was inclined to agree with the government's view when this issue was discussed at the November 26, 2019 status hearing. *See* Tr. 11/26/19 at 31:1-7 ("The question is not how did you identify 150 problematic trades buy why are these 150 trades problematic."). But on further consideration, the Court concludes that the government's argument begs the question of whether the selection criteria systematically included, or excluded, information that would potentially be relevant to a determination of whether a particular trading episode was fraudulent. Suppose, for example, that market volatility affects the pricing of legitimate market orders and that the spread between bids and offers diverges more significantly as volatility

4

increases.[4] If that were so, and if the government's selection criteria did not take market volatility into account by, for example, excluding trades during high volatility periods, the government's pool of potentially fraudulent trades might not distinguish between unusual bid/offer spreads indicative of market volatility and those indicative of spoofing. And *a fortiori*, neither would the list of trading episodes distilled from that initial pool—unless the subjective analysis conducted by the government took market volatility into account.

Hence the defendants' desire to fight bulk evidence with bulk evidence. As noted above, the government intends to present the balance of the 150 trading episodes not covered in detail during its case-in-chief in summary fashion; the defense maintains that it should be permitted to challenge that evidence in bulk fashion as well. In the example above, that would mean by demonstrating that the selection criteria failed to consider volatility—a factor that might provide a legitimate explanation for unusual price movements that the government attributes to fraudulent intent. Unless the defendants know the selection parameters, however, they cannot explore whether there is a basis to make such an argument. Accordingly, the Court concludes that disclosure of the selection criteria initially used by the government to identify potentially fraudulent trading episodes is warranted.[5]

Date: February 12, 2020

John J. Tharp, Jr.
United States District Judge

---

[4] The Court is not suggesting that there is, in fact, a correlation between market volatility and bid/offer spreads. This is merely a hypothetical assumption offered for illustrative purposes.

[5] This is merely a disclosure ruling; it is not a ruling as to the admissibility of any evidence or the propriety of any argument that may be predicated on the selection criteria the government employed.