IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 18 CR 00035 |
| | ) | Judge John J. Tharp, Jr. |
| v. | ) | |
| | ) | |
| JAMES VORLEY and | ) | |
| CEDRIC CHANU, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Defendant James Vorley has moved to suppress statements he made during an interview conducted by two Deutsche Bank employees on March 17, 2015. He maintains that his statements during this interview were compelled by the government in violation of the Fifth Amendment. Because Mr. Vorley's statements were not "compelled" within the meaning of the Fifth Amendment, however, his motion to suppress is denied.

## BACKGROUND[1]

Mr. Vorley started as a spot gold and silver trader on Deutsche Bank's precious metals desk in May 2007 and worked at the Bank through about March 19, 2015. Sometime in 2009, Deutsche Bank began an internal investigation to determine whether traders were engaging in spoofing trades; that investigation continued through at least the March 17, 2015 interview that is

---

[1] The facts set forth here are, to the Court's understanding, undisputed. They are taken from the defendant's motion and the exhibits attached thereto, including the transcript of the March 17, 2015 interview that is the subject of the motion. Because the Court concludes that Mr. Vorley's statements were not compelled, facts pertinent only to the question of whether the March 17, 2015 interview constitutes state action by the government are omitted.

the subject of Mr. Vorley's motion. Ultimately, the Bank's investigation reviewed trading activity spanning the period from January 1, 2007 through August 17, 2013.

During the course of the Bank's investigation, Mr. Vorley was interviewed nine times. The first three interviews took place in 2013 (August 16, November 15, November 22). Following these interviews, in early 2014 the Bank convened a disciplinary hearing panel to address, among other issues, instances in which Mr. Vorley allegedly "bluffed" or "spoofed" while engaging in market transactions around the time of the daily fixes in the precious metals markets. On February 27, 2014, the panel determined that Mr. Vorley had used unprofessional language in some of his communications but had not engaged in misconduct that warranted disciplinary action.

Nevertheless, Mr. Vorley was interviewed by Bank investigators three more times in 2014 (May 9, May 23, and October 9). During 2014, Deutsche Bank decided to eliminate its precious metals trading desk as part of a strategic restructuring. In late November 2014, Deutsche Bank informed the members of its precious metals desk of its decision to discontinue the precious metals trading business and in December the Bank gave Mr. Vorley formal notice that his employment would be "terminated by reason of redundancy" as of March 11, 2015. In connection with this termination, the Bank offered Mr. Vorley a severance package worth approximately £119,000. He had also accrued deferred compensation of about £400,000.

In the meantime, in late November 2014, the United States government began its own investigation of spoofing by the Deutsche Bank precious metals desk. On November 25, 2014, the Antitrust Division of the Department of Justice issued a request for documents to Deutsche Bank as part of what all acknowledge was a government investigation of spoofing in trading on the precious metals markets. The Commodities Futures Trading Commission ("CFTC") issued a

subpoena on February 3, 2015 similarly seeking documents from the Bank. The Bank produced documents to the Antitrust Division in April 2015 and to the CFTC a few weeks later in May.

Deutsche Bank subsequently interviewed Mr. Vorley three more times (on February 9, February 19, and March 17, 2015). After the two February interviews, Deutsche Bank issued another "Invitation to Disciplinary Investigation Meeting" to Mr. Vorley on March 9, 2015. Ex. J. The letter advised Mr. Vorley that in connection with the Bank's investigation into its precious metals trading activities, information had emerged suggesting that Vorley may have engaged in inappropriate ordering and trading activity. "In particular," the letter advised, "there is a instance [sic] of trading we have identified . . . on 16 March 2011, during the course of which you said that you were '*spoofing it up / ahem ahem*'." (italics in original). The Bank advised that it wished to question Vorley concerning this trading activity and supplied a number of documents relating to this episode. It further advised that it had identified other examples of similar trading conduct "which we would like to discuss with you in addition to your actions on 16 March 2011."

In addition to advising Mr. Vorley of the intended subject matter of the interview, the letter also provided information about procedural aspects of the interview. It stated that Vorley was "required to attend" the interview, which would be conducted by relevant Bank personnel, and that "a note taker will available [sic] to record and transcribe the meeting." It advised that Vorley could be accompanied to the interview by a "Companion"—that is, a work colleague or union official. Most critically, for purposes of this motion, the letter acknowledged Vorley's impending termination from the Bank, advising that the investigation would go forward "regardless of whether your employment has terminated." If the investigation concluded that Vorley had breached the Bank's trading policy, it went on to explain, "then notwithstanding the fact that your employment will have already terminated, the relevant Disciplinary Panel will be required to make

3

findings as to appropriate sanctions that would otherwise have applied had you remained an employee and also as to the impact of any such conduct on any outstanding deferred compensation. As such, you are strongly encouraged to participate fully and openly in the Disciplinary Investigation . . . ."

After receiving the disciplinary interview letter, Mr. Vorley consulted with his attorneys. Tr. at 22G, 27F.[2] He was advised by counsel to participate in the interview but to discuss only the March 16, 2011 transaction for which the Bank had provided data. His attorneys advised him not to "talk about any of the others." Tr. at 27F. In advance of the interview, Mr. Vorley prepared a written narrative explaining the March 16, 2011 trading sequence. *See* Tr. at 7G (Vorley offering "to read what I've prepared"); Tr. at 7H ("I've written what I—I've looked at the stuff and I've written sort of setting out —"); Tr. at 9B (Fawcett asking Vorley to slow down "instead of whizzing through this, because obviously you're reading it very quickly"); Tr. at 12B (Lissman asking Vorley to slow down: "I appreciate you writing this letter . . . but it's going way too quick for my pen"); Tr. at 28B (Vorley offering copies of what he had prepared).

The disciplinary interview took place on March 17, 2015. The Deutsche Bank participants were Sarah Fawcett, the Director of the Bank's employee relations office, and Robert Lissman, a compliance officer for the Bank.[3] Mr. Vorley attended the meeting alone; although he had counsel, his lawyer did not attend the interview and Vorley did not avail himself of the opportunity to have a "Companion" with him either. The interview, which lasted about 90 minutes, was recorded and

---

[2] Citations to "Tr." are to the transcript of the disciplinary interview. The citations include the page number and nearest alphabetical designation on the right-hand side of the page: "22G," for example, refers to page 22 of the interview transcript and the dialog closest to the "G" on the right-hand side of the page.

[3] Although it is not evident from the transcript, Lissman participated in the interview by phone, according to information that Ms. Fawcett provided to the FBI several years later. Ex. K.

transcribed. Mr. Vorley had the opportunity to review the initial transcription for accuracy and did so within a couple of days of the interview.[4]

From the outset of the interview, Mr. Vorley endeavored to offer his explanation for the March 16, 2011 trading sequence that had been highlighted in the disciplinary hearing letter. He repeatedly suggested that the most efficient course for addressing the matter would be for him to present his prepared narrative to the Bank's representatives. *See*, *e.g.*, Tr. at 1D ("Right, if you don't mind, I've done some prep."); Tr. at 2B ("I've done some prep work . . . . If you want me to just take you through it, I'm happy to just—I've obviously been able to analyse and sit and look at things and sort of offer explanations and stuff."); Tr. at 2C ("I've done some preparatory work that I'd like to take you both through."); Tr. at 5D ("As I say, I've done a bit of preparatory work to take you through things as I see them. They might be a bit more useful and give you a bit more background."); Tr. at 6A ("I can run you through that as part of this"); Tr. at 7G ("If you'd like me to read what I've prepared, it might answer questions that you have, or it might lead to a few."). Mr. Vorley answered all of the questions put to him concerning the March 16, 2011 trade and stated repeatedly that doing so was consistent with the cooperation he had provided to the Bank during the prior two years. *See, e.g.,* Tr. at 20F ("I'm here to answer your questions [about the March 16, 2011 trading], and I'm here to be as helpful as I have been all through this process as possible.").

---

[4] Mr. Vorley claims not to have known the interview was being recorded. That assertion is difficult to credit in view of the multiple references during the interview to the fact that a transcript of the interview would be prepared and the disciplinary letter's statement that a "note taker" would "record and transcribe the meeting." Ex. J. at 3. In any event, Mr. Vorley's motion does not contest the accuracy of the transcript, which is included as Exhibit O to the motion, and Mr. Vorley makes no argument that his statements should be suppressed because he did not understand that the interview was being recorded.

Notwithstanding his willingness to discuss the March 16, 2011 trading sequence, and consistent with the advice he had received from his attorneys, Mr. Vorley drew a firm line around that trade in defining the scope of his cooperation and willingness to answer questions. Mr. Vorley was entirely unwilling to answer questions about other trades, which had not been specifically identified in the interview letter and for which the Bank had not provided him with the relevant data. As soon as Fawcett and Lissman attempted to move on to discuss other trades, Mr. Vorley repeatedly and unequivocally refused to answer. Here is the initial exchange (Tr. at 18D):

SF: We've got some data, because we refer to another instance in the letter, but you don't have that, so we've got some of that data that we can go through —

JV: I'm not going to sit here and comment on things that have so far not been available to me.

SF: Well we'll show them to you, we can ask some questions, answer to your best recollection —

JV: I'm not going to comment on anything. As you can see, everything is four years old and to sit here and pull things that are four years apart. It's tough enough [inaudible] on an ad-hoc basis.

RL: Shall we just —

SF: Let's go through the questions, and do your best.

JV: I'm not going to comment on anything.

SF: Well let's just show you the data.

JV: No.

SF: Well you don't want to see the data?

JV: No.

SF: I think what we should do is show you the data, and tell you —

JV: No. I'm here to discuss the details in the pack,[5] and not willing to comment on similar examples which up to this point have been unavailable to me.

---

[5] The Court understands references during the interview to "the pack" to refer to the March 9, 2015 letter and the materials it contained pertaining to the March 16, 2011 trading sequence.

That the interview letter had stated that the Bank wanted to discuss "a number of further examples of you engaging in similar trading conduct in 2011" did not sway Mr. Vorley (Tr. at 18H; Tr. at 21G):

| | |
|---|---|
| SF: | Okay, well in the letter that we sent to you, we referred [to] there being other examples, because they are numerous. But what I want to do is — |
| JV: | I know but, why hadn't I been provided? — |
| SF: | give you the dates, show you the data. |
| JV: | I'm not going to talk to you about other data. |

* * *

| | |
|---|---|
| SF: | But in the pack and in the letter — |
| JV: | I understand that. |
| SF: | It says specifically—hang on, let me finish. |
| JV: | Do you have all of the available data? |
| SF: | Can I just finish what I'm going to say? The Bank has also identified a number of further examples of you engaging [in similar][6] conduct which we would like to discuss with you, in addition to your actions. That was in the letter, so you knew in advance of coming here today — |
| JV: | No, it was a request, and I replied to that request. |
| SF: | Well, you came here — |
| JV: | To discuss the pack. |
| SF: | And the letter was included in the pack, and the letter says there are additional matters. |
| JV: | I'm not here to discuss anything other than that. |

---

[6] The transcript reflects that the transcriber was unsure of the words between "engaging" and "conduct" and supplied "[in incriminating?]" as a guess. Because Ms. Fawcett was apparently reading directly from the interview letter at that point, the Court has substituted the words from the letter ("in similar") as likely more accurate.

Mr. Vorley's position did not change when the Bank asked him merely to listen to their questions about other trades and confirmed that he was under no obligation to answer those questions (Tr. at 19A; Tr. at 20B; Tr. at 20E):

| | |
|---|---|
| SF: | We'll go through the process of showing—if you want to say you're not going to answer any questions that's fine. But let us show you the data. |

* * *

| | |
|---|---|
| SF: | That's your prerogative, to choose not to answer the questions, but in the letter that we sent you , we did say that there are other examples. What we would like to do is show you those examples— |

* * *

| | |
|---|---|
| JV: | If you wanted to give me the opportunity to look at it, you could have sent it as part of the pack, surely? |
| SF: | Fine, but be that as it may, we have data. If you take a look at it — |
| JV: | I'm not going to look at the data. . . . My position here is very clear. I hope you respect that. |

Mr. Vorley explained that he was willing to answer questions about the March 16, 2011 trade because he understood that his reference to spoofing had sounded alarms and because the Bank had supplied at least some of the available information about what was happening on the trading desk at the time (Tr. at 20A; Tr. at 25H):

| | |
|---|---|
| JV: | I understand why I was provided with this pack. I understand the terminology that was used in the conversation with this pack, and why it became—and I understand that if that term hadn't been used, I doubt I'd be sitting here talking to you about this pack. So I've come here and addressed the pack that you sent me. You must understand that to sit there and—you know, I've had a week to look at this and to go through it, and to sort of analyse it and think about it. To sit here and put trade data in front of me—I'm not going to comment on it, and I don't think it is a very good way to conduct this. |

* * *

8

> JV: The fact that your letter referred to spoofing, so I understand that there's spoofing in the conversation—so I totally get it, and I've addressed this all the way through . . . ."

Mr. Vorley also complained of the unfairness of the Bank's expectation that he would engage in such a process given his past cooperation (Tr. at 19E; Tr. at 24H; Tr. at 25H):

> JV: I don't think that's fair.
>
> * * *
>
> JV: I've been here for two years, helping. I've never shirked my responsibilities. I've attended every meeting. I've been fully cooperative at all times, and even at this point when I've left the Bank and you send me something that you need comment on, I don't sit there and go, "No". I come up, I look at it. I take it very seriously, and I come here to provide you with a list of question and be helpful, and I walk [in] here and it's almost like, "Oh, we've got this as well. What's that? You're asking me to do the impossible.
>
> * * *
>
> JV: As I say, I've been involved in this for two years. Two years, I've done nothing but cooperate.

Mr. Vorley's cooperation with the Bank came to an end that day. Rather than cooperate with the Bank's efforts to explore trades other than the March 16, 2011 trade, Mr. Vorley refused to discuss them. In doing so, he shut down the interview; the efforts of Fawcett and Lissman to convince him to at least entertain their questions about other trades were entirely unsuccessful. And although it appears that there was some continuing dialog between the Bank and Vorley about providing additional data for Vorley to review, Vorley never submitted to a further interview by the Bank.

Notwithstanding Mr. Vorley's refusal to answer questions about trading activity other than on March 16, 2011, the Bank's investigators did not mention his deferred compensation during the interview. When Vorley, in closing, inquired about a time frame for wrapping up the investigation,

9

Fawcett eschewed the opportunity to use Vorley's financial concerns as leverage to convince him to answer the additional questions that he had refused to entertain. Instead, she empathized with his "need for closure" (Tr. at 28H – 29A):

JV:        I don't have employment now. I don't have a job and I've got no money coming in. I can't actually seek a job because I haven't agreed [to] a settlement with you guys. I'm really in a tough situation.

SF:        I completely understand, and I think what we are trying our best to do is strike a balance between making sure that we have a fair and balanced due process, and that we also bring things to resolution for you as soon as possible, so that you can move on. That is in the forefront of our minds, and we are working very hard to do that. And it is unfortunate, as I'm sure you know, in a big organization like this that decisions don't always get made quickly. As I say, a lot of it will depend on other lines of inquiry, if any, that we choose to undertake, and if there is more data to be reviewed, other people to be interviewed, and all of that can take time. But I will try and keep you informed as much as possible about what's happening, and let you know as soon as we can.

## ANALYSIS

The Fifth Amendment, in relevant part, provides that no person "shall be compelled in any criminal case to be a witness against himself." This prohibition is in play here because the government seeks to introduce statements made by Mr. Vorley in its case-in-chief at the trial of this matter. "It has long been held that [the Fifth Amendment] not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984). Mr. Vorley claims that he was compelled, by the United States

government, to answer the Bank's questions during the interview and that use of those statements at trial would therefore violate his Fifth Amendment privilege against self-incrimination.[7]

The threshold issue presented by Mr. Vorley's motion, then, is whether his statements to the Deutsche Bank investigators during the March 17, 2015 interview were "compelled" within the meaning of the Fifth Amendment. The privilege against compelled testimony against oneself applies only to compulsion by the government, *see generally Blum v. Yaretsky,* 457 U.S. 991 (1982), but if the statements were not compelled then it does not matter if the Bank's personnel were acting at the behest, whether express or implied, of the Government in interviewing Mr. Vorley on that occasion. There is no violation of the Fifth Amendment in asking a suspect in a non-custodial setting to incriminate himself. "The [Fifth] Amendment speaks of compulsion. It does not preclude a witness from testifying voluntarily in matters which may incriminate him." *Monia,* 317 U.S. 424, 427 (1943).

**I. Mr. Vorley was not compelled to answer the Bank's questions as a matter of fact.**

It is indisputable that Mr. Vorley was not "compelled" to answer the Bank's questions during the March 17, 2015 interview: he refused to answer any questions about his trading activity other than those concerning a single trading sequence in which he engaged. In view of his persistent refusals, Mr. Vorley's contention that he had no choice but to answer the Bank's questions given the risk that he would lose substantial deferred compensation lacks any merit. Mr. Vorley answered the questions he was willing to answer and refused to answer those that he did not. Having amply demonstrated his willingness and ability to refuse to answer the Bank's questions—and having ended the interview as a result—Mr. Vorley cannot credibly claim that he

---

[7] Mr. Vorley's motion does not identify any specific statements during the interview that it seeks to suppress as "compelled." His argument is that all statements made during the interview were compelled.

had no choice but to do the Bank's bidding. Mr. Vorley plainly did not answer the questions he did because he believed he would lose his deferred compensation if he did not; were that the case, he would have answered the Bank's questions about his trading on other occasions in 2011 as well.

Not surprisingly, the Government makes this elementary point in its response brief. Mr. Vorley offers no reply other than to assert that his refusal, on the advice of counsel, "to answer questions on the fly about matters that had not been described in the bank's letter does not render his earlier statements on the matters that were described in the letter any less coerced." Reply at 13. But plainly it does. Vorley's position that given the risk of losing his deferred compensation, he had no choice but to appear for the interview and answer the Bank's questions about the matters raised in the letter is simply untenable given the indisputable fact that he refused to answer any questions about his trading conduct in 2011 other than those concerning a single trading sequence on March 16 of that year. The Bank's disciplinary letter expressly stated that the Bank's inquiry was broader, and that it had "also identified a number of further examples of you engaging in similar trading conduct in 2011, which we would like to discuss with you *in addition to your actions on 16 March 2011*." Ex. J. at 3 (emphasis added). Mr. Vorley does not explain (and the Court cannot fathom) why Mr. Vorley believed that refusing to answer the Bank's questions about trading on March 16, 2011 would mean the loss of his deferred compensation while refusing to answer questions about the other "similar trading conduct" in 2011 the Bank wanted to explore would not. Mr. Vorley can't have it both ways. *See*, *e.g.*, *Murphy*, 465 U.S. at 438 (1984) (that defendant "apparently felt no compunction" about denying some criminal conduct while admitting other conduct "strongly suggests that the 'threat' of revocation did not overwhelm his resistance").

To be sure, Mr. Vorley provided reasons during the interview why he would not answer questions about trades other than on March 16, 2011. He made it pellucid that he did not believe

that it was fair for the Bank to seek answers to those questions without providing him with all of the relevant data and information relating to the other trades in advance of the interview and that his attorneys had instructed him (whether for that reason or others) not to talk about any other trades. But the question here is not whether Mr. Vorley had good reasons or poor reasons not to answer the Bank's questions; the question is whether he had a choice not to do so. Obviously, he did, and he exercised that choice in refusing, for whatever reasons, to answer questions that he was not inclined to answer. That he consulted with counsel before the interview and invoked their advice in refusing to answer questions confirms, rather than undermines, Mr. Vorley's freedom of choice in responding to the Bank's disciplinary letter.

The letter's statement that Mr. Vorley's attendance at the March 17 investigatory meeting was "required" does not suggest otherwise. As an initial matter, Mr. Vorley explained during the interview that he regarded the letter as "a request," Tr. at 21H, but the letter's statement that Mr. Vorley's attendance was "required" is beside the point in any event. The issue is not whether Mr. Vorley was "required" to attend the meeting; it is whether statements that he made during the meeting were compelled. Mr. Vorley's choice to answer questions about one trading sequence but not others shows that he was not compelled to answer questions, and the Bank's investigators expressly and repeatedly confirmed that Mr. Vorley did, in fact, have the option not to answer any of their questions. When he objected to answering questions about trades other than the March 16, 2011 sequence, the Bank's investigators asked Vorley to let them at least show him the data and acknowledged that he was not required to answer their questions. *See*, *e.g.*, Tr. at 19A ("if you want to say you're not going to answer any questions that's fine"); Tr. at 19F ("if you choose not to answer, that's your prerogative"); Tr. 20B ("that's your prerogative, to choose not to answer the questions"). Mr. Vorley refused, however, to listen to the information that the Bank offered to

provide, even when (the transcript makes clear) the investigators were frustrated and annoyed by his recalcitrance. And it bears noting that, despite their frustration and annoyance, at no point during the interview—not even at the conclusion when Mr. Vorley pressed for a prompt closure to the investigation—did the Bank's investigators suggest that in refusing to answer their questions, Mr. Vorley was prolonging the investigation and courting adverse action by the Bank regarding his deferred compensation.

The point is a simple one: the risk of losing his deferred compensation did not compel Mr. Vorley to make any statements during the March 17, 2015 interview; had that risk been sufficient to compel him to speak even at the risk of self-incrimination, Mr. Vorley would not have shut down the interview rather than answer questions about all but one trading episode in 2011. As an issue of fact, the statements Mr. Vorley made during the March 17 interview were not compelled.[8]

**II. Mr. Vorley was not compelled to answer the Bank's questions as a matter of law.**

Even had Mr. Vorley believed that he had to answer questions about his trading on March 16, 2011 (but no others), that belief was objectively unreasonable because the mere possibility that the Bank would take some adverse action with respect to his deferred compensation is not, as a matter of law, sufficient to constitute compulsion within the meaning of the Fifth Amendment.

Relying on *Garrity v. State of New Jersey*, 385 U.S. 493 (1967), Mr. Vorley asserts that he answered questions during the March 17, 2015 interview only because he was required to attend

---

[8] An evidentiary hearing is not required. The evidence of Mr. Vorley's contention that he "had no choice but to attend the interview and answer questions about the allegations in the letter" is before the Court in the form of Mr. Vorley's affidavit. ECF No. 146-19 at ¶ 10. The contrary evidence, consisting primarily of the notice of interview letter and the transcript of the interview are similarly of record. In view of the indisputable facts of Mr. Vorley's repeated, adamant, and unequivocal refusals to answer questions about any of the "further examples of you engaging in similar trading conduct in 2011," Ex. J at 3, the Court cannot credit Mr. Vorley's claim that he "had no choice" but to answer the Bank's questions.

the interview on penalty of losing over £400,000 in deferred compensation.[9] In *Garrity*, several police officers testified in an investigation concerning alleged fixing of traffic tickets after being warned that they had a right not to testify if doing so would tend to incriminate them but that they would lose their jobs if they so invoked that right. *Id*. at 494. A state law in effect at the time required termination of the employment of any police officer (or other public official) who invoked his Fifth Amendment rights in any official investigation or criminal proceeding. *Id*. at 494 n.1. Observing that "[t]he "choice imposed on petitioners was one between self-incrimination or job forfeiture," the Supreme Court held that requiring such a choice was unduly coercive and that the admission of statements secured by "threat of removal from office" could not be deemed voluntary and their admission violated the officers' Fifth Amendment privilege against compelled self-incrimination. *Id*. at 497-98, 500.

*Garrity*, however, is easily distinguished. To begin, Mr. Vorley was not, as were the police officers in Garrity, presented with the choice of answering questions or losing his job: his employment with the Bank had already been terminated for reasons that had nothing to do with the interview in question (or even the investigation). Recognizing as much, Mr. Vorley contends that what he stood to lose if he refused to answer questions—some £400,000 in deferred compensation—was just as coercive as the loss of employment faced by the police officers in Garrity.

Perhaps so, but *Garrity* is distinguishable for a more substantial reason. In *Garrity*, the penalty for invoking the Fifth Amendment privilege was certain. The police officers knew that they would lose their jobs if they invoked the Fifth Amendment: they were expressly told so and

---

[9] Mr. Vorley makes no argument that the circumstances of the interview itself were coercive, so it is not necessary to address in detail the various factors cited by the Government in arguing that the interview did not take place in a coercive environment.

state law required their removal if they claimed the privilege. By contrast, whether Mr. Vorley faced any risk to his receipt of deferred compensation if he refused to answer the Bank's questions was entirely speculative. Vorley contends that the letter he received concerning the interview made the threat to his deferred compensation "explicit" in that "the bank deliberately highlighted the potential forfeiture of deferred compensation in order to coerce Mr. Vorley into making statements about his alleged misconduct," Reply at 9, but that characterization of the letter conflates the potential consequences to Vorley if the investigators determined that he had engaged in conduct that violated the Bank's trading policies with the notion of a penalty that would be imposed for failing to participate in the interview.[10] The disciplinary letter cautioned Vorley about the former; it said nothing at all about the latter. The letter advised Mr. Vorley that, notwithstanding the fact that he was no longer an employee, the investigation would continue and, "***[i]f it is found that you have committed conduct in breach of a Bank policy***," the Disciplinary panel would consider "***the impact of any such conduct on any outstanding deferred compensation***." Ex. J at 4 (emphasis added). And, indeed, in explaining that the disciplinary panel would consider action concerning deferred compensation only upon a finding that Mr. Vorley had violated Bank policy, the letter confirms that such action would not automatically follow from a refusal to respond to the Bank's questions. *See United States v. Indorato*, 628 F.2d 711, 716 (1st Cir. 1980) (in finding statements were not compelled, noting that "[t]he language used in the rules providing that for violation a member may be tried and upon conviction may be subject to dismissal or other disciplinary action

---

[10] It is also impossible to square with the fact that neither of the Bank's investigators said anything during the interview about Vorley's deferred compensation, even when he pressed them for information about the timetable for concluding the investigation and explained his financial concerns. Had the Bank been attempting to coerce Vorley into answering questions, it is difficult to imagine that the investigators would not have tried to use Mr. Vorley's financial vulnerability as leverage to convince him to answer questions about the additional trading activity they wanted to explore with him.

suggests that dismissal would not have automatically followed defendant's invocation of the fifth amendment."). Vorley acknowledges that the reference to deferred compensation is "not phrased as an automatic consequence of his failure to participate" in the interview, Reply at 9, but that grudging acknowledgment skirts the more fundamental point: the risk to his deferred compensation is not phrased as a consequence of his failure to participate at all. The letter makes the issue of deferred compensation a function of whether Vorley violated Bank policy, not whether he participated in the interview.

*United States v. Ambrose*, 668 F.3d 943 (7th Cir. 2012), illustrates the distinction. There, the defendant, a Deputy United States Marshal, claimed he was coerced into making incriminatory statements because he feared losing his job if he did not talk to the investigating officials. The Seventh Circuit held that there had been no coercion, however, despite the fact that those officials had repeatedly made statements that highlighted the possibility that he could lose his job. *Id*. at 960 ("Fitzgerald repeatedly informed him that the decision as to Ambrose's job was not in Fitzgerald's control"; "Fitzgerald responded to those inquiries by emphasizing that Ambrose was possibly facing prosecution, and that he was not the decisionmaker regarding Ambrose's employment but that it would seem to be a tough road for him to retain it"). In so holding, the Seventh Circuit distinguished the officials' statements adverting to the possibility that the defendant might lose his job as the result of misconduct from coercive threats to terminate the defendant from employment if he refused to cooperate: "Any fear of job loss that Ambrose experienced stemmed from the nature of Ambrose's conduct, which involved the use of his position for criminal acts." *Id*. The same is true of Mr. Vorley's fears about the possible loss of his deferred compensation package.

The disciplinary letter, of course, does not foreclose the possibility that the Bank would penalize Mr. Vorley for refusing to participate in the interview. But *Garrity*—in which the penalty for invoking the privilege was certain—simply does not address situations, like this one, in which there is a less-than-certain risk of a substantial adverse consequence to invoking the Fifth Amendment privilege. The Supreme Court made this point in *Minnesota v. Murphy*, 465 U.S. 420 (1984). Murphy was a probationer who confessed to a rape and murder some seven years earlier in response to questioning about those crimes by his probation officer. Murphy filed a motion to suppress his statements to the probation officer as having been obtained in violation of his Fifth Amendment rights, claiming that he had no choice but to confess because the conditions of his probation required him to report to his probation officer as directed and to be truthful with the probation officer "in all matters." *Id.* at 422. The Minnesota Supreme Court held for Murphy, reasoning that use of the statements violated the Fifth Amendment because Murphy was compelled to answer the probation officer's questions given the requirements that he meet with the officer and answer her questions truthfully. *Id.* at 425.

The Supreme Court reversed. Acknowledging "so-called 'penalty' cases" like *Garrity*, in which states had sought to induce witnesses to forgo the Fifth Amendment privilege by threatening to impose severe economic or other employment-related sanctions "capable of forcing the self-incrimination which the Amendment forbids," 465 U.S. at 434, the Court held that Murphy had not been presented with that Hobson's choice. Noting in this context the importance of defining "the precise contours of Murphy's obligation to respond to questions," *id.* at 437, the Court explained that Murphy's "required" meeting with the probation officer did not, on its face, threaten a penalty for refusing to answer questions. The *Murphy* Court distinguished *Garrity* on this basis as a case in which the witnesses had been "expressly informed" that the coercive penalty would

18

be imposed if they invoked their privilege against self-incrimination. *Id*. at 437-38. As the Seventh Circuit has explained, "the Court in *Murphy* held that ***the lesser price that consists of a merely plausible fear that invoking one's Fifth Amendment privilege will get one into trouble . . . is not a heavy enough penalty to excuse the failure to assert the privilege*." *United States v. Cranley*, 350 F.3d 617, 622 (7th Cir. 2003) (emphasis added).

The Seventh Circuit made the same point in *United States v. Corbin*, when it held that "for this coercion exception to apply, the threat of a penalty for remaining silent must have been explicit. The fact that a defendant is expected to give candid answers in a particular situation and *might* suffer adverse consequences if he does not . . . is not enough to excuse him from affirmatively invoking his fifth amendment privilege if he does not wish to incriminate himself." *United States v. Corbin*, 998 F.2d 1377, 1390 (7th Cir. 1993). Similarly, in *Indorato*, the First Circuit rejected an argument that statements made to police investigators were coerced because police department rules provided that a failure to obey lawful orders could result in dismissal. Holding that such rules posed by superiors posed no "overt threat" of removal—unlike in *Garrity*—the First Circuit stated: ***We do not think that the subjective fears of defendant as to what might happen if he refused to answer his superior officers are sufficient to bring him within Garrity's cloak of protection*. 628 F.2d at 716 (emphasis added). *See also*, *e.g.*, *United States v. Palmquist*, 712 F.3d 640, 645 (1st Cir. 2013) ("*Garrity* immunity is contingent upon the degree of certainty that an employee's silence alone will subject the employee to severe employment sanctions."); *United States v. Johnson*, 131 F.3d 132 (2d Cir. 1997) ("alleged belief that he was required to provide information to law enforcement officials or lose his job, based on his subjective understanding of his employer's disciplinary rules, will not give rise to a *Garrity* inadmissibility because he was never explicitly threatened with termination of his employment."); *United States*

*v. Solomon*, 509 F.2d 863, 872 (2d Cir. 1975) (despite NYSE rule providing that failure to testify before Board "may" be suspended or expelled from the Exchange, finding no coercion because "there was no certainty what penalty NYSE would prescribe if Solomon refused to speak."); *United States v. Ferguson*, No. CRIM.3:06CR137CFD, 2007 WL 4240782, at *5 (D. Conn. Nov. 30, 2007) (letter informing employee that non-cooperation "may result ... in a reassessment by [the company] of the factors governing whether it is obligated to indemnify [him] for [his] reasonable legal expenses" and referencing company by-laws did not compel cooperation with investigators).

Harkening to the need to consider "the precise contours" of the allegedly coercive impetus to respond to questions, as *Murphy* instructs, the Court concludes that, as a matter of law, there is no basis on which to conclude that Mr. Vorley had an objectively reasonable belief that the Bank would have denied his deferred compensation had he refused to participate in the March 17 interview and answer the Bank's questions about his trading activity. Again, the disciplinary letter says nothing about the consequences of failing to participate in the interview but speaks only of the consequences of a determination that Vorley violated Bank policy. And as discussed above, even if the letter were construed to tie possible adverse action with respect to deferred compensation to Vorley's participation in the interview, both the Supreme Court and the Seventh Circuit have made plain that even "a plausible fear," in the words of the *Cranley* court, that the Bank would deny him deferred compensation if he refused to answer questions does not rise to the level of coercion that implicates the Fifth Amendment. Mr. Vorley undoubtedly hoped that by meeting with the Bank's investigators and explaining his reference to "spoofing" during his trading activity on March 16, 2011, he would be able to expedite a settlement with the Bank regarding his deferred compensation. But "the privilege against compelled self-incrimination is not offended when a defendant yields to the pressure to testify . . . in the hope of leniency." *Harvey v. Shillinger*,

76 F.3d 1528, 1535 (10th Cir. 1996). Compulsion, under the constitutional privilege, requires an objectively reasonable fear that a potent sanction will be imposed for failing to speak. Mr. Vorley had no such basis to support his claim that he "had no choice" but to make statements to the Deutsche Bank investigators.

\* \* \* \* \*

For the foregoing reasons, the Court finds that, as a matter of fact, Mr. Vorley's statements during the interview of March 17, 2015 were not compelled and that, as a matter of law, the Bank made no coercive threat that provided an objectively reasonable basis for Mr. Vorley to believe that if he declined to answer questions during the interview, the Bank would take adverse action against his deferred compensation. Accordingly, Mr. Vorley's motion to suppress the use of those statements at trial as violative of the Fifth Amendment is denied.[11]

Date: March 11, 2020

_____
John J. Tharp, Jr.
United States District Judge

---

[11] As noted above, because Mr. Vorley's statements were not compelled within the meaning of the Fifth Amendment, it is not necessary to consider whether the Bank's actions in conducting the March 17, 2015 interview are attributable to the government.