UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | No. 18 Cr. 35 (Tharp, J.) |
| v. | ) | |
| | ) | |
| JAMES VORLEY and CEDRIC CHANU, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' OPPOSITION TO THE GOVERNMENT'S MOTION FOR
PRELIMINARY ADMISSION OF CO-CONSPIRATOR STATEMENTS**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

LEGAL STANDARD........................................................................................................... 3

ARGUMENT ..................................................................................................................... 4

I.     THE PROFFERED EVIDENCE FAILS TO ESTABLISH THE EXISTENCE OF A CRIMINAL CONSPIRACY........................................................................................ 4

II.    THE PROFFERED EVIDENCE FAILS TO ESTABLISH THAT THE ALLEGED CO-CONPSIRATORS KNOWINGLY JOINED A CRIMINAL CONSPIRACY ................................................................................................... 11

    1.    Vorley and Chanu ........................................................................... 12

    2.    David Liew....................................................................................... 13

    3.    Bases, Farthing, Parker, and Ong.................................................... 14

III.   THE SPECIFIC STATEMENTS IDENTIFIED BY THE GOVERNMENT ARE NOT ADMISSIBLE UNDER RULE 801(D)(2)(E) BECAUSE THEY ARE NOT STATEMENTS IN FURTHERANCE OF A CONSPIRACY ....................................... 17

    1.    Electronic Chats .............................................................................. 20

    2.    Oral Statements ............................................................................... 28

CONCLUSION................................................................................................................ 31

# TABLE OF AUTHORITIES

**CASES**

*Bourjaily v. United States*,
 483 U.S. 171 (1987) ...........................................................................................4, 14

*United States v. Bills*,
 No. 14 CR 135, 2016 WL 4366546 (N.D. Ill. Aug. 16, 2016) ................................5

*United States v. Campbell*,
 985 F.2d 341 (7th Cir. 1993) ...............................................................................11

*United States v. Conn*,
 297 F.3d 548 (7th Cir. 2002) ...............................................................................10

*United States v. Cornett*,
 195 F.3d 776 (5th Cir. 1999) ......................................................................... *passim*

*United States v. Cozzo*,
 No. 02 CR 400, 2004 WL 1151630 (N.D. Ill. Apr. 28, 2004) ........................ *passim*

*United States v. Curry*,
 977 F.2d 1042 (7th Cir. 1992) ..............................................................................20

*United States v. Davis*,
 838 F.2d 909 (7th Cir. 1988) ...............................................................................13

*United States v. Davis*,
 845 F.3d 282 (7th Cir. 2016) .........................................................................1, 3, 4

*United States v. Doerr*,
 886 F.2d 944 (7th Cir.1989) ........................................................................ *passim*

*United States v. Easley*,
 994 F.2d 1241 (7th Cir. 1993) ..............................................................................17

*United States v. Eubanks*,
 591 F.2d 513 (9th Cir. 1979) ...............................................................................18

*United States v. Haynie*,
 179 F.3d 1048 (7th Cir. 1999) ................................................................................3

*United States v. House*,
 No. 14 CR 10, 2015 WL 1058093 (N.D. Ill. Mar. 6, 2015) .................................18

*United States v. Hunte*,
 196 F.3d 687 (7th Cir. 1999) .................................................................................5

*United States v. Johnson*,
  927 F.2d 999 (7th Cir. 1991) ................................................................. *passim*

*United States v. Lieberman*,
  637 F.2d 95 (2d Cir. 1980)................................................................17, 21

*United States v. Martin*,
  618 F.3d 705 (7th Cir. 2010) .......................................................................11

*United States v. Means*,
  695 F.2d 811 (5th Cir. 1983) ................................................................. *passim*

*United States v. Posner*,
  764 F.2d 1535 (11th Cir. 1985) ..................................................................18

*United States v. Quiroz*,
  874 F.3d 562 (7th Cir. 2017) .......................................................................4

*United States v. Santiago*,
  582 F.2d 1128 (7th Cir. 1978) ............................................................. *passim*

*United States v. Santos*,
  20 F.3d 280 (7th Cir. 1994) ................................................................18, 20

*United States v. Thomas*,
  284 F.3d 746 (7th Cir. 2002) .......................................................................5

*United States v. Townsend*,
  924 F.2d 1385 (7th Cir. 1991) ..............................................................11, 12

**RULES AND STATUTES**

7 U.S.C. § 6c(a)(5)(C).................................................................................13

7 U.S.C. § 13(a)(2).....................................................................................13

18 U.S.C. § 1343.........................................................................................13

Fed. R. Evid. 106 ........................................................................................17

Fed. R. Evid. 602 ........................................................................................10

Fed. R. Evid. 701 ........................................................................................10

Fed. R. Evid. 801(d)(2) .......................................................................... *passim*

Defendants James Vorley and Cedric Chanu respectfully submit this opposition to the Government's Motion for Preliminary Admission of Co-Conspirator Statements (Dkt. 199) (the "*Santiago* Proffer").[1]

## PRELIMINARY STATEMENT

The government makes the sweeping claim that the defendants and their alleged co-conspirators—essentially the entire precious metals desk at a major bank—were engaged in a five-year-long conspiracy to commit wire fraud affecting a financial institution. *Santiago* Proffer 11. The *Santiago* Proffer, however, falls well short of demonstrating the existence of such a criminal conspiracy. Indeed, it ignores the key disputed issue in this case: whether the charged conduct involved an implied fraudulent misrepresentation. In order to show the defendants and their alleged co-conspirators were engaged in a conspiracy to defraud other market participants— as this Court explained in its order denying the motion to dismiss the indictment—the government must present evidence that those orders conveyed a material misrepresentation to other market participants about their intent. *See* Mem. Op. & Order 29 ("Whether there was anything false or misleading about the communications the defendants made when they placed Spoofing Orders will depend on what their bids and offers meant to other market participants.").

The proffered evidence fails to demonstrate that the alleged conspiracy existed or that the alleged co-conspirators were parties to any agreement to commit fraud. The government

---

[1] The *Santiago* procedure allows the Court to make a preliminary determination of the admissibility of statements of alleged co-conspirators made during and in furtherance of the conspiracy under Rule 801(d)(2)(E) and to admit such statements conditionally based on the government's proffer. *United States v. Davis*, 845 F.3d 282, 286 (7th Cir. 2016) (citing *United States v. Santiago*, 582 F.2d 1128, 1130-31 (7th Cir. 1978)). This opposition therefore focuses on the defendants' objections to admissibility of the proffered statements under Rule 801(d)(2)(E). To the extent that the government seeks to admit the same out-of-court statements on some other basis, the defendants respectfully reserve their rights to raise additional objections at the appropriate time.

repeatedly asserts that the various traders on the precious metals desk engaged in "deceptive trading," as if this demonstrates that they had an agreement to or knew that they were engaging in fraud. *E.g.*, *Santiago* Proffer 11, 16, 17, 18, 19, 20, 22. But evidence that employees on Deutsche Bank's precious metals desk discussed or engaged in "deceptive trading" does not remotely establish that they conspired to misrepresent anything to other traders. The false equivalence of "deceptive trading" with fraud ignores the fact that trading is a competitive enterprise in which traders must actively conceal their strategies in order to be successful.

To take a familiar example, an "iceberg order," which reveals only part of the amount a trader intends to buy or sell, *id.* at 2 n.1, is deceptive in that it hides, and thereby *expressly* misrepresents, true available supply or demand. Likewise, traders may "shred" large orders into a series of smaller orders to be executed over time in order to disguise the true size of the order. Yet such "deceptive trading" is widely accepted as perfectly lawful. The government's bare allegations that the placement of orders with the intent to cancel before execution conveyed a false impression of supply or demand cannot substitute for evidence of a material misrepresentation as part of a conspiracy to commit fraud. Even the government's cooperating witness, David Liew, who has pleaded guilty, will testify that entering visible orders opposite iceberg orders—the trading he now describes as "spoofing"—was described to him as a legitimate technique to gather market information or to clear risk, and he did not believe at the time that he was involved in market manipulation, fraud, or any other criminal activity.

Nor has the government adequately explained how the various statements it seeks to admit into evidence furthered the alleged conspiracy. The statements appear to have been selected based on search terms such as "spoof" and "manipulate." They are, however, presented without context

2

(or even time stamps)[2], and they are replete with unexplained, imperceptible jargon and ambiguity. Some of them have nothing to do with futures trading at all, much less the allegedly fraudulent activity described in the indictment. With respect to the majority of the statements, the government has not even bothered to state what they are *supposed* to mean, much less how they advanced the objectives of the alleged conspiracy. With respect to others, the government merely asserts that they demonstrate coordination among traders or knowledge of wrongdoing, falling well short of the showing necessary to meet the "in furtherance" requirement.

The government's motion to admit the proffered statements preliminarily under Rule 801(d)(2)(E) should therefore be denied.

## LEGAL STANDARD

Before offering co-conspirator statements into evidence under Rule 801(d)(2)(E), the government must make a preliminary showing of admissibility by way of a written *Santiago* proffer. *See United States v. Davis*, 845 F.3d 282, 286 (7th Cir. 2016). If the Court determines to admit such statements, "the *Santiago* procedure [then] requires the government to close the evidentiary loop at trial." *Id.* "If at the close of its case the prosecution has not met its burden to show that the statements are admissible, the defendant can move for a mistrial or to have the statements stricken." *Id.* (quoting *United States v. Haynie*, 179 F.3d 1048, 1050 (7th Cir. 1999)) (internal quotation marks omitted).

In order for co-conspirator statements to be admitted the government must establish "by a preponderance of the evidence that (1) a conspiracy existed, (2) the defendant and the declarant were involved in the conspiracy, and (3) the statements were made during and in furtherance of

---

[2] For convenience, the full text of the electronic chat messages (including the full transcript of the messages and associated time stamps) associated with the 24 excerpts proffered by the government are annexed hereto as Exhibit A (Chats 1-24).

the conspiracy." *Id.* When considering the question of admissibility, "[t]he court 'may examine the hearsay statements sought to be admitted' and give the evidence 'such weight as ... judgment and experience counsel.'" *United States v. Quiroz*, 874 F.3d 562, 570 (7th Cir. 2017) (quoting *Bourjaily v. United States*, 483 U.S. 171, 175 (1987)). However, the record must also contain independent evidence corroborating the existence of the conspiracy and the participation of both the defendant and the declarant in it. *Quiroz*, 874 F.3d at 570; *Davis*, 845 F.3d at 286.

## ARGUMENT

### I. THE PROFFERED EVIDENCE FAILS TO ESTABLISH THE EXISTENCE OF A CRIMINAL CONSPIRACY

In its *Santiago* Proffer, the government seeks to establish that "between 2008 and 2013, traders working at Deutsche Bank on the global precious metals trading desk (the 'Desk') agreed to, and did, engage in deceptive trading in the precious metals futures markets." *Santiago* Proffer 11. Specifically, the government alleges that they conspired to commit wire fraud affecting a financial institution. *Id.* at 11-12. As evidence of the alleged conspiracy, the government relies on (i) the expected testimony of its cooperating witness, Liew, *id.* at 12-13, (ii) "transcripts of many chats from between 2007 and 2012" showing that the traders "were working in concert (even from physically remote locations)," *id.* at 13, and (iii) "trading data [] to corroborate Liew's account that he, Vorley, Chanu, and others agreed to, and did, engage in deceptive trading practices, both on their own and together with one another," *id.* at 16. The evidence itself—as opposed to the government's spin on it—demonstrates only that traders on Deutsche Bank's precious metals desk at times worked together to make money for the bank, not that they agreed to commit wire fraud together.

To begin, the government's *Santiago* Proffer fails completely to acknowledge the context in which the defendants and their alleged co-conspirators worked. According to the government,

4

the defendants and their colleagues on the precious metals desk "were part of a single cohesive unit," and "each trader's bonus compensation was dependent in part on the profitability (sometimes called 'PNL') of the Desk as a whole." *Santiago* Proffer 12. However, unlike, say, a conspiracy to distribute illegal drugs or to rob banks, where mere participation in the joint venture supports an inference of an agreement among co-conspirators to commit crimes, the defendants and their colleagues were engaged in the legitimate business activity of precious metals trading. They were employees of Deutsche Bank, where they were engaged in a lawful business activity— precious metals trading. They were *supposed* to work together with their colleagues in order to improve the precious metals desk's profitability. And, unsurprisingly, they communicated and sometimes collaborated with one another when doing their jobs. None of this has anything to do with criminal activity.

In these circumstances, the government cannot meet its burden to demonstrate the admissibility of alleged co-conspirator statements by proffering evidence that traders on the desk were engaged in a joint venture, or that they coordinated with one another when trading, or that they shared a common interest in trading profitably. To show the existence of a conspiracy in the relevant sense, the government must demonstrate that they agreed to commit *crimes* together. *United States v. Thomas*, 284 F.3d 746, 751 (7th Cir. 2002) ("The essence of conspiracy is, of course, an agreement to commit a crime."); *see also United States v. Bills*, No. 14 CR 135, 2016 WL 4366546, at *4 (N.D. Ill. Aug. 16, 2016) (stating that the government must "establish the existence of an agreement between two or more persons 'for the purpose of committing, by their joint efforts, a criminal act'") (citing *United States v. Hunte*, 196 F.3d 687, 691 (7th Cir. 1999) (internal quotation marks omitted)).

The government repeatedly invokes the term "deceptive trading" as if it equates with fraud. *E.g.*, *Santiago* Proffer 11, 16, 17, 18, 19, 20, 22. The proffered evidence, however, does not address the key disputed issue in this case: whether the open market trading consisting of real, at risk bids and offers, was fraudulent based on the traders' supposed intent to cancel the trades before they were executed. This is fatal because "deception" is inherent in the competitive activity of trading. Indeed, concealment of one's trading strategy, including by means of misdirection, can be the key to successful trading. *See* Brief for Amici Curiae Jerry W. Markham and Ronald H. Filler, filed in *Coscia v. United States*, No. 17-1099, at *17-21 (U.S. Mar. 8, 2018), https://www.supremecourt.gov/DocketPDF/17/17-1099/38186/20180308125439149_Amicus%20Brief%20of%20Professors%20Ronald%20Filler%20and%20Jerry%20Markham.pdf (last visited July 30, 2020) (describing techniques by which traders actively "mask their trading" in order to avoid detection by other market participants).[3]

Given the context of their employment as traders competing with other traders on the open market, the handful of electronic chat communications cited in the *Santiago* Proffer also fail to demonstrate the existence of a criminal conspiracy:

- *First*, the government cites a chat on July 22, 2010, in which Chanu asks Liew to "watch the orders together" because it's "better to have 4 eyes" on the market. *Santiago* Proffer 13; Chat 8.[4]

---

[3] The defendants will present expert testimony on the competitive nature of futures trading from Professor Markham, a former Chief Counsel in the Division of Enforcement of the U.S. Commodity Futures Trading Commission and an expert on the history and regulation of commodities markets. Consistent with the statements in his amicus brief to the U.S. Supreme Court, Professor Markham will testify that traders actively and legitimately conceal their intentions and strategies from other market participants.

[4] The electronic chats are identified using the numbers assigned to them by the government. *See Santiago* Proffer 26-65. We discuss the chats in greater detail in the chart in Point III, *infra*, and the full chats are annexed hereto in Exhibit A.

- *Second*, the government cites two instances, on August 8, 2011[5] and November 3, 2010, when Chanu and Vorley, respectively, attempted to "help" Liew (a much less experienced trader), and which the government claims involved spoofing. *Santiago* Proffer 13-14; Chats 18 & 9.

- *Third*, the government cites a "multitrader" chat on November 16, 2010, in which Daniel Swasbrook[6] asks Ronan Donohoe for help in rectifying a mistake by another Deutsche Bank colleague in which he bought 74,000 oz. of gold instead of 7,400 oz., and Chanu writes, "I am taking care of it … what a team!" *Santiago* Proffer 14; Chat 10.

- *Fourth*, the government cites two chats in January 2009, in which Chanu refers to "trick[ing]" or "trigger[ing]" an algorithm. *Santiago* Proffer 15-16; Chats 2 & 3.

The government argues that these communications, when combined with trading data, demonstrate traders engaging in "deceptive trading." *Santiago* Proffer 16. And the government presumably assumes that references to "tricks," or "tricking" or "triggering" algorithms, speak for themselves. They do not. The proffered evidence represents lawful instances of collaboration among co-workers that, notwithstanding the "deceptive" label supplied by the government, did not involve any material misrepresentations to other market participants.

As the evidence will demonstrate at trial, it is an accepted part of trading that traders need not disclose their intentions to other traders. It is indeed the key to successful trading to disguise your strategy from other market participants. Accordingly, among the order types permitted on the COMEX exchange, for example, are "iceberg" orders displaying only part of the full order amount to the market and fill-or-kill orders that are automatically cancelled unless filled immediately, one-cancels-the-other orders that are placed in pairs such that if one is executed the

---

[5] The *Santiago* Proffer mistakenly identifies this chat as being dated "August 8, 2010." *Santiago* Proffer 13.

[6] Swasbrook and his colleague worked on the FX desk, not the precious metals desk. This is significant because the loss associated with the mistaken purchase would not have affected the profitability of the precious metals desk.

other cancels immediately.[7]  Each of these order types *expressly* misrepresents something about supply and demand, yet they are entirely lawful.  Of course, the placement, modification, and cancelation of orders of any kind can be described as "deceptive" in the sense that other market participants might say after the fact that they would or would not have entered into a transaction if they had known of the trader's true "intent" or how long the order would remain on the market.  But, as all market participants understand, the placement of such orders does not convey anything about the trader's intent and is not fraudulent.

In an effort to show that episodic communications, innocuous on their face, in fact refer to fraud, the government cites contemporaneous trading data and states that "[t]he government expects to testify" that Chanu and Vorley placed orders that were intended to facilitate the execution of opposite side orders and were not intended to be executed.  *Santiago* Proffer 14; *see also id.* at 14-16 (describing trading involving iceberg orders opposite visible orders that were canceled).  Of course, "the government" won't be testifying to anything.  Moreover, the defense will demonstrate through cross-examination and otherwise that the trading sequences the government intends to introduce in its case in chief at trial are entirely consistent with lawful trading.  The government's conclusory assertions about the trading data—none of which has been provided to the Court in connection with the *Santiago* Proffer—does not support an inference that the defendants were engaged in spoofing, much less that their trading was fraudulent.

To be sure, the government expects its cooperating witness, David Liew, to testify that, "when he started working at Deutsche Bank in December 2009, he observed Vorley and Chanu trading in a manner that Liew (and others) refer[r]ed to at the time as 'spamming' or 'jamming,'

---

[7] CME Group, COMEX Rulebook Definitions, *at* https://www.cmegroup.com/content/dam/cmegroup/rulebook/NYMEX/1/NYMEX-COMEX_Definitions.pdf (last visited July 30, 2020).

and which today Liew would describe as 'spoofing.'" *Santiago* Proffer 12-13. The government also cites a conversation between Liew and his supervisor, Farthing, who Liew reports told him "in substance" that spoofing was prevalent and an advantageous trading strategy. *Id.* at 13. And the government also expects Liew to "confirm" that the 61 trading sequences the government will introduce in its case-in-chief at trial reflect alleged co-conspirators engaged in "deceptive trading practices" both independently and together. *Id.* at 16-17. However, the government exaggerates the persuasive power of Liew's testimony.

Liew, an inexperienced, junior trader who worked on Deutsche Bank's precious metals desk in Singapore for less than two years, was caught committing serious crimes, including antitrust violations, various forms of fraud, and market manipulation, with an employee of another bank, Michael Chan. In an effort to avoid prison for those offenses, Liew has agreed to testify against his former colleagues at Deutsche Bank. Yet, his testimony will not support the existence of a conspiracy to commit wire fraud. His after-the-fact conclusions that he and his former colleagues were acting unlawfully will not establish that they had any agreement or understanding to commit crimes.

Notably, Liew's attorney made two proffers to the government in which he described Liew's perceptions of the trading now alleged to be fraudulent and made clear that Liew had no knowledge of a conspiracy to commit wire fraud among the traders on Deutsche Bank's precious metals desks. Ex. B (DOJ09187213–DOJ01987219; DOJ01987227–DOJ01987233). According to the attorney, Liew learned to trade by watching more senior traders, including Farthing, Vorley, and Chanu. In November 2010, Liew observed Vorley entering and canceling orders, and he asked about the trading. *Id.* at 7216, 7229. Vorley explained that he was doing two things: (1) gaining intelligence about whether other market participants were human beings or algorithms and (2)

9

clearing risk. *Id.* at 7216. Neither has anything to do with market manipulation or fraud. Indeed, Liew understood Vorley's trading to be entirely legal, and Vorley never told him to keep it hidden. *Id.* ("Liew would say at no time did Vorley tell him spoofing had to be done covertly or hidden."). Nor did Vorley use the word "spoofing," a term Liew only later learned from his co-conspirator Chan. *Id.*

Liew will also say that all of the alleged spoofing occurred in the open, in full view of the bank's compliance officers on the trading floor, none of whom ever raised any objection to the conduct now alleged to be fraudulent. *Id.* at 7219. Moreover, throughout his time at Deutsche Bank, and indeed up until 2016 when he was contacted by the government, it never occurred to him that the trading he now describes as spoofing was a form of market manipulation. *See id.* at 7227 ("At the time, Liew did not connect the act of spoofing and the market manipulation training that he received."), 7229 ("While he understood in principle what market manipulation was, it did not occur to him at this time to look at spoofing in terms of the manipulation training he received."). To the contrary, at the time Liew apparently thought that the conduct he now calls illegal was perfectly legitimate.

Liew's testimony, far from establishing the existence of a conspiracy, will demonstrate the complete *absence* of any illicit agreement. Moreover, his anticipated after-the-fact interpretation of trading data associated with the 61 "Episodes" that the government intends to introduce in its case-in-chief at trial—including trading that he does not specifically remember and even trading in which he had no involvement and trading on dates when he was not working at the bank—would be inadmissible lay opinion testimony. *See* Fed. R. Evid. 602 & 701; *United States v. Conn*, 297 F.3d 548, 554 (7th Cir. 2002) ("Lay opinion testimony is admissible only to help the jury or the court to understand the facts about which the witness is testifying and not to provide specialized

10

explanations or interpretations that an untrained layman could not make if perceiving the same acts or events." (internal citations and quotations omitted)).

At bottom, it is only the government's false equation of "spoofing," or what it refers to as "deceptive trading practices," with criminal fraud that supports its claim that a conspiracy existed. It is therefore highly unlikely that the government will be able to establish the existence of a criminal conspiracy at trial, even by a preponderance of the evidence.

## II. THE PROFFERED EVIDENCE FAILS TO ESTABLISH THAT THE ALLEGED CO-CONPSIRATORS KNOWINGLY JOINED A CRIMINAL CONSPIRACY

Just as the proffered evidence fails to establish the existence of a criminal conspiracy, it also fails to show that the defendants and the other alleged co-conspirators knowingly joined a criminal conspiracy.

In order to demonstrate an individual's membership in a conspiracy, the government must show a "participatory link" consisting of proof that the individual both "knew of the conspiracy and that he intended to join and associate himself with its criminal design and purpose." *United States v. Campbell*, 985 F.2d 341, 344-45 (7th Cir. 1993). The focus is not on whether the individual was a member of a particular "group," but whether he or she intentionally joined the criminal "agreement." *United States v. Martin*, 618 F.3d 705, 734 (7th Cir. 2010) (citing *United States v. Townsend*, 924 F.2d 1385 (7th Cir. 1991) (as amended). "The agreement is all-important in conspiracy, for one must look to the nature of the agreement to decide several critical issues, such as whether the requisite mental state is also present[.]" *Martin*, 618 F.3d at 735 (quoting 2 Wayne R. LaFave, *Substantive Criminal Law* § 12.2(a) (2d ed. 2010)) (internal quotation marks omitted).

11

1.       **Vorley and Chanu**

The *Santiago* Proffer fails to show that Vorley or Chanu knew of or intended to join a conspiracy to commit wire fraud. That Vorley and Chanu worked on Deutsche Bank's precious metals desk between 2008 and 2013, or that the overall profitability of the precious metals desk might have affected their compensation, *see Santiago* Proffer 17, 20, plainly fail to establish any link to a criminal scheme. *See Townsend*, 924 F.2d at 1392 ("The fact that we can squeeze a group into a hypothetical organizational chart says little about whether a single agreement exists between the members of the group.").

The government notes that both Vorley and Chanu were required to attend training sessions on Deutsche Bank's compliance policies, which "specifically prohibited 'any transaction or order to trade which gives, or is likely to give a false or misleading impression as to the supply, demand for, or price of one or more investments.'" *Santiago* Proffer 19, 22. This evidence again misses the mark. Contrary to the government's suggestion, placement of at risk bids and offers on an exchange does not "give a false or misleading impression" as to supply, demand, or price. Such orders can be bought or sold just like any other order on the exchange, and just like any other order they may be canceled at any time.

The government's proffer notably omits the fact that its own cooperator, Liew, did not connect the conduct he now describes as spoofing with the market manipulation training he received at Deutsche Bank. Ex. B at 7227, 7229. Indeed, it appears that Deutsche Bank did not even offer formal training on "spoofing" until late 2012. The training materials circulated at that time emphasized the confusion surrounding the new Dodd-Frank anti-spoofing provision and stated the CFTC had not provided clear guidance as to what was and what was not prohibited. Ex.

C (DOJ00433566 – DOJ00433575).[8]  The bank's policies and training will not demonstrate that Vorley and Chanu were not acting in good faith.

The government also alleges that Vorley and Chanu's participation in the conspiracy is shown by their own statements, primarily in electronic chats.  According to the government, "[t]he content of the chats (especially, in some instances, when paired with the corresponding trading data) demonstrates that [Vorley and Chanu were] knowingly and actively conducting deceptive trading and that [they] understood it was wrong."  *Santiago* Proffer 17, 20.  However, as discussed in Section I, *supra*, evidence that the defendants were engaging in "deceptive trading" does not establish membership in a criminal conspiracy.  Likewise, the proffered chats, when read in their proper context, fail to show that either Vorley or Chanu had the requisite criminal intent.

### 2.    David Liew

The government notes that its cooperating witness, Liew, pleaded guilty to conspiracy to commit wire fraud affecting a financial institution, in violation of 18 U.S.C. § 1343, and spoofing, in violation of 7 U.S.C. § 6c(a)(5)(C) & 13(a)(2).  *Santiago* Proffer 23.  It is widely accepted that the "fact that a person may plead guilty to or be convicted of a crime may not be used as substantive evidence that another individual is also guilty of that crime."  *United States v. Davis*, 838 F.2d 909, 917 (7th Cir. 1988).  In addition, as discussed at pp. 9-10, *supra*, his testimony will not establish the existence of a conspiracy, much less that Liew had an agreement with any of his former colleagues at Deutsche Bank to commit crimes.  Indeed, Liew does not recall any of his

---

[8] On September 28, 2012, Raymond Key emailed a listserv titled "GM-Metals Traders All."  Ex. C. at 3566. Attached to the email was a presentation titled "Disruptive Trading Practices."  The first slide is titled "Why are we here?" and states "[b]ecause the CFTC has redefined what they consider to be improper market practices without the benefit of providing clear rules and definitions."  *Id*. at 3568.

colleagues discussing an agreement to engage in fraud, and he has told the government that he did not realize at the time that his trading was illegal.  Ex. B at 7227, 7229.

### 3.    Bases, Farthing, Parker, and Ong

The *Santiago* Proffer alleges that four other employees on the Deutsche Bank precious metals desk, Edward Bases, Adam Farthing, Eric Parker, and Teng Kong Ong, also participated in the alleged conspiracy "through their agreement to assist other traders on the Desk in executing Primary Orders by placing Fraudulent Orders in the market, and for each to realize the benefit from others trading doing the same."  *Santiago* Proffer 24.  With respect to these individuals, the government relies entirely on their status as employees assigned to the precious metals desk and the proffered co-conspirator statements themselves in an attempt to "show their knowing and willing participation in, and benefitting from, conduct which furthered the conspiracy."  *Id.* (citing *Bourjaily*, 483 U.S. at 178-79).  The effort once again fails.

#### Bases

The proffered evidence of Bases's participation in the alleged conspiracy consists of three electronic chats involving Bases and Chanu, and one each with Vorley and Farthing.  *See* Chats 2, 4, 5, 6, 7.  The *Santiago* Proffer does not explain what the chats mean, much less how they show Bases's participation in a criminal conspiracy.

#### Farthing

The *Santiago* Proffer does not specifically state what role Farthing is supposed to have played in the alleged conspiracy.  He is identified as Liew's direct supervisor, and he worked in Singapore.  He allegedly told Liew "that the profitability of the overall Desk impacted the bonuses of individual traders," *Santiago* Proffer 12, that "[i]f Liew met a certain target, he could receive a specific amount for himself," *id.* at 66, and "that Vorley and Chanu's performance expectations were greater than Liew's because they had more experience," *id.*  Furthermore, he allegedly

14

"encouraged Liew to learn from more senior traders like Vorley and Chanu." *Id.* at 13, *see also id.* at 66. Liew also reportedly said that Farthing told him, "in substance," that spoofing was a prevalent practice on the Desk, and an advantageous strategy. *Id.* at 13; *see also id.* at 66 (Liew understood from Farthing that "spoofing was the way things were and it was a way to get yourself a better shot" and he should "always do what it takes"). Finally, Liew reports that Farthing allegedly "praised Liew after Liew and Chanu finished working an order in a way that involve[ed] spoofing on more than one occasion." *Id.* at 66.

The proffered statements positively reek of speculation by Liew and do not demonstrate Farthing's participation in a conspiracy. Liew's anticipated testimony that Farthing told him, "in substance," that spoofing was prevalent and a good strategy are notably weak. They clash with other facts. For instance, Liew closely shadowed Farthing during his first six months on the precious metals desk, which would have been December 2009 through May 2010, and he continued to sit next to Farthing on the desk in Singapore thereafter. Ex. B at 7215. Yet Liew's attorney told the government that he only first learned about spoofing in late 2010, and he never observed Farthing spoofing. *Id.* at 7218 ("Liew doesn't recall Farthing spoofing, but he had to be aware of the team's efforts to clear the risk. Does recall Farthing involved in efforts to clear risk that were not spoofing."). In the absence of evidence that Farthing actually instructed Liew to work with his colleagues on the precious metals desk to commit crimes, Liew's recollection of vague statements encouraging Liew, a junior trader, to learn from more senior traders on the desk, as well as statements explaining that bonuses would be awarded based on both individual and overall desk performance are entirely innocuous.

15

**Parker**

The evidence of Parker's alleged participation in the alleged conspiracy consists of a single electronic chat with Chanu on August 27, 2012. Chat 23.[9] The transcript of the full chat, as opposed to the excerpts provided by the government, shows that they are discussing plans for a "call out" to other banks for two-way price quotes; in other words, Chanu and Parker are not talking about trading futures on an electronic exchange. Ex. A, Chat 23, DOJ00005212. Chanu's statement, "we ll spoof it ahahaha," is a prime example of the fact that "spoof" has multiple meanings, several of which have nothing to do with the conduct proscribed by the Dodd-Frank law. This chat, having nothing whatsoever to do with the allegedly fraudulent conduct charged in the indictment, cannot be used to establish Parker's participation in the charged conspiracy.

**Ong**

Ong's alleged participation in the conspiracy consists of a single electronic chat with Chanu on January 29, 2009. Chat 3. In the course of the chat, Ong writes "you flashing bids to help get me done?" and Chanu writes, "yep" and "just to trigger algorythm." Ong also writes, "really … u gotta show me when i come to london for a week to meet the boys." The government alleges that the chat corresponds to trading data in which Chanu places and cancels orders in an effort to facilitate the execution of Ong's opposite side order. *Santiago* Proffer 15-16. However, the chat suggests that Ong was unaware of the alleged spoofing technique, refuting the suggestion that he was a party to the supposed agreement to engage in spoofing, and the government proffers no evidence that Ong took any further step to join the alleged conspiracy.

---

[9] The *Santiago* Proffer mistakenly identifies the chat as being dated August 27, 2008. *Santiago* Proffer 63.

### III. THE SPECIFIC STATEMENTS IDENTIFIED BY THE GOVERNMENT ARE NOT ADMISSIBLE UNDER RULE 801(d)(2)(E) BECAUSE THEY ARE NOT STATEMENTS IN FURTHERANCE OF A CONSPIRACY

The government seeks to admit (a) written statements contained in excerpts from 24 electronic "chat" communications, *see Santiago* Proffer 26-65, and (b) Liew's testimony about various conversations he had with Chanu, Vorley, and Farthing, *id.* at 65-67, as statements of co-conspirators under Rule 801(d)(2)(E).[10]  As explained below, the government has not established that these statements were made in furtherance of the alleged criminal conspiracy.

Rule 801(d)(2)(E) only authorizes the admission of statements "made by the party's coconspirator during and in furtherance of the conspiracy."  This "in furtherance requirement" represents a "*limitation* on the admissibility of co-conspirators' statements that is meant to be taken seriously."  *United States v. Johnson*, 927 F.2d 999, 1001 (7th Cir. 1991) (internal citations and quotations omitted; emphasis in original); *see also United States v. Lieberman*, 637 F.2d 95, 103 (2d Cir. 1980) ("The requirement that the statements have been in furtherance of the conspiracy is designed both to assure their reliability and to be consistent with the presumption that the coconspirator would have authorized them.").

A co-conspirator statement satisfies the in furtherance requirement when the statement is "part of the information flow between conspirators intended to help each perform a role." *Johnson*, 927 F.2d at 1002 (internal citations and quotations omitted).  A statement in furtherance

---

[10] The government also seeks to admit certain proffered statements under Rule 106 on the theory that they are "necessary to put the conspiratorial declarations in context."  *Santiago* Proffer 1; *see also id.* at 25 n.10.  However, this rule of completeness applies to the party "adverse" to the party offering statements into evidence and provides no basis for the offering party to offer other inadmissible statements to place its own evidence into context.  *See* Fed. R. Evid. 106 ("When a writing or recorded statement or part thereof is introduced by a party, *an adverse party* may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it."); *United States v. Easley*, 994 F.2d 1241, 1246 (7th Cir. 1993).

might, for example, "recruit other conspirators, control damage to an ongoing conspiracy or keep conspirators advised about the progress of the conspiracy." *Id.*; *see also United States v. House*, No. 14 CR 10, 2015 WL 1058093, at *5 (N.D. Ill. Mar. 6, 2015) (examples of ways in which statements may further the objectives of a conspiracy include: "(1) recruiting potential co-conspirators, (2) controlling damage to an ongoing conspiracy, (3) keeping co-conspirators advised of the progress of the conspiracy, (4) concealing the conspiracy, and (5) executing the conspiracy.").

By contrast, statements not intended to further the objectives of the alleged scheme are not admissible under Rule 801(d)(2)(E). For instance, "[m]ere 'idle chatter,' narrative declarations and superfluous casual remarks are not statements in furtherance of a conspiracy." *Johnson*, 927 F.2d at 1002; *see also United States v. Santos*, 20 F.3d 280, 286 (7th Cir. 1994) (finding that narrative discussions of past events were not in furtherance of a conspiracy); *United States v. Doerr*, 886 F.2d 944, 951 (7th Cir.1989) ("Narrative declarations, mere 'idle chatter,' and superfluous casual conversations . . . are not statements 'in furtherance' of a conspiracy." (internal citation omitted)); *United States v. Cozzo*, No. 02 CR 400, 2004 WL 1151630, at *2 (N.D. Ill. Apr. 28, 2004). "This is true even when . . . the declarant makes what can be construed as an offhand admission of culpability." *Johnson*, 927 F.2d at 1002 (citing *United States v. Posner*, 764 F.2d 1535, 1538 (11th Cir. 1985) ("a letter that 'spilled the beans' regarding the tax scheme could hardly be considered to have advanced any object of the conspiracy"); *United States v. Eubanks*, 591 F.2d 513, 520 (9th Cir. 1979) (a "casual admission of culpability to someone [the declarant] had individually decided to trust" is not in furtherance of the conspiracy)).

The government appears to have proffered a set of statements intended to demonstrate that the defendants and their colleagues on the precious metals desk engaged in "deceptive trading,"

18

without regard to whether the statements meet the "in furtherance" requirement. With respect to the majority of the proffered electronic chats, the government has not even bothered to explain what the declarants' statements supposedly mean, much less how they furthered the alleged conspiracy.[11] Most of the statements are no more than "idle chatter" among traders or statements that could at most constitute "casual admissions," under the government's theory, without any indication that they furthered the objectives of the alleged conspiracy. Although Vorley and Chanu's own statements would in some cases be admissible against them individually, as statements of a party opponent under Rule 801(d)(2)(A), the government has not established a foundation for admission of the proffered statements as co-conspirators' statements under Rule 801(d)(2)(E).[12]

---

[11] The *Santiago* Proffer is completely silent as to the meaning and alleged significance of 15 of the 24 proffered electronic chats. *See* Chats 4, 6, 7, 11, 12, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24.

[12] In *Johnson*, the Seventh Circuit explained that Rule 801(d)(2)(E) provides the exclusive means by which a co-conspirator statement may be admitted for the truth of the matter asserted against a defendant who is not the declarant. 927 F.2d at 1002-03. In other words, even if a statement could be admitted under one of the exceptions to the hearsay rule as the government suggests, *see Santiago* Proffer 10-11, it would not be admissible against a non-declarant defendant unless it satisfies the requirements of Rule 801(d)(2)(E).

### 1. Electronic Chats

| Chat 1 (June 26, 2007): Vorley, Patrick Cornish |
| --- |

**Proffer:**

- The *Santiago* Proffer does not state how this chat allegedly furthered the alleged conspiracy.

**Argument:**

- The chat occurred prior to the start of the alleged conspiracy; it is therefore not a statement "during" the conspiracy. Rule 801(d)(2)(E); *see also United States v. Curry*, 977 F.2d 1042, 1057 (7th Cir. 1992) (statements occurring either before the beginning or after the end of an alleged conspiracy inadmissible under Rule 801(d)(2)(E)).
- Vorley's remark "easy to manipulate," particularly when read with the time stamps, most likely responds to Cornish's earlier remark that other market participants – "pukes" – are front running; he is complaining about manipulation by the "pukes," not by the traders at Deutsche Bank. *See* Ex. A, Chat 1, DOJ00096940.
- Even if Vorley's statement had the nefarious meaning suggested by the government (*see Santiago* Proffer 19), such a statement to Cornish (not alleged to be a participant in the conspiracy) would still be only idle chatter and not a statement "in furtherance" of the alleged conspiracy. *Cozzo*, 2004 WL 1151630, at *2 ) (noting that idle chatter is not "in furtherance" of a conspiracy); *Santos*, 20 F.3d at 286 ("Espino's statements to Kaiser were not part of any 'normal informational flow' between co-conspirators. Kaiser was not part of any conspiracy. Espino was merely commenting on his past activities and did not intend his remarks to further any objectives of his own scheme with Santos."); *Johnson*, 927 F.2d at 1001-02 (admission of culpability to a non-conspirator inadmissible as a co-conspirator statement).

| Chat 2 (January 28, 2009): Chanu, Bases |
| --- |

**Proffer:**

- The government alleges that excerpts of this chat, combined with the contemporaneous trade data, demonstrate that the alleged conspiracy predated Liew's involvement (*Santiago* Proffer 15) and that Chanu knew that his conduct was wrong (*id.* at 20). The government does not state how the chat furthered the conspiracy.

**Argument:**

- Bases's statement "that does show u how easy it is to manipulate it sometimes," and Chanu's reply, "yeah of course … basically you tricked alkll the algorythm," constitute no more than idle banter among traders in competition with computers, not an admission that they knew their conduct was illegal. *Id.* at 20. Even if the chat were incriminating, nothing in the chat would have furthered the alleged conspiracy. *See Doerr*, 886 F.2d at 951 ("Narrative declarations, mere 'idle chatter,' and superfluous casual conversations . . . are not statements 'in furtherance' of a conspiracy."); *United States v. Cornett*, 195 F.3d 776, 783-85 (5th Cir. 1999) (although conversation between co-conspirators "touch[ed] upon the conspiracy" it constituted "mere idle chatter" not in furtherance); *United States v. Means*, 695 F.2d 811, 818 (5th Cir. 1983) (finding a statement to be mere idle conversation where "nothing exists in the record to indicate that he somehow intended to further the scheme by announcing it").

| Chat 3 (January 29, 2009): Chanu, Ong |
|---|

**Proffer:**

- The government alleges that this chat, combined with the contemporaneous trade data, shows Chanu coordinating with another trader (*Santiago* Proffer 15-16).

**Argument:**

- There is no evidence that Ong was a party to any agreement to engage in wire fraud.
- Like the comments in Chat 2, Chanu's statement "just to trigger algorithm" constitutes no more than the idle banter of a trader in competition with computers, not an admission that Chanu knew his conduct was illegal.
- Even if the chat were incriminating, the statement to Ong would not have furthered the alleged conspiracy. *See Johnson*, 927 F.2d at 1001-02; *Doerr*, 886 F.2d at 951; *Cornett*, 195 F.3d at 783-85; *Means*, 695 F.2d at 818; *Cozzo*, 2004 WL 1151630, at *2.

| Chat 4 (January 30, 2009): Chanu, Bases |
|---|

**Proffer:**

- The *Santiago* Proffer does not state how this chat allegedly furthered the alleged conspiracy or anything about the contemporaneous trading data.

**Argument**:

- The chat on its face consists of nothing but idle chatter among traders. *See Johnson*, 927 F.2d at 1001-02; *Doerr*, 886 F.2d at 951; *Means*, 695 F.2d at 818; *Cozzo*, 2004 WL 1151630, at *2.

| Chat 5 (February 3, 2009): Chanu, Bases |
|---|

**Proffer:**

- The government alleges that this chat demonstrates an episode of coordinated trading (*Santiago* Proffer 21) but does not state how the chat furthered the alleged conspiracy.

**Argument:**

Even if the chat were incriminating, it would be idle chatter that would not have furthered the alleged conspiracy. *See United States v. Lieberman,* 637 F.2d 95, 102 (2d Cir.1980) (noting that certain statements "smack[ed] of nothing more than casual conversation about past events" are not in furtherance of the conspiracy); *see also Johnson*, 927 F.2d at 1001-02; *Doerr*, 886 F.2d at 951; *Cornett*, 195 F.3d at 783-85; *Means*, 695 F.2d at 818; *Cozzo*, 2004 WL 1151630, at *2.

### Chat 6 (October 7, 2009): Vorley, Bases

**Proffer:**

- The *Santiago* Proffer does not state how this chat allegedly furthered the alleged conspiracy or anything about the contemporaneous trading data.

**Argument:**

- Even if the chat were incriminating, it would be idle chatter that would not have furthered the alleged conspiracy. *See Johnson*, 927 F.2d at 1001-02; *Doerr*, 886 F.2d at 951; *Cornett*, 195 F.3d at 783-85; *Means*, 695 F.2d at 818; *Cozzo*, 2004 WL 1151630, at *2.

### Chat 7 (December 16, 2009): Bases, Farthing

**Proffer:**

- The *Santiago* Proffer does not state how this chat allegedly furthered the alleged conspiracy or anything about the contemporaneous trading data.
- The government has not identified any Episode involving Bases or Farthing on this date.

**Argument:**

- On its face, Bases's question, "For anyone. Or a spoof?" and Farthing's response "spoof," suggest that the term was being used to describe an order that was not a customer order but instead an order for Farthing's proprietary book. *Santiago* Proffer 34. It does not appear to refer to an order placed and quickly canceled to facilitate an opposite side order, as alleged in the indictment.
- Even if the chat were incriminating, it would be idle chatter that would not have furthered the alleged conspiracy. *See Johnson*, 927 F.2d at 1001-02; *Doerr*, 886 F.2d at 951; *Cornett*, 195 F.3d at 783-85; *Means*, 695 F.2d at 818; *Cozzo*, 2004 WL 1151630, at *2.

### Chat 8 (July 22, 2010): Chanu, Liew

**Proffer:**

- The government alleges that this chat demonstrates co-conspirators working in concert from different physical locations (*Santiago* Proffer 13) and demonstrates Chanu's participation (*id.* at 21-22) but does not state how the chat furthered the alleged conspiracy or anything about the contemporaneous trading data.

**Argument:**

- The chat on its face refers to buying and selling gold, not illegal spoofing.  *See* Ex. A, Chat 8, DOJ0359639.
- Even if the chat were incriminating, it would be idle chatter that would not have furthered the alleged conspiracy.  *See Johnson*, 927 F.2d at 1001-02; *Doerr*, 886 F.2d at 951; *Cornett*, 195 F.3d at 783-85; *Means*, 695 F.2d at 818; *Cozzo*, 2004 WL 1151630, at *2.

### Chat 9 (November 3, 2010): Vorley, Liew

**Proffer:**

- The government alleges that this chat involves Vorley describing how he was helping Liew execute an order (*Santiago* Proffer 14) and that, combined with the contemporaneous trade data, demonstrates that Vorley entered bids that he quickly canceled in an attempt to artificially inflate the market (*id.* at 17-18) but does not state how the chat furthered the alleged conspiracy.

**Argument:**

- The chat does not refer to spoofing; it merely reflects Vorley's attempt to assist a junior colleague who was, in Liew's own words, "showing his grad [intern] how its [sic] NOT done."  *Id.* at 36.
- Even if the chat were incriminating, it would be idle chatter that would not have furthered the alleged conspiracy.  *See Johnson*, 927 F.2d at 1001-02; *Doerr*, 886 F.2d at 951; *Cornett*, 195 F.3d at 783-85; *Means*, 695 F.2d at 818; *Cozzo*, 2004 WL 1151630, at *2.

### Chat 10 (November 16, 2010): Chanu, Ronan Donohoe, Luigi Gentile, Daniel Swasbrook

**Proffer:**

- The government alleges that this chat, combined with the contemporaneous trade data, demonstrates that the alleged conspiracy extended to other traders besides Vorley, Chanu, and Liew (*Santiago* Proffer 14-15).  It does not say how it furthered the conspiracy.

**Argument:**

- As discussed at p. 7, *supra*, this chat involves Daniel Swasbrook, from the FX desk, asking for assistance in rectifying a mistake by one of his colleagues.  Chanu says he's "taking care of it."  *Santiago* Proffer 14.  There is no apparent reference to spoofing.
- The government also omits the end of the chat, where it is noted that the Episode resulted in a loss, which would have been booked to the FX desk and would have had no conceivable connection with the PNL of the precious metals desk.  *See* Ex. A, Chat 10, DOJ03640389.
- Even if the chat were incriminating, it would be idle chatter that would not have furthered the alleged conspiracy.  *See Johnson*, 927 F.2d at 1001-02; *Doerr*, 886 F.2d at 951; *Cornett*, 195 F.3d at 783-85; *Means*, 695 F.2d at 818; *Cozzo*, 2004 WL 1151630, at *2.

| Chat 11 (November 18, 2010): Chanu, Liew |
|---|
| **Proffer:**<br><br>• The *Santiago* Proffer does not state how this chat allegedly furthered the alleged conspiracy or anything about the contemporaneous trading data. |
| **Argument:**<br><br>• On its face, the chat does not appear to refer to spoofing; to the contrary, it refers expressly to "jobbing."[13]<br>• Even if the chat were deemed to relate to fraud, it would be idle chatter that would not have furthered the alleged conspiracy. *See Johnson*, 927 F.2d at 1001-02; *Doerr*, 886 F.2d at 951; *Cornett*, 195 F.3d at 783-85; *Means*, 695 F.2d at 818; *Cozzo*, 2004 WL 1151630, at *2. |
| Chat 12 (February 2, 2011): Chanu, Liew |
| **Proffer:**<br><br>• The *Santiago* Proffer does not state how this chat allegedly furthered the alleged conspiracy or anything about the contemporaneous trade data.<br>• The government has not identified any Episode involving Chanu or Liew on this date. |
| **Argument:**<br><br>• On its face, the chat consists of idle chatter about bonuses that would not have furthered the alleged conspiracy. |
| Chat 13 (February 8, 2011): Chanu, Liew |
| **Proffer:**<br><br>• The *Santiago* Proffer does not state how this chat allegedly furthered the alleged conspiracy or anything about the contemporaneous trading data. |
| **Argument:**<br><br>• On its face, the chat does not appear to refer to spoofing; Liew merely says "what a nightmare day" and thanks Chanu for "trying to help," and Chanu replies, "no prob dude."<br>• Even if the chat were incriminating, it would be idle chatter that would not have furthered the alleged conspiracy. *Johnson*, 927 F.2d at 1001-02; *Doerr*, 886 F.2d at 951; *Cornett*, 195 F.3d at 783-85; *Means*, 695 F.2d at 818; *Cozzo*, 2004 WL 1151630, at *2. |

---

[13] Jobbing is British slang for buying and selling quickly to take advantage of market movements (not spoofing). Jobber, Investopedia, https://www.investopedia.com/terms/j/jobber.asp (last visited July 30 2020); Stock Jobbing, Investopedia, https://www.investopedia.com/terms/s/stockjobbing.asp (last visited July 30, 2020).

| Chat 14 (March 16, 2011): Vorley, Farthing |
| --- |

**Proffer:**

- The government alleges that this chat, combined with the contemporaneous trading data, demonstrates that Vorley knew that his "deceptive trading" was wrong. *Santiago* Proffer 19.

**Argument:**

- Although the government suggests that the contemporaneous trading data confirms that Vorley was spoofing, the trading data in fact shows that he had made a mistake—he started to buy gold when he had been instructed to sell—and when his colleague pointed it out, he said he was "spoofing it up" as a joke (as confirmed by his use of "ahem ahem"). Nor is there any other suggestion that Vorley engaged in fraud with Farthing.
- Even if the chat were incriminating, it would be idle chatter that would not have furthered the alleged conspiracy. *Johnson*, 927 F.2d at 1001-02; *Doerr*, 886 F.2d at 951; *Cornett*, 195 F.3d at 783-85; *Means*, 695 F.2d at 818; *Cozzo*, 2004 WL 1151630, at *2.

| Chat 15 (March 24, 2011): Vorley, Liew |
| --- |

**Proffer:**

- The *Santiago* Proffer does not state how this chat allegedly furthered the alleged conspiracy or anything about the contemporaneous trading data.

**Argument:**

- On its face, the chat consists of idle chatter about bonuses that would not have furthered the alleged conspiracy.
- Even if the chat were incriminating, it would be idle chatter that would not have furthered the alleged conspiracy. *See Johnson*, 927 F.2d at 1001-02; *Doerr*, 886 F.2d at 951; *Cornett*, 195 F.3d at 783-85; *Means*, 695 F.2d at 818; *Cozzo*, 2004 WL 1151630, at *2.

| Chat 16 (July 21, 2011): Chanu, Liew |
| --- |

**Proffer:**

- The *Santiago* Proffer does not state how this chat allegedly furthered the alleged conspiracy or anything about the contemporaneous trading data.

**Argument:**

- On its face, the chat consists of idle chatter about bonuses that would not have furthered the alleged conspiracy.
- Even if the chat were incriminating, it would be idle chatter that would not have furthered the alleged conspiracy. *See Johnson*, 927 F.2d at 1001-02; *Doerr*, 886 F.2d at 951; *Cornett*, 195 F.3d at 783-85; *Means*, 695 F.2d at 818; *Cozzo*, 2004 WL 1151630, at *2.

| **Chat 17 (August 7, 2011): Chanu, Liew** |
|---|

**Proffer:**

- The *Santiago* Proffer does not state how this chat allegedly furthered the alleged conspiracy or anything about the contemporaneous trading data.

**Argument:**

- On its face, the chat does not appear to refer to spoofing; to the contrary, it contains several references to "jobbing." *See* Ex. A, Chat 17, DOJ00534649.
- Even if the chat were incriminating, it would be idle chatter that would not have furthered the alleged conspiracy. *See Johnson*, 927 F.2d at 1001-02; *Doerr*, 886 F.2d at 951; *Cornett*, 195 F.3d at 783-85; *Means*, 695 F.2d at 818; *Cozzo*, 2004 WL 1151630, at *2.

| **Chat 18 (August 8, 2011): Chanu, Liew** |
|---|

**Proffer:**

- The government alleges that this chat, combined with the contemporaneous trading data, shows coordinated trading (*Santiago* Proffer 13) but does not state how it furthered the alleged conspiracy.

**Argument:**

- On its face, the chat does not appear to refer to spoofing; to the contrary, it contains several references to "jobbing." *See* Ex. A, Chat 18, DOJ00325595.
- Even if the chat were incriminating, it would be idle chatter that would not have furthered the alleged conspiracy. *See Johnson*, 927 F.2d at 1001-02; *Doerr*, 886 F.2d at 951; *Cornett*, 195 F.3d at 783-85; *Means*, 695 F.2d at 818; *Cozzo*, 2004 WL 1151630, at *2.

| **Chat 19 (August 8, 2011): Chanu, Liew** |
|---|

**Proffer:**

- The *Santiago* Proffer does not state how this chat allegedly furthered the alleged conspiracy or anything about the contemporaneous trading data.

**Argument**:

- On its face, the chat does not appear to refer to spoofing; to the contrary, it contains references to "jobbing." *See* Ex. A, Chat 19, DOJ00534633.
- Even if the chat were incriminating, it would be idle chatter that would not have furthered the alleged conspiracy. *See Johnson*, 927 F.2d at 1001-02; *Doerr*, 886 F.2d at 951; *Cornett*, 195 F.3d at 783-85; *Means*, 695 F.2d at 818; *Cozzo*, 2004 WL 1151630, at *2.

| **Chat 20 (August 11, 2011): Chanu, Liew** |
|---|

**Proffer:**

- The *Santiago* Proffer does not state how this chat allegedly furthered the alleged conspiracy or anything about the contemporaneous trading data.
- The government has not identified any Episode involving Chanu or Liew on this date.

**Argument**

- On its face, the chat does not appear to refer to spoofing; to the contrary, it contains references to "jobbing." *See* Ex. A, Chat 20, DOJ03472757.
- Even if the chat were incriminating, it would be idle chatter that would not have furthered the alleged conspiracy. *See Johnson*, 927 F.2d at 1001-02; *Doerr*, 886 F.2d at 951; *Cornett*, 195 F.3d at 783-85; *Means*, 695 F.2d at 818; *Cozzo*, 2004 WL 1151630, at *2.

| Chat 21 (August 24, 2011): **Vorley, Gentile** |
|---|

**Proffer:**

- The *Santiago* Proffer does not state how this chat allegedly furthered the alleged conspiracy or anything about the contemporaneous trading data, and Gentile is not alleged to be a co-conspirator.
- The government has not identified any Episode involving Vorley or Gentile on this date.

**Argument:**

- On its face, the chat consists of idle chatter and even argument among coworkers that would not have furthered the alleged conspiracy. *See Johnson*, 927 F.2d at 1001-02; *Doerr*, 886 F.2d at 951; *Cornett*, 195 F.3d at 783-85; *Means*, 695 F.2d at 818; *Cozzo*, 2004 WL 1151630, at *2.

| Chat 22 (August 24, 2011): **Vorley, Chanu** |
|---|

**Proffer:**

- The *Santiago* Proffer does not state how this chat allegedly furthered the alleged conspiracy or anything about the contemporaneous trading data.

**Argument:**

- On its face, the chat consists of idle chatter and even argument among coworkers that would not have furthered the alleged conspiracy.
- Even if the chat were incriminating, it would be idle chatter that would not have furthered the alleged conspiracy. *See Johnson*, 927 F.2d at 1001-02; *Doerr*, 886 F.2d at 951; *Cornett*, 195 F.3d at 783-85; *Means*, 695 F.2d at 818; *Cozzo*, 2004 WL 1151630, at *2.

| Chat 23 (August 27, 2012): **Chanu, Parker** |
|---|

**Proffer:**

- The *Santiago* Proffer does not state how this chat allegedly furthered the alleged conspiracy or anything about the contemporaneous trading data.

**Argument:**

- As discussed at p. 16, *supra*, the transcript of the full chat, as opposed to the excerpts cited in the proffer, shows that Chanu and Parker were discussing plans for a "call out" to other banks for two-way price quotes. They were not talking about trading futures on an electronic exchange. Chanu's statement, "we ll spoof it ahahaha" is an example of the fact that "spoof" has multiple meanings, several of which are unrelated to illegal conduct under Dodd-Frank. *See* Ex. A, Chat 23, DOJ00005212.
- Even if the chat were incriminating, it would be idle chatter that would not have furthered the alleged conspiracy. *See Johnson*, 927 F.2d at 1001-02; *Doerr*, 886 F.2d at 951; *Cornett*, 195 F.3d at 783-85; *Means*, 695 F.2d at 818; *Cozzo*, 2004 WL 1151630, at *2.

| Chat 24 (December 20, 2012): Vorley, Farthing |
| --- |

**Proffer:**

- The *Santiago* Proffer does not state how this chat allegedly furthered the alleged conspiracy or anything about the contemporaneous trading data.

**Argument**:

- The excerpt cited by the government omits Vorley's remarks about ways he has sought to improve profitability, none of which refer to the alleged scheme to defraud.
- Even if the chat were incriminating, it would be idle chatter about compensation that would not have furthered the alleged conspiracy. *See Johnson*, 927 F.2d at 1001-02; *Doerr*, 886 F.2d at 951; *Cornett*, 195 F.3d at 783-85; *Means*, 695 F.2d at 818; *Cozzo*, 2004 WL 1151630, at *2.

## 2.    Oral Statements

The government also seeks to admit as co-conspirator statements Liew's testimony about oral conversations he had with his supervisor, Farthing, as well as conversations with Vorley and Chanu. *Santiago* Proffer 66-67. However, the government has not proffered evidence demonstrating that the conversations were intended to further the alleged conspiracy.

### Liew's Conversations with Farthing

The proffered conversations with Farthing involve two subjects. First, the government seeks to admit Liew's testimony about Farthing's statements to Liew concerning the relationship between the profitability of the precious metals desk and bonuses paid to individual traders. Specifically, Farthing allegedly told Liew "that the profitability of the overall Desk impacted the

bonuses of individual traders," *id.* at 12, that "[i]f Liew met a certain target, he could receive a specific amount for himself," *id.* at 66, and "that Vorley and Chanu's performance expectations were greater than Liew's because they had more experience," *id.* The government has not proffered, much less shown, that such statements were intended to further the objectives of the alleged conspiracy. Assuming that the bank incentivized its employees based on both their individual performance and the performance of the team, none of the proffered evidence suggests that it encouraged illegal methods of improving performance.

Second, the government seeks to admit Liew's testimony that Farthing "encouraged Liew to learn from more senior traders like Vorley and Chanu." *Santiago* Proffer 13, *see also id.* at 66. Furthermore, the government seeks to admit Liew's testimony that Farthing informed him, "*in substance*, that spoofing was a prevalent practice on the Desk, and it was an advantageous strategy." *Id.* at 13 (emphasis added); *see also id.* at 66 (citing Liew's expected testimony that Farthing told him "spoofing was the way things were and it was a way to get yourself a better shot"; "always do what it takes"). According to Liew, Farthing also "praised Liew after Liew and Chanu finished working an order in a way that involve[ed] spoofing on more than one occasion." *Id.* at 66. As discussed at pp. 9-10, 15-16, *supra*, statements reflect after-the-fact speculation by Liew as to Farthing's meaning, and there is no evidence that Farthing actually used the word "spoof" or encouraged Liew to commit crimes. As a result, the *Santiago* Proffer fails to show that they were intended to further the objectives of the alleged conspiracy.

### Liew's Conversations with Vorley and Chanu

In addition to Liew's conversations with his supervisor, Farthing, the government also seeks to admit Liew's testimony concerning unspecified conversations with Vorley and Chanu "which used the phrases 'spam,' 'jam,' and 'helping out,'" which Liew says he "understood … to

describe spoofing," as well as other unspecified conversations by video, chat, and telephone discussing "the placement of Fraudulent Orders." *Id.* at 66. Whether or not such statements can be described as "in furtherance" of the alleged conspiracy depends entirely on their context, which the *Santiago* Proffer fails to provide. Again, there is no evidence that the defendants told Liew to spoof or commit fraud or that the proffered conversations were intended to further any criminal objective other than Liew's after-the-fact speculation.

The government also seeks to admit a conversation involving Vorley and Liew, in which Vorley allegedly "told Liew that only one person handled Deutsche Bank's order book at a time because if more than one person was in the book, it created confusion if there were opposite positions, and it made no sense for PNL purposes." *Id.* at 67. The government has not explained how this statement related to or furthered the alleged conspiracy. Nor could a statement by Vorley that traders should not take "opposite positions" simultaneously further the alleged conspiracy, where the government's own theory is that the alleged co-conspirators entered orders on "opposite sides" of the market to effectuate their scheme. *Id.* at 16.

Finally, the government seeks to admit two in-person conversations involving Liew and Chanu after Chanu transferred from London to Singapore. Specifically, in mid-2011, "Liew recalled that Chanu checked in to see how Liew was doing and Liew told Chanu about his bad month." *Id.* at 67. In addition, "Liew recalls that Chanu offered to help Liew fill [a 15,000 oz. order]" to sell gold given to Liew by Farthing. *Id.* According to Liew, "[a]fter Liew and Chanu completed the order, Farthing leaned over and told Liew that they did a good job." *Id.* Again, the government has not explained how these statements relate to, much less furthered the alleged conspiracy.

## <u>CONCLUSION</u>

For the foregoing reasons, the Government's Motion for Preliminary Admission of Co-Conspirator Statements should be denied.

Dated:  July 31, 2020                                    Respectfully submitted,

*s/ Roger A. Burlingame*
Roger A. Burlingame
Matthew L. Mazur
Lauren Bowman
Dechert LLP
160 Queen Victoria Street
London EC4V 4QQ
United Kingdom
Phone: +44 20 7184 7333
Roger.Burlingame@dechert.com
Matthew.Mazur@dechert.com
Lauren.Bowman@dechert.com

Christopher S. Burrichter
Dechert LLP
35 W. Wacker Drive
Suite 3400
Chicago, IL 60601
Phone: (312) 646-5800
Christopher.Burrichter@dechert.com

*Attorneys for Defendant James Vorley*

*/s/ Michael G. McGovern*
Michael G. McGovern
Helen Gugel
Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036
Phone: (212) 841-8860
Michael.McGovern@ropesgray.com
Helen.Gugel@ropesgray.com

Aaron Katz
Ropes & Gray LLP
800 Boylston Street
Boston, MA 02199
Phone: (617) 951-7117
Aaron.Katz@ropesgray.com

Laura G. Hoey
Ropes & Gray LLP
191 North Wacker Drive
Chicago, IL 60606
Telephone: 312 845-1318
laura.hoey@ropesgray.com

*Attorneys for Defendant Cedric Chanu*

## **CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that on this 31st day of July, 2020, I filed the foregoing document using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

/s/ Roger A. Burlingame
Roger A. Burlingame