UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 18 CR 35 |
| v. | Judge John J. Tharp, Jr. |
| JAMES VORLEY and CEDRIC CHANU, | |
| Defendants. | |

**GOVERNMENT'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF ITS MOTION FOR PRELIMINARY ADMISSION OF CO-CONSPIRATOR STATEMENTS**

The United States of America respectfully submits this supplemental memorandum in support of its motion to admit certain co-conspirator statements at trial pursuant to *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978). As directed by the Court in its August 30, 2020 Order (Doc. No. 291), the government herein summarizes "evidence it intends to present to establish that futures market orders . . . are (or were) understood to carry an implicit representation by the trader that he or she intended for the order to be executed at the time it was entered," and proffers how each of the proposed co-conspirator statements was "in furtherance of" the charged conspiracy and scheme.

## I. Evidence that Market Orders Carry Implied Representations

The government expects two algorithmic traders to testify as victims in this case. Their testimony is expected to convey that futures orders carry implied representations as to the trader's intent to execute. Anand Twells (a trader at Citadel) testified in *Flotron* that "[w]e consider most orders to be placed with the intent to trade," and the government expects him to testify consistently in this case. More specifically, the government expects Twells to

1

testify consistently with his statement during an interview on December 10, 2019, that the defendants' orders "would have influenced [his] trading decision in this case because the strategy incorporated the assumption that live orders reflected legitimate supply and demand," meaning that Citadel's automated trading strategy operated on the assumption that market orders reflected a genuine intent to trade. Travis Varner (a Quantlab trader) will echo Twells. The government expects Varner to testify consistently with his statement during an interview on December 11, 2019, that he:

> assumed orders in the market were legitimate interest in buying and selling. QUANTLAB's algorithm also had the same assumption. Live orders in the market were expression of supply and demand. It would be more difficult to hedge or speculate if orders in the market were not always genuine. It would be hard to find the real truth. The negative long-term affect would be market participants would not want to trade. QUANTLAB's model would not work if the orders in the live market did not express true supply and demand.[1]

The significance of this anticipated testimony is that automated trading strategies (like manual traders) necessarily rely on futures market orders as expressions of genuine supply and demand to calculate a commodity's fair value. These strategies could not operate if orders did not reflect genuine trading interest, because it would be impossible to differentiate between real and illusory supply and demand.

The government will show that the defendants understood that algorithmic traders, in particular, perceived market orders as reflecting an intent to execute, and that the

---

[1] Another Quantlab employee, John Huth, testified to the same effect in *Flotron*: "[W]e operate under the assumption and the belief that the market data, the representation of orders that people are placing in the market, are faithfully representative of their intent, of what they're trying to do. If there's a buy order, we believe someone put that in there because they really want to buy. And so we kind of trust that. And the trust in that fidelity of the market data underpins kind of everything that we do. . . . And if there are participants in the market that are placing orders that aren't intended to be executed, that don't represent their true interest in trading at that price and that size, then it distorts and pollutes the data."

defendants exploited this perception to the detriment of algorithmic traders. For example, in a chat on January 28, 2009, Edward Bases (at the time, a Deutsche Bank trader) bragged to Chanu about Bases' ability to help Chanu fill his sell order by spoofing. *See* GX 44. Over the course of four minutes when Chanu was trying to *sell* 170 contracts with an iceberg, Bases placed 250 orders to *buy* a total of 2,740 contracts, canceling 98.1% of the orders in an average of 1.741 seconds. *See* Ex. A (summary chart for Episode 8). While Bases was placing and canceling bids, the market price moved from $890.70 per ounce to $892.50, which Bases took credit for: "got that up 2 bucks. . . . that does show u how easy it is to manipulate it soemtimes" *Id.* Chanu responded, "basically you tricked alkll the algorythm," and Bases replied, "correct / i know how to 'game' this stuff . . . . i f..k the mkt around a lot." *Id.* The very next day, Chanu deployed the same "trick" to help another Deutsche Bank trader, Tengkoon Ong. *See* GX 141. In a chat, Ong told Chanu that he was "going to sell 2k here." *Id.* Chanu then placed and canceled four bids (totaling 602 contracts) that were live for an average of 1.078 seconds. *See* Ex. B (summary chart for Episode 61). Ong then asked if Chanu was "flashing bids to help me get done," and Chanu responded, "yep . . . . just to trigger algorythm." GX 141.

The government expects David Liew to explain at trial that the reason sophisticated algorithms could be "tricked" or "triggered" in this manner is precisely because they interpreted live orders in the market as bona fide, meaning that they reflected an intent to execute and genuine interest in buying or selling.[2] Liew is expected to testify that, if other

---

[2] This is not to say that *only* algorithmic traders could be defrauded by spoofing. In fact, Vorley himself seems to have fallen victim to another trader's spoofing, as reflected in a chat from April 28, 2008: "he is a cock / he spoofs and if u read him right he leaves u there / if ur wrong he traders . . . . I knew he was a buyer / and i bit / i bet the cock bought 5 lacs [*i.e.*, 500,000 ounces]." GX 43. The government expects to show through trial testimony that Vorley likely misinterpreted sell orders in the market to reflect genuine interest in selling, and thus Vorley followed suit by also placing sell orders. When Vorley's sell orders were filled

traders did *not* rely on orders representing genuine trading interest, his and the defendants' fraudulent scheme would not have worked, because other traders would not have responded to their spoof orders. Although the defendants attack Liew's credibility, he has been consistent on this point, as shown by a chat from June 6, 2011, in which Liew explained, "as a manual trader i can use fake bids/offers and make the algo buy/sell into my real bid/offer. . . . so if im a seller / I just bid [] / let them jump and grab my offer." GX 70. Again, the government anticipates Liew will testify to his understanding that the "algos" reacted to "fake" orders because they assumed (wrongly) that his orders reflected a "real" intent to execute—a point the victims (Twells and Varner) will underscore.

A representative of the CME Group, Inc. ("CME"), John Scheerer, will corroborate Liew and the victims. Scheerer is expected to testify that it has *always* been violative of CME rules for a trader to place orders he does not intend—at the time of placement—to execute, that the rules exist to preserve market integrity, and that traders are expected to know and comply with the rules. Based on the defendants' exhibit list, the government expects they may introduce evidence that it was not until after the charged conspiracy period that the CME promulgated Rule 575, which expressly prohibits the entry of an order with the intent to cancel the order before execution. That is true, but even prior to Rule 575, the CME prohibited the same conduct and pursued enforcement actions against traders for spoofing under Rule 432. In fact, the government's trial evidence will show that in April 2013—prior to Rule 575—Vorley himself was "complaining another market participant is spoofing the June gold contract, approx 300 lots at a time, and pulling them as the order gets close to

---

by another market participant who was buying, Vorley realized that he had been spoofed and speculated that the other trader had been interested in buying all along.

market," and Deutsche Bank's compliance department advised him to contact the CME's Global Command Center.[3] GX 81. This evidence corroborates Scheerer's expected testimony that the entry of orders without the intent to trade was in fact prohibited by CME rules during the conspiracy period, that Vorley knew as much, and that the practice was viewed as sufficiently problematic to merit a complaint to the CME. Because the government's trial evidence thus will show that the CME has always prohibited the placement of orders without the intent to trade *and* that traders are expected to be (and were) familiar with the CME's rules, the natural import of Scheerer's anticipated testimony is that futures orders on the CME *do* implicitly represent an intent to trade—consistent with the expected testimony of Liew, Twells, Varner, and others.[4]

---

[3] The government's evidence also will show that, in September 2012, the head of Deutsche Bank's metals desk circulated to Vorley and Chanu (and others) a compliance presentation that referenced a CME enforcement action under Rule 432 based on spoofing during the first quarter of 2011, which noted that the subject trader "entered orders on the CME Globex® electronic trading platform . . . that were not made in good faith for the purpose of executing bona fide transactions." GX 132, 132A.

[4] The existence of exchange rules also helps to explain why the defendants are wrong to characterize iceberg orders as deceptive. When a trader spoofs, he engages in non-commercial conduct, creates the misleading appearance of buying or selling interest where none exists, and thus deceives market participants into believing something that is not true. Among other problems, that contravenes the CME's rule that "[a]ll orders must be entered for the purpose of executing bona fide transactions." It is reasonable to assess deception against the backdrop of exchange rules, and part of why spoofing deceives other traders is because the CME (and the law) prohibits it. Other traders therefore rely on market orders reflecting a genuine intent to execute, and they are fooled when that is not true. In contrast, the CME permits iceberg orders. When a trader uses an iceberg consistent with exchange rules, he merely hides the extent of his genuine buying or selling interest without misleading others as to whether he is acting for the purpose of executing a bona fide transaction. This distinction undercuts the defendants' position that the widespread use of icebergs shows that deception is acceptable in futures trading. That is *not* the case. As in other contexts, a materially deceptive or misleading representation or omission in futures trading is actionable as fraud if it is for the purpose of obtaining money. Iceberg orders on commodities exchanges that permit them (like the CME) do not cross the line because they are not materially deceptive or misleading, and the baseline assumptions and norms created by exchange rules play into that.

## II.     Statements "in Furtherance of" the Conspiracy and Scheme[5]

To determine whether a statement was made in furtherance of a conspiracy, "courts look for a reasonable basis upon which to conclude that the statement furthered the conspiracy's objectives." *United States v. Cozzo*, No. 02 CR 400, 2004 WL 1151630, at *2 (N.D. Ill. April 28, 2004). Under this standard, a "statement may be susceptible to alternative interpretations and still be 'in furtherance' of the conspiracy." *Id.*; *see also United States v. Ginsberg*, No. 14 CR 462, 2018 WL 5729745, at *6 (N.D. Ill. Nov. 2, 2018) ("The Court may find a statement furthered the conspiracy even if the statement was susceptible to alternative interpretations." (quotations omitted)). A "co-conspirator's statement need not have been made exclusively, or even primarily, to further the conspiracy" in order to be admissible under the co-conspirator exception. *United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000) (quotations and citations omitted). To be in furtherance, a statement "need not have been important or essential" to the conspiracy; "it need only be just important enough to serve some purpose to promote the conspiracy's objectives in order to be admissible." *Cozzo*, 2004 WL 1151630, at *2.

---

[5] As noted in the government's original *Santiago* proffer, certain of the identified statements do not rely only on Federal Rule of Evidence 801(d)(2)(E) for admission. In particular, some of the chats involving the defendants are independently admissible under Rule 801(d)(2)(A) as statements of a party-opponent. *See United States v. Maholias*, 985 F.2d 869, 877 (7th Cir. 1993). In addition, certain of the statements included herein will not be offered for the truth of the matter asserted, and therefore they do not constitute hearsay. For instance, statements offered to show the existence, illegality, or nature and scope of the charged conspiracy are not hearsay. *See United States v. Guyton*, 36 F.3d 655, 658 (7th Cir. 1994) (statement that defendant was out of cocaine was not hearsay because it was not offered for its truth but as evidence of membership in the conspiracy); *United States v. Herrera-Medina*, 853 F.2d 564, 565-66 (7th Cir. 1988) ("war stories" about the drug trade were not offered for the truth); *United States v. Van Daal Wyk*, 840 F.2d 494, 497-98 (7th Cir. 1988) (statements had non-hearsay value in establishing knowledge of and membership in conspiracy); *United States v. Tuchow*, 768 F.2d 855, 867-69 (7th Cir. 1985) (pre-conspiracy statements admissible to establish scope of the anticipated conspiratorial scheme).

Listed below are e-communications from the government's original *Santiago* proffer with additional detail as to how each statement furthered the charged conspiracy.[6]

### A.    June 26, 2007 chat between Vorley and Patrick Cornish (GX 38)

In this chat, Patrick Cornish, another Deutsche Bank trader, told Vorley, "I hate electronic trading." Vorley replied, "easy to manipulate / Dont get me started / I would use the floor if i still could." Although prior to the start of the charged conspiracy, this chat reflects Vorley's state of mind that the electronic market is "easy to manipulate" and further that manipulation was more difficult in the era of face-to-face trading on a trading floor—both crucial points that ultimately contributed to the success of the conspiracy.

### B.    January 28, 2009 chat between Chanu and Bases (GX 44)

In this chat, Bases bragged about his ability to spoof for Chanu's benefit. Contemporaneous trade data shows that Chanu entered an iceberg order to sell 170 gold futures contracts at a price of $892.50 per ounce at 7:37:16 a.m. At 7:42:29 a.m., with the market trading around $891.00, Chanu told Bases, "we are 1 usd away from the target price," Bases responded, "i will get it back for you," and Chanu replied, "we ll sell it." Bases then began to place 250 fully-visible orders to buy a total of 2,740 contracts (a notional value of $244,394,900). These orders were active for an average of 1.741 seconds, and Bases ultimately canceled 2,687 of the 2,740 contracts (98.1%). As Bases placed and quickly

---

[6] In an effort to comply with the Court's instruction to be comprehensive, the government's initial *Santiago* proffer included co-conspirator statements, as well as statements before and afterward for context. In the instant filing, the government has focused only on those statements which were in furtherance. Moreover, although the government has provided particularized reasons for admitting each statement included herein under Rule 801(d)(2)(E), each statement also is "part of the information flow between conspirators intended to help each perform his role" and therefore satisfies the "in furtherance" requirement. *United States v. Alviar*, 573 F.3d 526, 545 (7th Cir. 2009) (quotations and citations omitted).

canceled buy orders, the market price rose to where Chanu's iceberg sell order was waiting, and Chanu ultimately sold all 170 contracts in his iceberg order at his desired price. During the same sequence, as he was trying to sell, Chanu also placed and rapidly canceled (in 1.619 seconds) a single fully-visible order to buy 101 contracts. After Chanu's iceberg sell order was fully filled, he wrote to Bases, "Absolutely brilliant / thank you VM / teatch me that pls." Bases responded, "welcome . . . sometimes u can do it / and sometimes u cantr / but glad to help . . . got that up 2 bucks . . . that does show you how easy it is to manipulate it sometimes." Chanu then wrote, "yeah yeah of course," and Bases replied, "that was alot of clicking." Chanu wrote, "basically you tricked alkll the algorythm," and Bases responded, "good man / correct / i know how to 'game' this stuff . . . i just dotn have the time to do it . . . i f…k the mkt around a lot / not alot of people.. had it figgied out.. / thats why i love electronic trading." Chanu replied, "i understand why you want to trade at home," and later in the chat, Bases wrote, "we in it together."

This chat and corresponding trade data show Chanu and Bases actually narrating in real time their conspiratorial conduct, which falls within the scope of statements in furtherance of a conspiracy. *See United States v. Gupta*, 747 F.3d 111, 124-25 (2d Cir. 2014) (finding phone conversations discussing placement, or absence of placement of trades, admissible under 801(d)(2)(E) in case involving insider trading conspiracy); *see also United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000) (conducting or helping to conduct the business of the scheme). Chanu was trying to execute a genuine iceberg sell order (for 170 contracts), and both Bases and Chanu (to a lesser degree) placed and canceled spoof bids to trick other traders and facilitate the execution of Chanu's sell order at his desired price. Chanu's statement "we are 1 usd away from the target price" indicated that the market was

lower than where Chanu wanted to sell. Bases statement that he would "get it back for you" indicated that Bases would spoof to push up the price, furthering the conspiracy by artificially moving the price of gold futures in a direction that was more favorable to Chanu's and Deutsche Bank's position. After Bases' spoof orders successfully moved up the market price and helped Chanu's sell order get filled, Chanu approvingly wrote that Bases' strategy was "brilliant" and asked Bases to "teach me that pls." Chanu's interest in learning Bases' technique clearly shows coordination designed to advance the scheme. *See United States v. Arellano*, No. 17-cr-0051 (PGS), 2018 WL 4616113, at *6 (D.N.J. Sept. 26, 2018) (statements where one co-conspirator teaches another methods used in the scheme held to be in furtherance of the conspiracy).

Bases then told Chanu that spoofing sometimes worked and sometimes did not ("sometimes u can do it / and sometimes u cantr") but that, in this instance, his spoofing had pushed up the market price by "2 bucks" per ounce and this showed "how easy it is to manipulate" the market sometimes, which connotes a nefarious purpose that is inconsistent with legitimate commercial activity. These statements furthered the conspiracy by "instill[ing] confidence" in Chanu, *United States v. Elder*, 840 F.3d 455, 459 (7th Cir. 2016), and also served to review Bases' successful exploits, *see Cozzo*, 2004 WL 1151630, at *2.

Bases' statement "that was alot of clicking" refers to the need to rapidly click a mouse to place and cancel orders when spoofing, and was intended to showcase the manner and means of the conspiracy. Likewise, Chanu's laudatory statement that Bases "tricked alkll the algorythm" served to encourage another co-conspirator and to confirm a core purpose of the conspiracy, namely to place and cancel orders in a manner that exploited the default assumption of algorithmic traders that market orders represented genuine interest in

trading, so that the algorithmic traders would react to the conspirators' spoof orders by moving the market in a favorable direction to the conspirators. Bases' statement that he "f..k[s] the mkt around a lot" and "not alot of people.. had it figgied out" again confirms the nefarious purpose of the conspiracy as differentiated from the standard day-to-day business of traders on a precious metals desk at a large financial institution, and further confirms that the fraudulent trading strategy worked because other traders had not "figgied" it out. Bases' statement that he "love[s] electronic trading" underscored that the conspiracy depended on the CME's anonymous electronic trading system, presumably because placing and canceling spoof orders would quickly lose its effectiveness if practiced on a face-to-face trading floor. Chanu's statement that he "understand[s] why you want to trade at home" confirms that the manner and means of the conspiracy were clandestine, and would be easier to execute away from the bank's premises. Finally, Bases' statement "we in it together" explains why Bases was willing to place spoof orders for Chanu's benefit, *i.e.*, they shared a common interest in each other's profitability. *See e.g.*, *United States v. Ashman*, 979 F.2d 469, 489 (7th Cir. 1992) (discussions about the purpose, method or criminality of the conspiracy are statements in furtherance).

As this chat demonstrates, the conduct underlying the charged conspiracy and scheme differed in kind from the typical conduct of traders working together lawfully for their mutual benefit. In particular, the charged conduct involved non-economic orders that were not for the purpose of trading and instead were designed *solely* to "manipulate" or "f..k the market." These types of orders were well-suited to anonymous "electronic trading" or "trad[ing] at home," because their fraudulent nature required them to be concealed. As described above, non-bona fide orders of the type that were central to the charged conspiracy were prohibited

10

by CME rules (as well as the law) and also by Deutsche Bank compliance policies. As several of the chats listed herein also demonstrate, this type of non-economic, deceptive trading also differed from the ordinary business of a trading desk because it carried a risk of sizable, unwanted executions that could incur substantial losses. Finally, and as Liew will testify, the ordinary practice at Deutsche Bank was for only a single trader to be active in a given market at a time (especially close to the best bid-ask where the market was trading). This rule reduced the risk of intentional front-running and of traders accidentally trading with each other or negatively impacting each other's ability to execute at favorable prices. The existence of this rule highlights why the coordinated spoofing that was a hallmark of the charged conspiracy was so anomalous and why it was *not* consistent with traders legitimately working together for their mutual benefit.

### C.    January 29, 2009 chat between Chanu and Ong (GX 141)

The following day, Chanu built off Bases' spoofing tutorial and attempted to help another Deutsche Bank trader, Tengkoon Ong, by spoofing. *See, e.g.*, *United States v. Cruz-Rea*, 626 F.3d 929, 937-38 (7th Cir. 2010) (statements designed to recruit co-conspirators are in furtherance). In a chat, at 3:28:17 a.m., Ong told Chanu that he was "going to sell 2k here." Trade data shows that Ong then entered an order to sell 20 gold futures contracts (*i.e.*, 2,000 ounces). While Ong's sell order was active, Chanu quickly placed and canceled four fully-visible orders to buy a total of 602 contracts ($53,021,150 in notional value). These orders were active for an average of 1.078 seconds, and all were fully canceled. Between Chanu's second and third buy orders (*i.e.*, bids), Ong wrote, "you flashing bids to help me get done?" Chanu responded, "yep," and Ong replied, "nice." Chanu then explained, "just to trigger algorithm," echoing what Bases taught him the day before.

The government submits that, after Ong alerted Chanu to his intent to sell, Chanu placed and canceled buy orders he never intended to execute to help facilitate Ong's sell order. Ong's question about whether Chanu was "flashing bids to help me get it done" described the purpose of the conspiracy: to quickly place and cancel orders not for the purpose of actually buying, but instead to help Ong sell by defrauding other traders. Chanu's response – "*just* to trigger the algorithm" (emphasis added) – confirmed that he placed the buy orders solely to trick algorithmic traders into falsely believing that his bids reflected genuine demand, and thereby to fraudulently induce those same algorithmic traders to buy the contracts Ong was trying to sell. *See Gupta*, 747 F.3d at 124-25; *Johnson*, 200 F.3d at 533. The government submits that placing and cancelling orders without the intent to execute and solely to "trigger" another market participant to trade is not legitimate commercial activity. For these reasons, this communication furthered the conspiracy by helping to conduct the business of the scheme and by describing the method of criminality.

### D.     January 30, 2009 chat between Chanu and Bases (GX 45)

In this chat, Chanu and Bases discussed their coordinated efforts at spoofing. Trade data shows that Chanu placed an iceberg order to sell 160 contracts. While Chanu was executing that iceberg order, Bases placed 38 fully-visible orders for a total of 380 contracts on the buy-side of the market. Bases' buy orders were active for 1.739 seconds, and he canceled all but 10 of the 380 contracts. Moreover, shortly after Bases filled those 10 buy contracts, he canceled the remainder of his orders (rather than waiting for them to fill completely) and quickly traded out of his position by selling 10 contracts. At 7:56:15 a.m., shortly after Chanu finished selling and Bases canceled his buy orders, Chanu wrote,

"Appreciate thks mate," and Bases replied "welcome." Chanu then wrote, "what a team," and responded, "thats what im here for / to read it low / then help u get rid of it."

The government submits that the chat and data show that Bases was spoofing by placing and canceling buy orders to help Chanu execute his sell order. When Bases' spoof order started to get filled, Bases quickly canceled them and traded out of the position. Chanu's statement "Appreciate thks mate" was an expression of gratitude to Bases for exposing himself to the unwanted risk that his spoofs would be executed in an effort to help Chanu fill his sell order. Similarly, Chanu's statement "what a team" confirmed the existence and cohesiveness of the conspiracy, as did Bases' acknowledgement "that's what im here for / to . . . help you get rid of it," which taken in context refers to his willingness to place non-economic orders that he did not intend to execute for the purpose of helping his co-conspirator to "get rid of" (*i.e.*, sell) futures contracts.

### E.     February 3, 2009 chat between Chanu and Bases (GX 46)

In this chat, Bases and Chanu again discussed the conspiracy, and specifically how Bases again placed non-economic buy orders (*i.e.*, bids) and exposed himself to risk of unwanted executions for the purpose of helping Chanu and another Deutsche Bank trader, Eric Parker, sell more easily. *See United States v. Cox*, 923 F.2d 519, 527 (7th Cir. 1991) (statements in furtherance where discussions were "classic examples of statements made to conduct and further the business"). Trade data shows that, earlier that day, Parker placed a 100-contract iceberg sell order at a price of $910.30 per ounce, while the market was trading around $910.10. While Parker's order was active, Bases rapidly placed 24 orders to *buy* a total of 240 futures contracts. These orders were active for an average of 2.774 seconds, and after they were placed, the market moved up to $910.30 (where Parker's sell order was

waiting to be filled). Ultimately, 101 of Bases' 240 buy-side contracts were filled before he canceled the remainder. Approximately one hour later, in a chat, Bases instructed Chanu (who had been selling consistently that morning) to "offer 50 lots at 906.50 again," and Chanu then placed an iceberg order to sell 50 futures contracts at $906.50. A minute later, Chanu asked Bases, "down to 6?" which the government submits was Chanu asking whether to lower his order price from $906.50 to $906.00. Bases answered, "y," meaning "yes," and Chanu then moved his sell order down to $906.00. At that point, both Chanu and Bases began rapidly placing and canceling orders on the buy side of the market. In total, Chanu placed eight orders to buy a total of 808 contracts, which were active for 0.888 seconds on average, and Chanu canceled all 808 buy-side contracts. Bases placed 34 orders to buy a total of 340 contracts. These were active for an average of 1.355 seconds, and Bases canceled 329 of the 340 contracts (96.8%). Approximately 45 minutes later, Bases told Chanu in a chat that Bases had "lost a bit of money trying to bid it up for u and eric hahahahaha." The government submits that this statement is an acknowledgement that Bases placed buy orders that he did not intend to trade out of the ordinary course of business and for the sole purpose of helping Chanu and Parker fill their sell orders. Bases' statement acknowledges that his furthering of the conspiracy by helping other traders on the desk came at a cost: his own spoof orders on the buy-side were filled, which negatively affected his own trading profits. The government anticipates that Liew will testify that the phrase "bid it up" was used to describe spoofing activity. Hence, this communication furthered the conspiracy by describing its methods and keeping Chanu informed of developments, and the risks attendant to of placing orders with no intent to trade. *See United States v. Jordan*, 260 F.3d 930, 933 (8th Cir. 2001) ("A

statement informing a co-conspirator of the methods of obtaining methamphetamine is admissible because it is designed to help ensure continued involvement").

### F. October 7, 2009 chat between Vorley and Bases (GX 142)

In this chat, Bases seeks Vorley's acknowledgement that Bases spoofed for Vorley's benefit. Trade data shows that, shortly before 9:47:40 a.m., Vorley began to enter a series of orders that resulted in him buying 60 gold futures contracts.[7] While Vorley was buying, Bases entered and quickly canceled eight fully-visible orders on the sell-side of the market. At 9:49:54, after Vorley was finished buying, Bases wrote, "you are so lucky to have me," and Vorley responded, "i am very lucky." Bases then wrote, "i okept offering it down . . . ill telll you / one can def manipulate it if u are aggressive," and Vorley replied, "totally," thereby adopting Bases' statement. The government submits that, by recapping their exploits and commenting on the susceptibility of the market to manipulation, Vorley and Bases furthered the conspiracy by informing each other about its progess and instilling confidence in one other. *See Elder*, 840 F.3d at 459. Further, Bases' statement, and Vorley's agreement, that Vorley is "lucky to have me" is a discussion of the roles each participant had in the conspiracy. *See Cozzo*, 2004 WL 1151630, at *2.

### G. December 16, 2009 chat between Bases and Adam Farthing

This document was not included on the government's final exhibit list, so it is withdrawn from the government's request for consideration for admissibility in the *Santiago* proffer.

---

[7] This trading sequence is not on the government's pared-down list of 61 episodes for its case-in-chief. However, this sequence was on the government's original list of 150 episodes, which the government has reserved the right to use on cross-examination or in a rebuttal case.

### H. July 22, 2010 chat between Chanu and Liew (GX 53)

In this chat, Chanu and Liew discuss an instance of coordinated spoofing. Trade data shows that, at 2:29:19 a.m., Chanu placed an iceberg order to buy 10 gold futures contracts.[8] A little over a minute later, Liew also placed an order to buy 2 gold futures contracts. At 2:35:57, Chanu then began placing 112 orders to sell a total of 1,120 contracts. These orders were active for 4.081 seconds on average, and Chanu canceled all but 6 of the 1,120 contracts. Liew also placed 9 orders to sell a total of 90 contracts. Liew's sell orders were active for 1.054 seconds on average, and he canceled all 90. Meanwhile, at 2:35:54 a.m., Chanu asked Liew, "u got your gold?" and Liew replied, "yaya." At 2:36:10 a.m., after buying 4 contracts (of his 10-contract iceberg), Chanu then wrote, "got 4 lots / 6 to go." Liew wrote, "risking 50000k for 5."

The government submits that the chat and trade data reflect Liew's and Chanu's real-time narration of acts in furtherance of their conspiracy. When Chanu asked Liew if "u got your gold," he was asking if their strategy of placing non-economic spoof orders on the sell-side of the market had resulted in Liew being able to fill his buy order. By responding "yaya," Liew confirmed that it did. Chanu kept Liew updated on how their spoof orders were facilitating Chanu's ability to buy ("got 4 lots / 6 to go"), and Liew warned Chanu about the prospect that their non-economic, fraudulent strategy could backfire because they were risking getting filled on a huge quantity of sell orders they did not want to execute merely so they could buy a comparatively low volume of futures contracts ("risking 50000k for 5"). *See*

---

[8] Again, this trading sequence is not on the government's list of 61 episodes for its case-in-chief. However, this sequence was on the government's original list of 150 episodes, which the government has reserved the right to use on cross-examination or in a rebuttal case.

*United States v. Rea*, 621 F.3d 595, 605 (7th Cir. 2010) (informing and updating others about current status of conspiracy or conspiracy's progress, including failures, held in furtherance).

I.      **November 3, 2010 chat between Vorley and Liew (GX 8B)**

In this chat, Vorley and Liew discussed their coordinated spoofing. Trade data shows that Liew had placed, and was trying to execute, a 400-contract iceberg order to sell gold futures contracts over the course of nearly 10 minutes. While Liew was attempting to sell, he, Vorley, and Chanu each placed and rapidly canceled orders on the buy-side of the market. The government anticipates that Liew will describe this as an episode of coordinated spoofing. Of particular relevance to this chat, Vorley placed and canceled 29 orders to buy a total of 290 contracts. These orders were active for an average of 2.469 seconds, and Vorley canceled all 290 contracts. Approximately three minutes after Liew finished selling, Vorley wrote, "was classic / jam it / woooooooooooooo / i moved ur offer up / bif it up." The government anticipates that Liew will testify that "jam it" referred to the practice of placing spoof orders and that "bif it up" was a typographical error meant to read "bid it up." Liew will testify that the phrase "bid it up" was Vorley's confirmation that he had placed spoof buy orders (*i.e.*, bids) to push up the price in order to facilitate Liew's sales. In this part of the communication, Vorley furthered the conspiracy by advising Liew of the steps that he had taken to manipulate the market in the bank's and Liew's favor and by describing the method of manipulation. Furthermore, the communication also evidences a common understanding of terminology used to describe fraudulent trading. *See Arellano*, 2018 WL 4616113 at *6.

J.      **November 16, 2010 chat between Chanu and other Deutsche Bank traders (GX 55)**

In this chat, a number of Deutsche Bank precious metals traders, including Chanu, discussed how to trade out of an unwanted position. One trader, Daniel Swasbrook, indicated

17

that another desk member had mistakenly "bought 74K gold" instead of "7.4K," meaning that Deutsche Bank was long 66,600 ounces of unwanted gold. Swasbook stated, "you need to get me out," and "66.6 you need to sell." Another trader, Ronan Donahoe, then assured Swasbrook that "ced selling it," meaning Cedric Chanu, and "it is being sold." Chanu then wrote, "I am taking care of it." As the chat progressed, Chanu commented, "what a team !" and kept Swasbrook apprised of his progress (*e.g.*, "sold nearly 60k mate"). At the conclusion, Chanu wrote, "at least we sold it quite well." Trade data shows that, over nearly 11 minutes, Chanu used iceberg orders to sell 666 gold futures contracts (*i.e.*, 66,600 ounces), which is consistent with his stated intent to help Swasbrook offload his unwanted position. But while Chanu was focused on selling, trade data will show that he placed and rapidly canceled 45 orders to *buy* 540 contracts. These orders were active for an average of 5.540 seconds, and all 540 contracts were canceled. The government submits these buy orders were spoofs that were intended to make it easier for Chanu to accomplish Swasbrook's and the desk's aim of selling. The government anticipates the trial evidence will show that Deutsche Bank traders had the ability to, and regularly did, view each other's order activity in real time. As a result, other traders would have been able to view Chanu's spoof orders and see how they helped to facilitate his genuine sell orders. In this context, the government further submits that Chanu's statements "what a team" and "we sold it quite well" furthered the conspiracy by illustrating how he was willing and able to deploy his fraudulent trading strategy to the benefit of the desk. *See United States v. Haldeman*, 559 F.2d 31 (D.C. Cir. 1976) (statements made to "keep co-conspirators abreast of an ongoing conspiracy's activities and to review, to interpret, and to devise strategy" in furtherance).

### K. November 18, 2010 chat between Chanu and Liew (GX 54)

In this chat, Liew commented to Chanu that "as a house we are not looking too good." Liew also wrote, "I wanna learn more," and Chanu responded, "ask questions." While the government does not offer Liew's statement under Rule 801(d)(2)(E), this communication helps establish the existence of a conspiracy by showing a common understanding that the profitability of the desk is measured as a whole. This, in turn, provides a reason for traders to spoof to help each other. The chat also shows the relationship between co-conspirators, with Liew seeking advice from Chanu, the more experienced trader.

### L. February 2, 2011 chat between Liew and Mike Chan (GX 59)

The government withdraws this document from its request for consideration for admissibility in the *Santiago* proffer.

### M. February 8, 2011 chat between Chanu and Liew

This document was not included on the government's final exhibit list, so it is withdrawn from the government's request for consideration for admissibility in the *Santiago* proffer.

### N. March 16, 2011 chat between Vorley and Farthing (GX 61)

In this chat, Vorley explicitly told another Deutsche Bank trader, Adam Farthing, that Vorley was spoofing to help fill Farthing's order. In the chat, Farthing gave Vorley "5k gold" to sell. Trade data shows that Vorley placed an order to *buy* 50 futures contracts (*i.e.*, 5,000 ounces), and did buy 6 before Farthing confirmed that he wanted to *sell*, whereupon Vorley canceled his buy order. Vorley then placed an iceberg order to sell 56 contracts (*i.e.*, the 50 that Farthing wanted to sell, plus 6 to unwind the mistaken buy-side fills). But after placing the 56-contract sell order, Vorley placed 12 fully-visible orders to buy a total of 120

contracts. These orders were active for 1.158 second on average, and Vorley canceled all 120 contracts. Vorley then stated to Farthing, "spoofing it up / ahem ahem." Vorley reported during an interview with Deutsche Bank's compliance department in 2015 that his "spoofing it up" comment was a lighthearted reference to his original mistaken entry of a 50-lot buy order when Farthing actually wanted to sell. But the "spoofing it up" comment did not come until after Vorley had fixed the error by placing a 56-contract sell order and also placed and canceled 120 contracts on the buy-side of the market. The government submits that the "spoofing it up" comment actually referred to the 120 fully-visible buy-side contracts that were placed and canceled as spoofs in order to help execute the genuine iceberg sell order (which was even more pressing given Vorley's initial mistake)—thereby reporting to Farthing how Vorley had just worked to help him in their conspiracy. *See United States v. Potts*, 840 F.2d 368, 371 (7th Cir. 1987) (statements keeping conspirators advised as to the progress of the conspiracy is in furtherance). The fact that Farthing, who was monitoring the trading, did not tell Vorley that his 120 fully-visible buy-side contracts were *again* a mistake evidences the common understanding that the iceberg order was the genuine order, and the fully-visible orders were not actually intended to trade. The communication also evidences a common understanding of the word "spoofing." *See Arellano*, 2018 WL 4616113 at *6 (conversations which show "sharing of knowledge between the coconspirators" found to be in furtherance).

### O.  March 24, 2011 chat between Vorley and Liew (GX 62)

In this chat, Vorley and Liew discussed market conditions and Liew's profitability. Vorley advised that Liew should "build a pnl / u cant conquer everst in a day." Vorley's statement is admissible under under Rule 801(d)(2) and it also shows the focus on

profitiability that motivated the conspiracy (as well as legitimate aspects of the desk's trading) and the the relationship between Vorley and Liew.

**P.    July 21, 2011 chat between Chanu and Liew (GX 72)**

In this chat, Chanu and Liew discussed their profitability and the pressure they felt to make money. Specifically, Liew asked Chanu, "u meet ur target already?" and Chanu responded, "donno what our target is / i know that GH is fckin happy to have me here / even if he barely speak to me." Liew later commented, "cause my pnl is such a big hole…no one will remember / they just see one number / it better not be red" and Chanu responded, "agreed." While Chanu's statements are admissible under Rule 801(d)(2), they also show the focus on profitiability that motivated the conspiracy (as well as legitimate aspects of the desk's trading) and the the relationship between Liew and Chanu.

**Q.    August 7 and 8, 2011, chat between Chanu and Liew (GX 73)[9]**

In this chat, Chanu and Liew discussed their shared trading interests, with Chanu writing, for instance, "i bought only 50 lots for the 2 of us," "we buy another 30 lots," and "WE ARE BACK," and Liew writing, "we are a good team though" and referring to himself and Chanu as the single entity "liew chanu." Chanu and Liew also complemented each other on the trading skills, with Chanu writing, "well done Mr Liew" and "u doing well today," and Liew writing, "u are god." By way of contextualizing these statements, trade data from August 7 and 8, 2011, shows repeated instances of coordinated spoofing involving Liew and Chanu, most commonly with Chanu placing and canceling large, quick orders while Liew

---

[9] To avoid any confusion because there are four chats included on August 7 and 8, 2011, and they were identified by bates numbers in the government's *Santiago* proffer, GX 73 is DOJ00534649, GX 74 is DOJ00534625, GX 75 is DOJ00534633, and GX 12B is DOJ00325595.

executed trades on the opposite side of the market. (One such instance is described in the next subsection.) Given that context, the statements in this chat can be understood to further the conspiracy by re-confirming Liew's and Chanu's shared interests, and commenting on and celebrating their exploits and prowess. *See United States v. Molt*, 772 F.2d 366, 369 (7th Cir. 1985) (review of exploits held in furtherance).

**R.    August 8, 2011 chats between Chanu and Liew (GX 12B, 74, 75)**

In these chats from August 8, 2011, Chanu and Liew discussed their coordinated spoofing. As mentioned in the preceding subsection, trade data shows multiple instances of coordinated spoofing between Liew and Chanu. More specifically, Liew repeatedly attempted to sell gold futures contracts using iceberg orders, and Chanu repeatedly placed and canceled visible orders on the buy-side of the market while Liew was trying to sell. For instance, at 10:43:05 p.m., Chanu directed Liew to "sell 10k here / ill help you." Shortly afterward, Liew placed two iceberg orders to sell a total of 100 contracts (*i.e.*, 10,000 ounces). While Liew's iceberg sell orders were active, Chanu's placed and quickly canceled 40 visible orders to buy a total of 400 contracts. These visible buy-side orders were active for an average of 2.609 seconds, and Chanu canceled all 400 contracts. Shortly after Chanu canceled his bids, Liew wrote, "u be careful sweetie / dun get given here." The government expects Liew to testify that Chanu was instructing him how to execute his sell order ("sell 10k here") and indicating that Chanu would place non-economic orders he did not intend to execute to help fill Liew's order ("ill help you"). *See Arellano*, 2018 WL 4616113, at *6. Liew will testify that the conspirators often referred to coordinated spoofing as "helping." When Liew wrote "u be careful sweetie / dun get given here," he was warning Chanu about the risk of unwanted fills on his spoof bids.

As the trading day continued, Chanu gave Liew similar instructions on how to trade (*e.g.*, "if you see 1702 / sell 5k / then 5k at 1702.5," referring to specific price levels, and later, "sell 5k her[e]" and "sell the first 10k here"). Trade data indicates that Chanu continued to spoof on the buy-side of the market to help Liew sell. For example, over a five-minute period spanning roughly 11:13:00 p.m. to 11:18:00 p.m., Liew sold 50 contracts using iceberg orders. While Liew's sell orders were active, Chanu placed and rapidly canceled 66 fully-visible orders to buy a total of 660 contracts; these orders were active for 2.771 seconds on average, and Chanu canceled all 660 contracts. The government expects Liew to confirm that this was an instance of coordinate spoofing with Chanu placing non-economic bids he did not want to execute solely to help Liew sell for their common interest. As the day progressed, Chanu commented, "we did fcking well" and "i think we made / a lot." At the end of the trading day, Chanu wrote to Liew, "good work today" in recognition of their joint success in furthering the conspiracy. *See United States v. Prieto*, 549 F.3d 513, 524 (7th Cir. 2008) (receiving assurances from conspirators can qualify in furtherance).

### S.    August 11, 2011 chat between Chanu and Liew (GX 76)

In this chat, Liew noted that he "really just want to go home flat" and that he "need[s] to job it back," and Chanu asked him "what pnl ?" Liew replied "-30k" and Chanu responded, "easy / i ll do that for you ahaha…" The government anticipates Liew will testify that he was down $30,000 on the day, and Chanu offered to help him get "flat," *i.e.*, achieve a non-negative P&L. Liew is expected to testify that, in these circumstances, Chanu would spoof to help Liew. Further, Liew's statements about his financially unsuccessful day is the equivalent of him reporting to Chanu that he needs spoofing help to improve his position. This sort of

comment, seeking assistance from a co-conspirator, is in furtherance. *See Prieto*, 549 F.3d at 524 (report of conspirators' status held in furtherance).

### T.     August 24, 2011 chat between Vorley and Luigi Gentile (GX 137)

In this chat, Vorley wrote to Gentile, "u forget / my pnl is what I get paid on." Gentile wrote later, "u took ZERO risk in saving me," and Vorley responded by asking, "what sur obsession with risk." Gentile replied, "that's what we are paid for / take risk," and Vorley wrote, "no ur paid to make money mate / 2k or 20k / no one cares how u do it…" Vorley's statements are admissible under Rule 801(d)(2). In addition, this exchange shows the focus on profitability that motivated the conspiracy (as well as legitimate aspects of the desk's trading) and Vorley's state of mind with respect to making money ("no one cares how u do it").

### U.     August 24, 2011 chat between Vorley and Chanu (GX 146)

In this case, Vorley wrote, "this is really fking annoying isnt it," and Chanu replied, "I just bid it up to try to sell some / someone gave me ahahhaa." The government submits that Vorley meant that market conditions were difficult to trade in, and Chanu candidly reported to Vorley that he had resorted to placing non-economic buy orders ("I just bid it up") in an effort to sell ("to sell some"), but someone filled his unwanted buy orders ("someone gave me"), illustrating the risks of their illegitimate trading strategy. These statements furthered the conspiracy by keeping Vorley updated and warning Vorley that deploying their unlawful strategy in the prevailing market conditions was fraught with risk of unwanted executions. *See Rea*, 621 F.3d at 605.

### V.  August 27, 2008 chat between Chanu and Parker (GX 147)

In this chat, Chanu wrote to Parker, "I skewed the quote to the left / people scared / we ll spoof it ahahaha." The government submits that Chanu was describing his unlawful trading strategy to Parker in explicit terms. By way of background, and as the government expects to show at trial, Deutsche Bank traders used a trading interface that featured a price ladder, with bids stacked on the left and offers on the right. In this chat, Chanu was indicating to Parker that he had placed bids that he did not intend to execute ("skewed the quote to the left") and intended to "spoof it." Again, these statements furthered the conspiracy by updating a co-conspirator as to Chanu's plans. *See Rea*, 621 F.3d at 605.

### W.  December 20, 2012 chat between Vorley and Farthing (GX 139)

This document was not included on the government's final exhibit list, so it is withdrawn from the government's request for consideration for admissibility in the *Santiago* proffer.

### X.  Testimony of David Liew

As noted in the government's original *Santiago* proffer, in addition to statements in e-communications, Liew is expected to testify to oral conversations he had with his co-conspirators which were part of and in furtherance of the conspiracy.

Specifically, Liew is expected to testify that Farthing encouraged him to spoof and to learn from Vorley and Chanu. Liew is further expected to testify that Farthing advised him that his profitability would impact his bonus. These statements were in furtherance of the conspiracy because they constituted a directive from a co-conspirator and because they articulated how Liew could benefit from the scheme. *See Ashman*, 979 F.2d at 489

(discussions about the purpose, method, or criminality of the conspiracy are statements in furtherance).

In addition, Liew is expected to testify that he had conversations with Vorley and Chanu in which they used phrases like "spam," "jam," and "helping out," which Liew understood to connote spoofing. These conversations were in furtherance of the conspiracy because they showed a common understanding of these terms and because they articulated a method of accomplishing the conspiracy. *See Gupta*, 747 F.3d at 124-25 (finding phone conversations discussing placement, or absence of placement of trades, admissible under 801(d)(2)(E) in case involving insider trading conspiracy). Considering that Liew is also anticipated to testify that he learned to spoof from watching Vorley's and Chanu's trading, and that other chats and trade data reflect the use of these terms in combination with spoofing activity, these labels are diadactic in nature. *See Arellano*, 2018 WL 4616113, at *6 (statements where one co-conspirator teaches another methods used in the scheme held to be in furtherance of the conspiracy).

As indicated above, Liew also is expected to testify that it was the practice at Deutsche Baank to have only one trader in the order book at any given time. Therefore, each time that the defendants coordinated their trading with Liew (as illustrated at a minimum in the specific instances charged in Counts 5, 7, 8, 12, and 13 of the Superseding Indictment), their conduct went outside the scope of what ordinary co-workers would do. Far from merely "work[ing] together with their colleagues in order to improve the precious metals desk's profitability," this conduct knowingly and intentionally went *around* the normal practice of co-workers to achieve their improper aims. *See* Def. Opp'n to *Santiago*, at 5.

\*          \*          \*

The statements detailed herein and offered under Rule 801(d)(2)(E) were made in furtherance of the charged conspiracy and scheme. Each of the declarants was a member of the conspiracy, and their membership was not limited to their role as an employee of Deutsche Bank. Rather, their membership in the conspiracy is demonstrated through fraudulent trading outside the bounds of what was permitted by the CME, Deutsche Bank's written policies, and Deutche Bank's practice of having one trader active in the book at any given time. As such, and given the unmistakable non-economic nature of the orders the conspirators entered with no intent to execute, as well as the explicitly manipulative and deceitful purpose of their conduct—aimed especially at "tricking" or "triggering" algorithmic traders—the government respectfully requests that the Court admit the identified statements pursuant to Rule 801(d)(2)(E).

<div style="margin-left: 40%;">

Respectfully submitted,

ROBERT A. ZINK
Chief
Criminal Division, Fraud Section
U.S. Department of Justice

By:     */s/ Avi Perry*
        Brian Young, Deputy Chief
        Avi Perry, Assistant Chief
        Leslie S. Garthwaite, Trial Attorney
        Criminal Division, Fraud Section
        U.S. Department of Justice
        Telephone: (202) 616-4619
        Email: avi.perry@usdoj.gov

</div>

Dated: September 2, 2020

**CERTIFICATE OF SERVICE**

I certify that by electronically filing a copy of the foregoing brief through the court's electronic docketing system on September 2, 2020, I caused the motion to be filed on the defendants' counsel of record, who are ECF Filing Users and are served electronically by the Notice of Docket Activity.

*/s/ Avi Perry*
Avi Perry
Assistant Chief, Fraud Section