UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JAMES VORLEY and<br>CEDRIC CHANU,<br><br>Defendants. | No. 18 CR 35<br><br>Judge John J. Tharp, Jr. |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE
EVIDENCE RELATING TO DEUTSCHE BANK'S INTERNAL INVESTIGATION**

Defendant James Vorley's May 2015 interview about his trading practices is highly relevant evidence of a defendant discussing the very conduct alleged in the Superseding Indictment. Vorley's objection that admitting statements made by others during the interview violates his Sixth Amendment confrontation right fails both because none of the interview statements are testimonial and because the statements of others are not being offered for their truth. Vorley's objection that admitting his own statements violates his Fifth Amendment privilege against self-incrimination fails because the interview setting did not trigger his constitutional right to remain silent and, as this Court recognized previously, Vorley actually refused to answer questions without consequence. Finally, Vorley's objection that the statements should be excluded as confusing or prejudicial fails because it is based on counsel's own interpretation of Vorley's statements. These interpretations are contradicted by other evidence (including some of Vorley's own statements), and in any event are appropriately left to the jury to evaluate.

## BACKGROUND

In a letter dated March 9, 2015, Deutsche Bank's human resources ("HR") office sent Vorley an "invitation to disciplinary investigation meeting."[1] The letter noted that Vorley's position with the bank was "due to terminate on 11 March 2015 by reason of redundancy," but that nevertheless "a formal Disciplinary Investigation will be conducted into your involvement in a pattern of trading that, if established may amount to a breach of Bank policy."[2] The letter also described what the interview would cover, including an "instance of trading we have identified which occurred concurrently with a dialogue between you and a bank colleague (via instant messaging) on 16 March 2011." Enclosed with the letter were copies of the March 16, 2011 instant messaging chat, trade data from that date, two Deutsche Bank market conduct policies, and employee guidance.

In response to the letter, and after consulting his attorneys (according to his statements during the interview), Vorley sat for an interview with Sarah Fawcett, a Deutsche Bank HR professional, and Robert Lissmann, a Deutsche Bank compliance officer. The interview, which the bank recorded and transcribed, took place on March 17, 2015.[3] Vorley and Fawcett attended in person, and Lissman participated by telephone. *See* Doc. No. 185 at 4 n.3.

---

[1] The Court set forth the details of the invitation and ensuing interview in its order denying Vorley's motion to suppress his interview statements. *See* Order, March 11, 2020 (Doc. No. 185).

[2] The government identified the letter as GX 105 and its enclosures as GX 105A-105D on its exhibit list.

[3] The government identified the audio recording of the interview as GX 106 on its exhibit list, and clips of the recording as GX 106A-106U. The government also separately submitted the audio for transcription. The government identified the transcription as GX 107.

Vorley has stipulated to the authenticity of the letter, enclosures, and recording. However, on August 31, 2020 (following the deadline for motions *in limine*), Vorley filed the instant motion to exclude his statements. Doc. No. 292.[4]

## **ARGUMENT**

Introduction of the recorded interview (whether in its entirety or as excerpted clips) would not offend Vorley's confrontation rights because the United States will not offer statements made by other participants during the interview for the truth, and because Vorley's own statements to his employer were not "testimonial" for the purpose of the Sixth Amendment. Nor would admission of Vorley's statements violate his Fifth Amendment right to remain silent. Finally, Vorley's objection that his statements should be excluded as confusing or prejudicial fails because it is based on counsel's own (erroneous) interpretation of Vorley's statements. Because the interview recording captures Vorley offering implausible explanations for trading that is charged in the Superseding Indictment, as well as making assertions about his understanding about the legality of spoofing which are contradicted by

---

[4] Vorley claims that the timing of his motion "was prompted by the recent revelation that the government will seek to admit evidence of Deutsche Bank's internal investigation, including Vorley's entire 1.5 hour audiotaped interview, without calling a witness who can be cross-examined." Doc. No. 292 at 5. This assertion is difficult to understand. In fact, in Vorley's *Garrity* motion filed on January 10, 2020, defense counsel wrote: "In response to a request for notice under Federal Rule of Criminal Procedure 12(b)(4)(B), the government disclosed its intent to introduce an audio recording of Vorley's statements on March 17, 2015, at an employee disciplinary investigation interview conducted by his former employer, Deutsche Bank." Doc. No. 146 at 1. Then, on July 31, 2020, the government served a witness list that did not identify either Fawcett or Lissman, the person whom Vorley says he needs to confront. On the same day, the government served an exhibit list including GX 105 and GX 106 (the invitation letter and audio recording of the entire recording), as well as GX 106A-106U (the excerpted audio clips). The deadline for motions *in limine* was August 7, 2020.

his prior statements in chats, the recording is highly probative of Vorley's intent, awareness of his guilt, and other central issues of proof in this case, overcoming any possible prejudice.

I.  **SIXTH AMENDMENT CONFRONTATION RIGHTS**

The government proposes to introduce the audio recording through its case agent, Special Agent Jonathan Luca. The government proposes to introduce Vorley's own statements under Federal Rule of Evidence 801(d)(2)(A) (statements of a party opponent) and statements by the interviewers (Lissman and Fawcett) as non-hearsay statements to provide context for the party admissions. The defendant's confrontation rights are not offended by this approach. In *United States v. Tolliver*, the Seventh Circuit held that the introduction of a recording of the defendant made by a non-testifying declarant did not violate the defendant's Confrontation Clause rights because the government did not offer the declarant's words for their truth. 454 F.3d 660, 666 (7th Cir. 2006). The court explained that the Confrontation Clause

> only covers testimonial statements proffered to establish the truth of the matter asserted. In this case, as pointed out by the government, [the declarant's] statements were admissible to put [the defendant's] admissions on the tapes into context, making the admissions intelligible for the jury. Statements providing context for other admissible statements are not hearsay because they are not offered for their truth. As a result, the admission of such context evidence does not offend the Confrontation Clause because the declarant is not a witness against the accused.

*Id*. (internal citations omitted); *see also United States v. Gajo*, 290 F.3d 922, 930 (7th 2002) (finding it "well-settled" and "appropriate" where court did not admit non-conspirator statements "as non-hearsay, but rather to provide context to a coconspirator's statements properly admitted under Rule 801" in recorded conversation); *Williams v. Jaimet*, No. 13 C 04120, 2017 WL 1425591, at *6 (N.D. Ill. Apr. 20, 2017). This is especially true here where the vast majority of Fawsett's and Lissmann's utterances were questions, which are not

hearsay. *See United States v. Love*, 706 F.3d 832, 840 (7th Cir. 2013) ("[Q]uestions are not 'statements' and therefore are not hearsay."). If there is any lingering concern, the Court could make this point clear to the jury by giving an instruction that Fawsett's and Lissmann's statements should not be considered for their truth.

In addition, the statements made during the meeting do not implicate the Confrontation Clause because their "primary purpose" was not "testimonial." *See Ohio v. Clark*, 576 U.S. 237, 244 (2015) ("A statement cannot fall within the Confrontation Clause unless its primary purpose was testimonial."). In *Clark*, the Supreme Court elaborated that "[s]tatements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers." *Id*. at 249. Quoting *Clark*, the Seventh Circuit in *United States v. Klemis* held that "the key is whether a statement was given with the primary purpose of creating an out-of-court substitute for trial testimony." 859 F.3d 436, 445 (7th Cir. 2017); *see id* (where the statements were not provided to law enforcement, it makes it "significantly less likely" that the statements could be testimonial); *see also Tolliver*, 454 F.3d at 665 ("While *Crawford* did not firmly define the word 'testimonial' for every situation, examples and other guidance from the Supreme Court indicate that the term pertains to statements that a declarant makes in anticipation of or with an eye toward a criminal prosecution." ((internal quotes omitted)).

The record statements do not qualify as "testimonial." They were made in the context of an employment action that all parties attended voluntarily, and with no prospect of litigation (much less criminal prosecution) on the horizon. Any remaining chance that the statements could be considered testimonial is defeated by the fact that Vorley *said in a sworn*

5

*declaration to this Court* in which he attested that: "I was not told that the bank would create an audio recording of my statements or that it would turn over the recording to the United States government." *See* Vorley Decl., Doc. No. 146-19 at ¶ 11. He further revealed that his primary purposes for attending the meeting were to obtain deferred compensation and avoid a finding of misconduct, not as part of possible criminal investigation. *Id*. at ¶ 10.

Circumstantial evidence bolsters the point. The Deutsche Bank employees who conducted the interview were not law enforcement officers, and Lissmann, the compliance officer, did not even attend in person. At the beginning of the interview, Fawcett informed Vorley that the purpose of the meeting was to determine whether or not to implement disciplinary proceedings and that "the transcript will be shown to the Global Head of Employee Relations and UK Head of Compliance." Timestamp 1:27. The letter that Vorley received made clear that "the purpose of this meeting is to enable the disciplinary investigators to understand your version of events and to ask any questions which may be relevant to the Disciplinary Investigation." Finally, Vorley stated during the interview that he had "been in contact with a lawyer strictly on the basis of trying to get a settlement agreement for the last four months." Timestamp 1:30:38. But this lawyer did not attend the meeting. If Vorley intended for the meeting to be a mechanism for creating testimony in a criminal case, he surely would have brought his lawyer with him (and that lawyer would have been a criminal practitioner, not an employment lawyer). Therefore, there is no risk of infringing on Vorley's Sixth Amendment confrontation rights from introducing non-testimonial statements.

6

## II. FIFTH AMENDMENT PRIVILEGE AGAINST SELF-INCRIMINATION

As noted in the letter advising Vorley of the interview, the Deutsche Bank interviewers sought to ask about trading on March 16, 2011, as well as other instances of trading. *See* GX 105 at 2 ("The Bank has also identified a number of further examples of you engaging in similar trading conduct in 2011, which we would like to discuss with you in addition to your actions on 16 March 2011."). During certain portions of the recorded interview, the interviewers asked Vorley about trading on dates other than March 16, 2011. He repeatedly refused to answer. *See* Doc. No. 185 at 6-9 (summarizing transcript).

Vorley argues that playing these portions of the recording would violate his Fifth Amendment privilege against self-incrimination. Essentially, he is attempting to relitigate his argument that his interview statements were compelled. His arguments continue to be meritless for all the reasons previously identified in the Court's denial of Vorley's suppression motion under *Garrity*. As the Court noted, Vorley "was not compelled to answer the Bank's questions as a matter of fact," and "[t]here is no violation of the Fifth Amendment in asking a suspect in a non-custodial setting to incriminate himself." Doc. No. 185 at 11. Moreover, Vorley clearly felt entitled to offer answers that he believed would help his cause with his employer. It is well established that, "[i]n a noncustodial setting, where a 'defendant starts down an exculpatory path' and then refuses to expand on those statements, the use of his later silence at trial does not violate the Fifth Amendment." *United States v. Resnick*, 823 F.3d 888, 897–98 (7th Cir. 2016) (citing *United States v. Bonner*, 302 F.3d 776, 783–84 (7th Cir. 2002)); *see also United States v. Davenport*, 929 F.2d 1169, 1174 (7th Cir. 1991). As a result, Vorley's renewed Fifth Amendment argument fails.

## III. THE INTERVIEW IS HIGHLY PROBATIVE AND RELEVANT EVIDENCE

As noted above, the government proposes to introduce Vorley's recorded statement because it is highly probative of several central issues in this case: the defendant's intent, knowledge, and understanding of the offenses. *See, e.g.*, *United States v. Causey*, 748 F.3d 319, 318 (7th Cir. 2014) (evidence of defendant's knowledge and intent are "especially probative"). The recording of the interview is highly probative because, in it, Vorley discussed his gold futures trading on March 16, 2011, which is one of the 61 trading episodes that the government identified for its case-in-chief.[5] *See United States v. Vargas*, 552 F.3d 550 (7th Cir. 2008) ("The more probative the evidence, the more the court will tolerate some risk of prejudice, while less probative evidence will be received only if the risk of prejudice is more remote"). At least five aspects of the recording are particularly relevant to the charges in this case.

*First*, the evidence supports the conclusion that Vorley made a false statement during the interview about how the word "spoofing" was understood in 2011. At timestamp 19:46, Vorley argued that the word "spoofing," as he used it in his chat with Farthing, had a different connotation in 2011 than it did in 2015: "now, I acknowledge that the term spoofing has taken on a meaning in the current climate, which none of us wish to be associated with. However, in 2011, that was not the case. The term had not yet taken on toxic connotations it currently has." But that assertion is belied by a chat dated October 2, 2007, in which Vorley told another trader, "UBS and this spoofing is annoying me / its illegal for a start." GX 39. Relatedly, at time stamp 20:49, Vorley told Lissman that in 2011 the term "spoofing" was

---

[5] The government intends to offer Vorley's contemporaneous chat with Farthing (which he discussed at length during the interview) as GX 61.

frequently used to describe a game to determine which trader would buy coffee that day. While Vorley did not assert that his use of the word "spoofing" in the chat described this game, the fact that he raised the topic of how "spoofing" was used in a completely different (and benign) context shows intentional misdirection. In sum, the fact that Vorley lied to, and attempted to mislead, Deutsche Bank's compliance department about a particular trading episode at issue is highly probative of consciousness of guilt. Although the defendants are free to argue a different inference, the government should be permitted to present this evidence to the jury.

*Second*, at several points throughout the interview, Vorley suggested that his cancellations were merely "fat finger" errors, rather than intentional acts. *See* time stamps 35:20; 42:15; 45:33. Taken in conjunction with the trading data, the jury is entitled to interpret these assertions as implausible, which further supports the proposition that Vorley understood his trading to be unlawful. When asked by Lissmann "would it be normal for someone to put in an order and then cancel it a second later?" Vorley offered an analogy in which he compared trade cancellations to a shopper in a supermarket who picks up a can of soup and then puts it back after being advised that the purchase was no longer necessary. *See* Timestamp 1:12:34. This is an absurd proposition given the timing and number of cancellations in this episode, and reflected more broadly in Vorley's trading of a particular type, the jury is entitled to view this statement as an additional act of deception.

*Third*, although the participants spoke about compliance training at several points during the interview, Vorley never asserted that he interpreted Deutsche Bank policies as permitting traders to place orders with the intent to cancel, or that he otherwise had a good-faith belief to that effect. This evidence rebuts the anticipated defense that Vorley and his

9

colleagues did not receive clear guidance or understand that the conduct at issue was prohibited. More to the point, one possible defense strategy in this case is to concede that Vorley *did* place orders with the intent to cancel but did not understand that practice to be wrongful in 2011, and thus he lacked an intent to defraud. The defendants have already signaled a willingness to explore that defense with their expert disclosures and, in particular, Jerry Markham's anticipated testimony that spoofing was not understood to be wrongful. The government should be permitted to offer contrary evidence that bears on Vorley's intent.

*Fourth*, the conversation establishes important points on how Deutsche Bank's precious metals desk functioned. For example, Vorley said "we were a global team, so we had centers, obviously, across the world, as Deutsche Bank do, but we kind of ran as a central hub . . .we were getting stuff, you know, uh, we were having conversations with everything all the time." Timestamp 14:43. This statement shows the frequency of communication with other traders, which is probative of the operation of the conspiracy.[6]

*Finally*, the tone and content of the conversation, on the whole, illustrates that Vorley was an experienced and sophisticated trader. This aspect of the recording supports the conclusion that Vorley knew enough about trading to understand that his conduct was

---

[6] This point illustrates that there are certain statements made by Vorley that the government intends to offer against Vorley for the truth of the matter asserted. One notable exception is Vorley's passing reference to his co-defendants, Cedric Chanu, which was the subject of Chanu's recent motion under *Bruton v. United States*, 391 U.S. 123 (1968), and *Crawford v. Washington*, 541 U.S. 36 (2004). As stated in the government's opposition to Chanu's motion, Vorley's reference to Chanu is not being offered for the truth, namely that Vorley's trading was similar to Chanu's. Instead, the reference to Chanu (and other Deutsche Bank traders) in Vorley's recorded interview is simply to illustrate Vorley's deflections when questioned about his own trading and to provide context for his (false) denials. Further, the government is amenable to redacting this fleeting reference to Chanu.

wrongful and that the trading patterns (and in particular, the cancelations) at issue were intentional (as opposed to by mistake).

Vorley argues that the substance of the recording is irrelevant and unfairly prejudicial because he "sa[id] he cannot remember the trading four years earlier [and] hazard[ed] guesses at what might have been happening." Far from speculating, however, Vorley offered his interpretation of his events based on his review of the trading data and chat conversation that the bank provided to him before the interview. *See* timestamps 3:28 ("so, the . . . the pack you sent to me, I've sat here and I've um, I've done some prepatory work that I'd like to sort of take you both through"); 20:59 ("I pulled the chat apart and . . . and I think this is relevant in analyzing the conversations supplied in the pack"); 27:36 ("I have reviewed the pack to try to piece together what I traded, why I traded as I did"). Doc. No. 292 at 13. Rather than offering off-the-cuff speculation, Vorley arrived at the meeting with a *prepared statement*. In this context, the clarity of Vorley's memory of the transaction goes to the weight of the evidence, not its admissibility. Moreover, the probative value of Vorley's deceptive assertion about his generalized understanding of the word "spoofing" does not depend on how well he remembered the particular trade in question.

In addition to the admission of the recording itself, the government seeks to admit the invitation letter sent to Vorley. *See* GX 105. To be clear, the government is not offering the letter as a business record or otherwise for the truth of any matter asserted therein, but merely to show the effect on Vorley, namely that he had advance notice of what would be discussed during the interview and was not caught off guard by the questions. The defense's suggestion that Vorley's interview statements lack probative value because he "cannot remember the trading" and "hazard[ed] guess" illustrates precisely why the invitation letter

11

is necessary. As he acknowledged in the recording, Vorley received a letter on March 9, 2015, which notified him of the nature of the proceeding, identified the topic for discussion, and included copies of the relevant corporate policies. *See* timestamp 00:42 ("my letter's dated 9th of March"). GX 105 is necessary to establish that Vorley was neither surprised nor ambushed but instead went to the meeting with eyes wide open. The letter also does not cause unfair prejudice because it does not draw conclusions – instead, it notified Vorley that "the purpose of this meeting is to enable the disciplinary investigators to understand your version of events and to ask any questions which may be relevant to the Disciplinary Investigation."

For the reasons stated herein, the government respectfully requests that the Court deny the Vorley's motion to exclude the recorded interview and the related invitation letter.

                Respectfully submitted,

                ROBERT A. ZINK
                Chief
                Criminal Division, Fraud Section
                U.S. Department of Justice

By:    */s/ Brian R. Young*
                Brian Young, Deputy Chief
                Avi Perry, Assistant Chief
                Leslie S. Garthwaite, Trial Attorney
                Criminal Division, Fraud Section
                U.S. Department of Justice
                Telephone: (202) 616-3114
                Email: brian.young4@usdoj.gov

Dated: September 2, 2020

## **CERTIFICATE OF SERVICE**

      I certify that by electronically filing a copy of the foregoing brief through the court's electronic docketing system on September 2, 2020, I caused the motion to be filed on the defendants' counsel of record, who are ECF Filing Users and are served electronically by the Notice of Docket Activity.

                                    */s/ Brian Young*
                                    Brian Young
                                    Deputy Chief, Fraud Section